**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Sarah E. Piepmeier (SBN 227094)
May Eaton (SBN 298123)
Elise S. Edlin (SBN 293756)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105
spiepmeier@perkinscoie.com
eedlin@perkinscoie.com
mayeaton@perkinscoie.com
Telephone:      (415) 344-7000
Facsimile:      (415) 344-7050

Adam R. Alper (SBN 196834)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
adam.alper@kirkland.com
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
michael.devries@kirkland.com
Telephone:      (213) 680-8400
Facsimile:      (213) 680-8500

Elizabeth A. Cutri (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
elizabeth.cutri@kirkland.com

*Attorneys for Defendant Cisco Systems, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| NETFUEL, INC., | ) CASE NO. 5:18-cv-2352-EJD (NMC) |
| Plaintiff, | ) |
| v. | ) **DEFENDANT CISCO SYSTEMS,** |
| | ) **INC.'S MOTION TO EXCLUDE** |
| CISCO SYSTEMS, INC., | ) **PORTIONS OF EXPERT TESTIMONY** |
| | ) **BY MR. WALTER BRATIC AND** |
| Defendant. | ) **DR. AVIEL RUBIN** |
| | ) |
| | ) Judge:   Hon. Edward J. Davila |
| | ) Date:     March 12, 2020 |
| | ) Time:    9:00 a.m. |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

TABLE OF AUTHORITIES .................................................................................................... iii

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND ......................................................................................................... 2

    A. Mr. Bratic's Damages Theories and Dr. Rubin's Lack of Technical Support............. 2

        1. Mr. Bratic's Apportioned Profits Calculation.................................................. 2

        2. Mr. Bratic's Per-Unit Royalty Calculation. ..................................................... 4

        3. Opinions to Be Excluded. ................................................................................ 5

III. LEGAL STANDARDS ................................................................................................ 6

IV. ARGUMENT ............................................................................................................... 7

    A. Mr. Bratic's Profits Apportionment Analysis Lacks Quantitative Support................. 7

        1. Mr. Bratic and Dr. Rubin's Conclusion that "Security, Reliability, and Availability" Represent 33% of the Value of Network Operating Systems Lacks Quantitative Analysis and Should Be Excluded. ..................... 8

        2. Mr. Bratic and Dr. Rubin's Conclusions that the Accused Features Contribute 33% and 50%, of the Value of All "Security, Reliability, and Availability on the Accused Devices" Should Be Excluded. ........................ 10

            a. The Percentages Lack Quantitative Support...................................... 10

            b. Mr. Bratic Failed to Account for the Lack of Customer Use of the Accused Features. ....................................................................... 12

        3. Mr. Bratic and Dr. Rubin's Conclusion that 70% and 40% of the Functionality of the Accused Features is Attributable to the Patents-In-Suit Lacks Quantitative Analysis and Should Be Excluded. ......................... 13

    B. Mr. Bratic's Per-Unit Royalty Calculations Based on the BNP Agreement Should Be Excluded........................................................................................... 15

        1. Mr. Bratic's Apportionment of the BNP Per-Unit Fee Is Not Supported by Quantitative Analysis and Must Be Excluded. .......................................... 16

            a. Mr. Bratic Provided No Quantitative Support for PlexOS "Intellectual Property" Allegedly Accounting for 20% of the BNP Software License Fee. .............................................................. 16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

b.    The Opinion that 60% Of PlexOS Intellectual Property Is Attributable to the Patents-In-Suit Is Unsupported............................. 18

2.    The BNP Transaction Is Neither Technologically nor Economically Comparable to the Hypothetical Negotiation, and Mr. Bratic Failed to Account for the Differences........................................................................ 20

a.    Mr. Bratic Assumes Economic Comparability and Fails to Account for Differences in Circumstances. ........................................ 20

b.    Mr. Bratic's Technological Comparability Conclusions Are Unsupported. .................................................................................... 22

V.    CONCLUSION.................................................................................................... 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
No. 04-02266, 2010 WL 11575000 (N.D. Cal. Aug. 30, 2010)............................................ 20

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-01846, 2013 WL 5958176 (N.D. Cal. Nov. 7, 2013)................................................ 25

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 12-00630, 2014 WL 794328 (N.D. Cal. Feb. 25, 2014)................................. 7, 21, 22, 25

*DataQuill Ltd. v. High Tech Computer Corp.*,
887 F. Supp. 2d 999 (S.D. Cal. 2011) ................................................................ 20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ................................................................................ 2, 6

*Fenner Investments, LTD. v. Hewlett-Packard Co.*,
No. 08-273, 2010 WL 3911372 (E.D. Tex. Apr. 16, 2010) .................................... 24

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
No. 13-03999, 2015 WL 4272870 (N.D. Cal. July 14, 2015) ........................................ 14, 20

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................ passim

*GPNE Corp. v. Apple, Inc.*,
No. 12-02885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ..................................... passim

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ................................................................ 7, 10, 12, 23

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ............................................................ 7, 13, 14, 25

*Open Text S.A. v. Box, Inc.*,
No. 13-04910, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ......................................... 15, 23

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ............................................................ 7, 20, 21, 25

*Wordtech Sys., Inc v. Integrated Networks Sols., Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) .............................................................. 20

**Rules**

Fed. R. Evid. 702 .......................................................................... 6, 7, 11, 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

<u>**NOTICE OF MOTION AND MOTION**</u>

PLEASE TAKE NOTICE that on March 12, 2020 at 9:00 a.m., in Courtroom 1, 5th Floor, United States District Court for the Northern District of California, San Jose Courthouse, 280 South First Street, San Jose, CA 95113, Defendant Cisco Systems, Inc. ("Cisco") shall and hereby does move for an order excluding certain testimony of NetFuel, Inc.'s damages expert Walter Bratic and testimony from its technical expert, Aviel Rubin, on which Mr. Bratic relied.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

I.     INTRODUCTION

Despite being unable to demonstrate that Cisco—or anyone who has purchased a Cisco product—has ever used the claimed inventions, NetFuel is demanding approximately ███████ from Cisco for their alleged use. This demand, made through the reports of its damages expert, Mr. Walter Bratic, is all the more surprising given that it is based largely on assumptions that have no methodological basis. This is on top of the fact that NetFuel itself had no success selling the network monitoring software, PlexOS, that its founder and sole named patent inventor James Harlow says practiced NetFuel's patents. Despite attempting to market and sell PlexOS for about fourteen years, NetFuel was able to recruit only two companies to use it: (1) NetFuel gave the software to Bank of America ("B of A") *for free*, and (2) then B of A paid NetFuel so that BNP Paribas ("BNP") could continue using PlexOS after BNP purchased B of A's prime brokerage unit. This transaction with BNP Paribas, the "BNP Agreement"—worth about ███████—was NetFuel's only sale of its PlexOS software in the 19 years from its founding until today.

After NetFuel obtained the two patents it now asserts against Cisco and determined that it could not successfully sell PlexOS, NetFuel changed its strategy to monetize its patents. But NetFuel has not been able to get any company to take a license to use any of its patents—even after litigation against F5 Networks, Inc., which NetFuel dismissed after *Markman* ███████.

Nonetheless, NetFuel persists in asserting that the patents in this case warrant approximately ███████ from Cisco based on accusations that relate to a few features from within Cisco's comprehensive operating system software, some of which must be used in combinations that can only be created by a user. Attempting to justify its enormous damages request, NetFuel's experts rely on two theories: (1) apportioned profits, and (2) a per-unit royalty. Both theories suffer from the same fundamental and fatal flaw: they are based on vague, qualitative notions that lack underlying support or methodology. As discussed in more detail below, NetFuel's apportioned profits calculations rely on percentages unsupported by quantitative analysis or mathematical reasoning. NetFuel's second per-unit royalty theory also suffers from the problem that it is based on NetFuel's single transaction with BNP, a fundamentally different type of business agreement that Mr. Bratic makes no effort, as a matter of technology or economics, to connect to a hypothetical patent license negotiation between NetFuel

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

and Cisco. NetFuel's apportioned profits and per-unit royalty theories should be excluded for failing to meet the basic requirements set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

## II.    BACKGROUND

### A.    Mr. Bratic's Damages Theories and Dr. Rubin's Lack of Technical Support.

NetFuel's damages expert, Mr. Walter Bratic, opined that Cisco should be liable for no less than ▮▮▮▮▮▮▮▮▮▮ for alleged infringement of the '659 and '730 Patents. Ex. 3 (Bratic Op. Report) at ¶¶ 11, 211, 215, 217; Ex. 1 (Bratic Supp. Rep.) at ¶ 15; Ex. 2 (Bratic Reply Rep.) at ¶ 78. Mr. Bratic's reports included a recitation of purported facts about the network equipment market, discussion of "security" and "reliability" of networking equipment, and descriptions of the Accused Devices, Patents-In-Suit,  Accused Operating Systems, and also the Accused Cisco Software Features: Embedded Event Manager ("EEM") in combination with Control Plane Policing ("CoPP"), EEM in combination with Local Packet Transport Services ("LPTS"), and Excessive Punt Flow Trap ("EPFT"). To determine a reasonable royalty, he defined the hypothetical negotiation, described each of the *Georgia-Pacific* factors, and decided whether each factor had an "upward," "downward," or "neutral" effect. He also offered two royalty calculations based on conclusions of Dr. Rubin: (1) a per-unit royalty calculation and (2) an apportioned profits calculation based on revenue.

#### 1.    Mr. Bratic's Apportioned Profits Calculation.

The four Accused Cisco Operating Systems—IOS, IOS-XE, IOS-XR, and NX-OS—run on Cisco's network router and switch products. They are, as the name implies, ***operating systems***: each is responsible for the operation of the functionalities of the router or switch on which it runs.

NetFuel accuses, as explained above, just four of the many features within Cisco's operating systems. As NetFuel is required to do under the law related to reasonable royalty damages, its expert Mr. Bratic made an effort to apportion the Cisco profits he relies upon as part of his damages calculation. For Mr. Bratic's apportioned profits calculation, he started with his calculation of Cisco's revenues for Accused Devices (*i.e.,* devices he identified as running operating systems that include the Accused Software Features), and subtracted revenues for those products that he considered to be convoyed sales, or sales of products that he believed were either spare parts or software other than the

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Accused Operating Systems. Ex. 3 at ¶ 173; Ex. 1 at ¶ 10. He then calculated a figure he holds out as gross profits by subtracting the costs from the revenues, though he did not subtract any incremental costs such as sales and marketing expenses. Ex. 3 at ¶ 174; Ex. 1 at ¶ 10. Starting with this gross profits figure, the below diagram can be used to visualize the steps that Mr. Bratic took:[1]



Mr. Bratic applied his first apportionment multiplier to reduce his calculation of the gross profits to those profits that are allegedly attributable to what he identified as the smallest salable patent practicing unit, the Operating System. He opined that this percentage was 32.5%. Ex. 3 at ¶¶ 177-178, 197. Next, Mr. Bratic applied a series of apportionment percentages in an attempt to reduce his calculation of the Operating System gross profits to profits allegedly attributable to the claimed invention. For these percentages, he relied entirely on conclusory opinions offered by NetFuel's technical expert Dr. Rubin regarding the value of the various Accused Features. He first apportioned to 33% of the profits allegedly representing the "contribution of security, reliability, and availability to the Accused Operating Systems." Ex. 3 at ¶ 198. For the Accused Feature EPFT, he then

---

[1] Mr. Bratic calculated this number as ▮▮▮▮▮▮ in his Supplemental Report, and ▮▮▮▮▮▮ in his Opening Report based on different identifications of PIDs. Ex. 3 at ¶¶ 11, 215; Ex. 1 at ¶ 9, 15. However, the challenged apportionment calculations were applied in the same manner for each conclusion, and all three amounts should be excluded.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

apportioned to another 33% based on Dr. Rubin's conclusion that 33% of the "security, reliability, and availability" of Cisco's IOS-XR operating system is purportedly attributable to EPFT. Then he apportioned to another 70% based on an opinion from Dr. Rubin that "70% of EPFT is attributable to the '730 Patent." Ex. 3 at ¶ 199. Based on these adjustments, Mr. Bratic concluded for EPFT that "approximately 2.5% of the sales and profits of Accused Devices,"—*i.e.*, Accused Router And Switch Products—"with the IOS-XR operating system are attributable to the '730 Patent." *Id.* Separately, for the Accused Feature combination of EEM and CoPP/LPTS, he apportioned to 50% based on an opinion offered by Dr. Rubin that "50% of the security, reliability, and availability of the Accused Operating Systems is attributable to the [Accused] combination." He further apportioned to 40% based on Dr. Rubin's offered opinion that 40% of functionality of the feature combination is attributable to the Patents-In-Suit. Ex. 3 at ¶ 200.

Based on these apportionments, Mr. Bratic concluded for the combination of EEM and CoPP/LPTS, "approximately 2.1% of the sales and profits of Accused Devices with the IOS, IOS XE, IOS XR, and NX-OS operating systems are attributable to the Patents-In-Suit." *Id.* From these calculations, Mr. Bratic used a 2% apportionment to determine gross profits. Ex. 3 at ¶¶ 201–202; Ex. 1 at ¶¶ 10, 13; Ex. 2 at ¶ 78. In his final reduction, Mr. Bratic reduced by an additional 50% based on a "50/50 split of the benefits received by Cisco." Ex. 3 at ¶ 214; Ex. 1 at ¶ 14; Ex. 2 at ¶ 78. This resulted in Mr. Bratic's calculation of ▬▬▬▬▬▬. Ex. 2 at ¶ 78.[2]

## 2. Mr. Bratic's Per-Unit Royalty Calculation.

Under this theory, Mr. Bratic calculated the royalty base by identifying Cisco Accused Products by their SKU or product ID ("PID"), which he believed each contain a processor accessed by an instance of the Accused Operating System. Ex. 3 at ¶¶ 208–210; Ex. 4 (Bratic Dep. Tr.) at 65:24–66:7. Mr. Bratic uses his estimate of the quantity of processors running the Accused Operating System as his royalty base. Ex. 3 at ¶¶ 208–210; Ex. 4 at 65:24–66:7. Purporting to apply *Georgia-Pacific* Factor Number 1, (*Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)), Mr. Bratic calculated a royalty rate of ▬▬▬▬▬, based solely on NetFuel's

---

[2] *See, supra*, FN1.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

one and only sale of a license for its PlexOS software to banking institution BNP in 2008, two years before NetFuel's first patent issued. Ex. 3 at ¶¶ 137–144; Ex. 4 at 105:13–23. Starting with ███████ ████████████████████ that BNP paid for the PlexOS software license, Mr. Bratic adjusted this fee to 20%, or ████, based on his conclusion that this is the value of the "intellectual property" in PlexOS. Ex. 3 at ¶¶ 139–144; Ex. 4 at 122:18–123:14. He then further reduced that amount to 60%, or ████, based on Dr. Rubin's offered opinion that "the patented inventions represent 60% of the functionality or value of PlexOS." Ex. 5 (Rubin Op. Rep.) at ¶ 382; Ex. 4 at 158:17–159:6. Mr. Bratic reached his ████████████████████████████████████████████████████████ ████. Ex. 1 at ¶¶ 11–12, 15.

### 3.    Opinions to Be Excluded.

Cisco seeks to strike certain portions of Mr. Bratic's and Dr. Rubin's reports that fail to meet the standards of Federal Rule of Evidence 702 and *Daubert*.[4] For the reasons described below, Cisco respectfully requests that Mr. Bratic's damages figures of ███████████████ (Ex. 3 at ¶11), ███████████████████ (Ex. 1 at ¶15), ███████████████ (Ex. 2 at ¶78) be excluded. Specifically, Cisco respectfully requests that the following entire paragraphs of NetFuel's experts' reports, and all opinions and Appendixes set forth in them and related to them, be excluded: Ex. 3 at ¶¶ 11, 135-145, 197–203, 205-211, 212–217; Ex. 1 at ¶¶ 9-15; Ex. 2  at ¶¶ 70–76, 78; Ex. 5 at ¶¶ 382-390; Ex. 6 at ¶¶ 121-124, 133-136, 138-144. These paragraphs are summarized briefly below:

- Mr. Bratic's per-unit royalty calculations based on the BNP Agreement, purportedly falling under *Georgia-Pacific* Factor 1: Ex. 3 at ¶¶ 11, 135-145, 207-211, 217; Ex. 1 at ¶¶ 11-12, 15; Ex. 2 at ¶¶ 70–76.
  - Dr. Rubin's opinion, which Mr. Bratic relies upon, that the patented inventions represent 60% of the functionality or value of PlexOS. Ex. 5 at ¶ 382; Ex. 6 at ¶¶ 121-124.

---

[3] Mr. Bratic calculated this number as ███████████████ in his Opening Report based on a different identifications of PIDs. Ex. 3 at ¶ 211. However, the challenged per-unit calculations were applied in the same manner for each conclusion, and both amounts should be excluded.

[4] Cisco reserves its right to challenge at a later time the accuracy, veracity, and weight that should be given to any opinions of NetFuel's experts that are not excluded under *Daubert* and Rule 702, whether or not addressed in this motion.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

- Mr. Bratic's profits apportionment analysis based on Dr. Rubin's unsupported calculations: Ex. 3 at ¶¶ 11, 197–203, 205-206, 212–217; Ex. 1 at ¶¶ 9-10, 13-15; Ex. 2 at ¶ 78.

  o Dr. Rubin's opinion, which Mr. Bratic relies upon, that 33% of the profits allegedly representing the "contribution of security, reliability, and availability to the Accused Operating Systems." Ex. 5 at ¶ 383-386; Ex. 6 at ¶¶ 133-134.

  o Dr. Rubin's opinion, which Mr. Bratic relies upon that 33% and 50% of the value of all security, reliability, and availability features on the Accused Devices are attributable to EPFT and the combination of EEM and CoPP/LPTS, respectively. Ex. 5 at ¶¶ 387-388; Ex. 6 at ¶¶ 135-136.

  o Dr. Rubin's opinion, which Mr. Bratic relies upon that 70% and 40% of EPFT and the combination of EEM and CoPP/LPTS, respectively, is allegedly attributable to the Patents-In-Suit. Ex. 5 at ¶¶ 389-390; Ex. 6 at ¶¶ 138-144.

## III.   LEGAL STANDARDS

A jury may hear expert testimony only if it is based on "scientific, technical, or other specialized knowledge" and it "will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. The trial judge, in a "gatekeeping role" (*Daubert*, 509 U.S. at 597), must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The party proffering expert testimony has the burden to establish by a preponderance of the evidence that such testimony is sufficiently reliable. *See id.* at 592 n.10. An expert may provide her opinion to the jury only if her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. To be admissible, expert testimony must be "based on sufficient facts or data," "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." *Id.*

The Federal Circuit has condemned the use of arbitrary, "plucked out of thin air" percentages in damages apportionment analyses. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012). "Experts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'" *GPNE Corp. v.*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

*Apple, Inc.*, No. 12-02885, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (citation omitted). Likewise, an expert's apportionment analysis may not simply rely on "vague qualitative notions of the relative importance" of an Accused Feature or Functionality. *LaserDynamics*, 694 F.3d at 69.

The Federal Circuit has also "long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis in original). "[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1325 (Fed. Cir. 2009). "Expert testimony based on license agreements must provide a jury enough information to 'evaluat[e] the probative value of those agreements,' lest the jury be given 'little more than a recitation of royalty numbers' to determine the outcome of a particular hypothetical negotiation." *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-00630, 2014 WL 794328, at *8 (N.D. Cal. Feb. 25, 2014) (citations omitted). Opinions that fail to address the technological and economic differences of supposedly comparable agreements are "unreliable, irrelevant, and unhelpful to the jury's task or evaluating the result of the hypothetical negotiation" and should be excluded. *Id.* at *11; *ResQNet.com*, 594 F.3d at 873.

## IV.   ARGUMENT

### A.   Mr. Bratic's Profits Apportionment Analysis Lacks Quantitative Support.

As described above, Mr. Bratic calculated a royalty based on a percentage of Cisco's alleged gross revenues. *See generally* Ex. 3 at ¶¶ 173–74. For that calculation, Mr. Bratic started with the gross revenues for the devices that he identified, and then he applied a series of apportionments to arrive at a 2.1% apportionment, or "no less than approximately 2%." *Id.* at ¶¶ 177–202. The following apportionments are particularly problematic, as they are unsupported by quantitative analysis or methodology (*GPNE*, 2014 WL 1494247, at *4 ("Experts must follow some discernable methodology, and may not be 'a black box into which data is fed at one end and from which an answer emerges at the other.'") (citation omitted)):

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

- Apportionment to 33% for the profits allegedly representing the "contribution of security, reliability, and availability to the Accused Operating Systems." Ex. 3 at ¶ 198; Ex. 5 at ¶ 386; Ex. 6 at ¶¶ 133-134.

- Apportionment to 33% and 50% for the alleged contributions of the Accused Features to the value of all security, reliability, and availability on the Accused Devices. Ex. 3 at ¶¶ 199–200; Ex. 5 at ¶¶ 388-389; Ex. 6 at ¶¶ 136, 138-140.

- Apportionment to 70% and 40% for the portions of the Accused Features that is allegedly attributable to the Patents-In-Suit. Ex. 3 at ¶¶ 199–200.

As explained below, each of these adjustments rely on figures Dr. Rubin offered that are not supported by any analysis. Ex. 3 at ¶¶ 198–200. With no underlying support, explanation, or quantitative reasoning whatsoever, these percentages are "classic *ipse dixit* reasoning," not based on "sufficiently reliable and testable methodology to prevent exclusion under *Daubert*." *GPNE*, 2014 WL 1494247, at *4–5.

> ### 1. Mr. Bratic and Dr. Rubin's Conclusion that "Security, Reliability, and Availability" Represent 33% of the Value of Network Operating Systems Lacks Quantitative Analysis and Should Be Excluded.

The first step in Mr. Bratic's problematic apportionment analysis relied on Dr. Rubin's assertion that so-called "security, reliability, and availability" allegedly represent 33% of the value the Accused Cisco Operating Systems. Ex. 3 at ¶ 198. This opinion suffers from numerous shortcomings, not the least of which is that it is not clear what Mr. Bratic and Dr. Rubin mean by "security, reliability, and availability." Critical for purposes of this motion, however, Mr. Bratic has not offered—and did not know when pressed—any details as to how Dr. Rubin arrived at a figure of 33%. Ex. 4 at 206:22–24 (Q: "Did Dr. Rubin tell you how he arrived at that 33% figure?" A: "No."). Further, Mr. Bratic did not know which of the many software features in a given Cisco operating system Dr. Rubin considered in order to reach his conclusion. Ex. 4 at 206:25–207:8. He also did not know what portion of the 33% figure is purportedly attributable to "security," versus "reliability," versus "availability." *Id.* at 207:9–14. And Dr. Rubin did not provide Mr. Bratic with any further quantitative data or analysis to support this 33% figure. *Id.* at 207:15–18. For example, Dr. Rubin did not give Mr. Bratic with any information about the relative importance of other networking functionality that he considered in the "total" or

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

"100%" denominator value from which he concluded 33% was represented by security, reliability, and availability. *Id.* at 207:19–208:2. As Mr. Bratic himself admitted, he plainly "[did not] know the specifics of how [Dr. Rubin] arrived at 33% as his apportionment for these three functionalities with respect to the accused operating system." *Id.* at 208:14–17.

Dr. Rubin's reports also do not supply the crucial missing analysis. For example, in paragraph 384 of Dr. Rubin's Opening Report, he opined that "[s]ecurity, reliability, and availability are extremely important to the network operating systems that run on network routers and switches" without providing a single citation to support any of his statements. *See* Ex. 5 at ¶ 384. He simply stated that these aspects of networking devices are "extremely important." Ex. 5 at ¶ 384. He provided no analysis as to which "security, reliability, and availability" features allegedly comprise the 33%, or how he identified such features or determined that a given feature purportedly relates to "security, reliability, or availability." Ex. 5 at ¶ 384. When pressed during deposition, Dr. Rubin admitted that he failed to identify any other aspects of the Accused Operating Systems that he considers comprise the remaining 67% or to evaluate their relative importance. Ex. 7 (12/17/19 Rubin Dep. Tr.) at 248:15–21. The so-called "[i]ndustry research" on which Dr. Rubin relies consists of just three websites, all of which relate to a single Cisco product. Ex. 5 at ¶ 385; Ex. 7 at 228:5–8 (Q: "And the examples that you provide [in paragraph 385] are those three Website links in footnotes 45 through 47 all pertaining to the Cisco ASR 1K, right?" A: "That's right."). Dr. Rubin's entire explanation purportedly supporting his apportionment percentage is a broad, vague statement, devoid of quantitative support:

> Based on my experience in computer networking and security, my knowledge of the nature and function of routers and switches, the research I have described, and my knowledge and understanding of the Accused Products and Cisco's network operating systems, it is my opinion that security, reliability, and availability represent (conservatively) at least 33% of the value of network operating system software.

Ex. 5 at ¶ 386.

Dr. Rubin should have demonstrated an appropriate quantitative analysis by providing calculations to demonstrate how he arrived at the 33% figure. As a basic mathematical matter, a percentage such as 33% is derived from a fraction, which must have a numerator and a denominator. But Dr. Rubin provided neither. His report contained no analysis as to what the numerator and denominator consist of or what units he used to determine them, such as individual features within

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  Cisco's operating systems, parts of features, or some other unit or basis. Dr. Rubin also admitted that

2  he failed to identify any other aspects of networking devices he considered to be within the remaining

3  67% "of the value of network operating system software" (*id.*) as well as to explain and evaluate their

4  relative importance. Ex. 7 at 248:15–21. As Cisco's expert Dr. Almeroth pointed out:

> Cisco's network operating system software provides for a whole host of functionalities other than 'security, reliability, and availability,' such as high-speed communications, application optimization, automated provisioning, cloud connectivity, among others. The primary function of a router is to route packets, which Dr. Rubin does not even mention.

8  Ex. 8 (Almeroth Responsive Rep.) at ¶ 381.

9  During deposition, Dr. Rubin's response to the lack of quantitative analysis was simply that

10  the figure was "supported by my many years of studying and teaching computer security" and "by

11  industry research, as I noted in my Opening Report." Ex. 6 at ¶ 134. But "'years of experience' alone

12  does not constitute a sufficiently reliable and testable methodology to prevent exclusion under

13  *Daubert*." *GPNE*, 2014 WL 1494247 at *4.

14  At bottom, Dr. Rubin's 33% figure was simply "plucked out of thin air." *Id.* at *6 (citing

15  *LaserDynamics*, 694 F.3d at 69). A "complete lack of economic analysis to quantitatively support the

16  one-third apportionment echoes the kind of arbitrariness of the '25% Rule' that [the Federal Circuit]

17  emphatically rejected from damages experts" and "alone justif[ies] excluding" an expert's opinions.

18  *Id*. This apportionment opinion is not backed by "sufficient facts or data," or by "reliable principles

19  and methods" (Fed. R. Evid. 702) and must be excluded.

> **2.** **Mr. Bratic and Dr. Rubin's Conclusions that the Accused Features Contribute 33% and 50%, of the Value of All "Security, Reliability, and Availability on the Accused Devices" Should Be Excluded.**

> **a.** **The Percentages Lack Quantitative Support.**

23  Mr. Bratic's next revenue apportionment step relied on two opinions offered by Dr. Rubin: (1)

24  that 33% of the value of "security, reliability, and availability" of Cisco's IOS-XR operating system

25  is allegedly attributable to the Accused EPFT Feature, and (2) that 50% of the value of the "security,

26  reliability, and availability" of Cisco's IOS, IOS-XE, IOS-XR, and NX-OS operating systems is

27  allegedly attributable to the Accused Combination of EEM and either CoPP or LPTS. Ex. 3 at ¶¶ 199,

28  200. Again, Mr. Bratic offered no information as to how Dr. Rubin arrived at these percentages. Ex. 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

at 209:22–210:9, 214:6–8. Dr. Rubin did not explain to Mr. Bratic which security features he considered as the "100%" or total security features on the Accused Devices. *Id.* at 214:23–215:1. "[Dr. Rubin] didn't give [Mr. Bratic] any percentage for what the value of EEM would be to security, reliability and availability of networking devices," "[Dr. Rubin] didn't give [Mr. Bratic] any percentage that he would attribute to LPTS of security, reliability and availability of operating systems," and "[Dr. Rubin] didn't tell [Mr. Bratic] how he" "weigh[ed] the importance of any other security features when he came up with his 50%." *Id.* at 215:2–216:1. As with the other apportionment figures Mr. Bratic applies, Dr. Rubin did not provide—and Mr. Bratic did not request—"any quantitative analysis to support his conclusion that 33% of security, reliability and availability of IOS XR is attributable to EPFT." *Id.* at 209:25–210:9. Likewise, Mr. Bratic readily admitted that Dr. Rubin did not provide him with "any quantitative analysis to support his conclusion that 50% of the security, reliability and availability of [IOS, IOS XE, IOS XR, and NX-OS] is attributable to the combination of CoPP and EEM or CoPP and LPTS [sic]." *Id.* at 214:9–14.

And as with the other unsupported percentages, Mr. Bratic and Dr. Rubin failed to provide any analysis weighing or explaining the value of the Accused Features against other "security, reliability, and availability" features. Both experts had access to information about the plethora of different software features in the Accused Cisco Operating Systems, including information about features that relate to things like "network security." For example, a document titled "Network Security Features for Cisco ASR 1000 Series Routers" lists more than thirty security features in one of the Accused Devices, the ASR 1000 series routers. Ex. 9 (CSI-NF-00002346). However, Mr. Bratic did not analyze in his report, or discuss with Dr. Rubin, the value of any of these listed "network security features" when discussing and opining about the relative value of the Accused Features to the total number of security-related features in the Accused Operating Systems. Ex. 4 at 210:25–212:4; Ex. 9.

As with Dr. Rubin's other apportionment percentages, he failed to provide any quantitative analysis to support the 33% and 50% figures applied by Mr. Bratic's in this apportionment step. Dr. Rubin did not indicate which features comprise his denominator or "100%" of the "security, reliability, and availability" features in his analysis, or explain the weight or value he attributes to those other features that are not accused. Instead, he merely based these conclusions on "all of [his]

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

experience in computer networking and security and [his] knowledge and understanding of the Accused Products and Cisco's network operating systems. Ex. 5 at ¶ 388. And he did not cure this deficiency in his Reply Report. Instead, Dr. Rubin simply reasserted that his opinion is supported by his "experience in the field, [his] understanding of the features themselves, and [his] understanding of the operating systems on which they run." Ex. 6 at ¶ 136. He also relies on qualitative assessments, such as EPFT allegedly being "a must have feature" and "a mandatory requirement." Ex. 6 at ¶ 135; *see also* Ex. 5 at ¶ 387 (claiming that combinations of EEM and CoPP/LPTS have "additional capability beyond EPFT" and therefore "provide[] a higher contribution to the security, reliability, and availability of the Accused Devices"). These unsupported conclusions do not meet the standards set by the Federal Circuit. "[V]ague qualitative notions of [] relative importance" are precisely the type of insufficient expert testimony the Federal Circuit has emphatically rejected as arbitrary and demanding exclusion. *LaserDynamics*, 694 F.3d at 69.

> **b.** **Mr. Bratic Failed to Account for the Lack of Customer Use of the Accused Features.**

As a fundamental matter, despite subpoenaing over 20 Cisco customers, NetFuel has not found a single instance where the Accused EEM and CoPP/LPTS Features were combined in the way NetFuel contends they must be combined in order to infringe. Dr. Rubin is aware that there is no evidence in this case that any Cisco customer has ever used the combination of EEM and CoPP/LPTS in the manner accused of infringement. Ex. 10 (6/11/19 Rubin Dep. Tr.) at 116:16-22 (Q: "You are not aware of any evidence that anyone at a customer of Cisco ***has ever done or implemented*** what is described in the Network Test report that's Exhibit 7; correct?" Dr. Rubin: "***I don't have any specific evidence of that***."); *id.* at 174:8–15; *id.* at 180:21–181:3; *id.* at 203:18–22 (Q: "Okay. Have you ever seen any of these three scripts that you just mentioned in paragraphs 72, 84, and 96 anywhere else outside of your expert report and the experimental work that you did?" A: "No."); Ex. 4 at 234:11-14 (Q: "You never asked how many customers are there that have ever used EEM and CoPP in a way that infringes the asserted patents?" A; Mr. Bratic: "I don't believe so."). In fact, distinguished Cisco engineers who work closely with these features are unaware of them being used by any customers. Ex. 11 (Subburayan Dep. Tr.) at 96:18-97:6; Ex. 12 (9/18/19 Thuijs Dep. Tr.) at 90:15–91:7. This

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

evidence is completely ignored when the experts determined that the Accused Features provides 50% and 33% of the value of security, reliability, and availability.

Mr. Bratic purports to have considered the extent of use of the invention (which he admits he never asked about (*see* Ex. 4 at 228:25–234:14) under *Georgia-Pacific* Factor 11, which looks at "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." *Georgia-Pacific*, 318 F. Supp. at 1120. According to Mr. Bratic, this is somehow accounted for in his "50/50 split of the benefits received by Cisco." Ex. 3 at 214. However, Mr. Bratic's purported analysis under this factor actually fails to take into account the extent that anyone actually used the claimed invention and any evidence probative of that lack of use. He supports his conclusion that "Cisco has made significant use of the patented invention," simply based on the fact that Cisco has sold the Accused Devices. Ex. 3 at ¶¶ 190-191. This is because NetFuel and Mr. Bratic rely entirely on NetFuel's claim that the Accused Operating Systems are **capable** of satisfying the claims of the Patents-In-Suit. Dkt. 124 at 12. But where the user of an accused product must take affirmative and specific steps in order to do what is claimed in an asserted patent, the sale of a product that is allegedly capable of allowing those steps to take place—absent evidence that any customers actually do the steps—is not probative of "how the parties would have valued the patented feature during the hypothetical negotiation." *Lucent Techs.*, 580 F.3d at 1333. "Implicit in [*Georgia-Pacific* Factor 11] is the premise that an invention used frequently is generally more valuable than a comparable invention used infrequently." *Id.* Thus, the relevant question should be: after an allegedly infringing product is sold, do people actually use the Accused Feature? The answer here is no, and Mr. Bratic's calculations fail to account for this. *See Finjan, Inc. v. Blue Coat Sys., Inc.,* No. 13-03999, 2015 WL 4272870, at *6 (N.D. Cal. July 14, 2015) (acknowledging damages valuation based on the extent of use of the asserted method, system, and computer-readable storage medium claims).

### 3.   Mr. Bratic and Dr. Rubin's Conclusion that 70% and 40% of the Functionality of the Accused Features is Attributable to the Patents-In-Suit Lacks Quantitative Analysis and Should Be Excluded.

For the next apportionment, Mr. Bratic once again relied on similar conclusory opinions from Dr. Rubin' that "70% of EPFT is attributable to the '730 Patent" and "40% of functionality of

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

CoPP/EEM and [EEM]/LPTS is attributable to the Patents-In-Suit." Ex. 3 at ¶¶ 199–200. Again, Mr. Bratic admitted that he did not know why Dr. Rubin attributed 70% of EPFT to the '730 Patent or why he attributed 40% of the combinations of EEM and CoPP/LPTS to the Patents-In-Suit. Ex. 4 at 212:19–21, 216:9–13. Mr. Bratic was not aware of any quantitative analysis supporting how Dr. Rubin came up with 70% or 40%. *Id.* at 212:22–24, 216:18–20. Dr. Rubin did not discuss with Mr. Bratic which aspects of the Accused Features are and are not allegedly attributable to the Patents-In-Suit. *Id.* at 213:14–20. Mr. Bratic simply adopted these numbers. *Id.* at 212:19–213:20, 216:4–20.

As with the other apportionment figures, Dr. Rubin's Opening Report provided no quantitative analysis supporting his percentages. In fact, he cited no support of any kind. *See* Ex. 5 at ¶¶ 389, 390; *see also* Ex. 7 at 236:4–10, 239:18–22 (Q: "And you don't provide any citations to specific support for the statements you make in paragraph 390 supporting your 40 percent figure, do you?" A: Dr. Rubin: "I don't have citations in this paragraph."). Dr. Rubin again failed to take even the most basic step of identifying a numerator and denominator or describing what he considered to be the entirety of the functionality of EPFT or the entirety of the functionality of EEM and CoPP/LPTS. Ex. 4 at 212:25–213:2, 216:14–17.

Dr. Rubin claims to have "weighed the relative value of EPFT's [allegedly] infringing functionality and non-infringing functionality and determined that the former is much more significant than the latter," and also claims to have determined that EPFT's allegedly infringing functionality is "somewhat more than twice as valuable than [sic] its non-infringing functionality," but he offers no explanation for these conclusions, other than to call them "conservative[]." Ex. 6 at ¶¶ 139, 142. Similarly, it is insufficient to pick 40% as a "conservative" estimate based on his determination that "the non-infringing functionality of EEM in combination with CoPP or LPTS [is] comparable in value to the infringing functionality," with no explanation why. *See Open Text S.A. v. Box, Inc.,* No. 13-04910, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) ("[M]aking arbitrary cuts to a portion of the royalty base does not give an expert a free hand to use the remaining revenue without apportionment. Such purportedly 'conservative' gestures do not come with the reward of using over-inclusive calculations elsewhere."); Ex. 6 at ¶ 142. His deposition testimony did not cure the defect: all he had to offer were more subjective, qualitative statements, such as that "the purpose of EEM is ***very much***

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

*related* to security," and "a large portion of them are related to security." Ex. 7 at 240:11–16 (emphasis added). Off-the-cuff, unsupported apportionment figures like the ones repeatedly offered by Dr. Rubin, and repeatedly adopted by Mr. Bratic, fail to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. They also risk "the danger of unfair prejudice" to Cisco. *Daubert*, 509 U.S. at 595. Every percentage point in a given step in the apportionment analysis has a significant consequence when it comes to the ultimate dollar figure to which NetFuel claims to be entitled. Ex. 4 at 149:16–20 (admitting that even a 2% difference in apportionment "has a mathematical impact on the total royalty"). For all of the reasons explained above, each of the apportionment percentages offered by Dr. Rubin and applied by Mr. Bratic was merely "plucked out of thin air" and lacks "quantitative[] support" and "economic analysis." *GPNE*, 2014 WL 1494247, at *6. All of Mr. Bratic's and Dr. Rubin's opinions related to apportionment percentages, set forth in the paragraphs listed above in Section II.A.3, fail to meet the standards set forth by the Federal Circuit and must be excluded.

**B.      Mr. Bratic's Per-Unit Royalty Calculations Based on the BNP Agreement Should Be Excluded.**

Mr. Bratic's royalty rate ▓▓▓▓▓▓ was based entirely on the sole transaction in which NetFuel sold PlexOS software licenses to BNP, via B of A, in connection with B of A selling a business unit to BNP before NetFuel's patents were even issued. Under the BNP Agreement, B of A, on behalf of BNP, paid NetFuel ▓▓▓▓▓▓▓▓▓▓ of "GAS/PlexOS" plus an additional ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Ex. 3 at ¶ 137. Mr. Bratic's opinions relying on the BNP Agreement, purportedly under *Georgia-Pacific* Factor 1, should be excluded because (1) as above, his apportionment of the per-unit fee is not supported by any quantitative analysis; and (2) the Agreement is neither technologically nor economically comparable to the hypothetical negotiation, and Mr. Bratic failed to account for the differences. Any of the deficiencies described below is independently sufficient to exclude Mr. Bratic's testimony on this issue.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1.   **Mr. Bratic's Apportionment of the BNP Per-Unit Fee Is Not Supported by Quantitative Analysis and Must Be Excluded.**

For his per-unit royalty calculation, Mr. Bratic opined, under *Georgia-Pacific* Factor 1, that the purportedly established royalty rate for the hypothetical negotiation would be ▮▮▮▮▮ ▮▮▮▮ in the Accused Products that contain the Accused Operating Systems. Ex. 3 at ¶ 145. Both apportionments applied as part of this opinion lack the concrete quantitative underpinnings that the Federal Circuit requires and must be excluded.

a.   **Mr. Bratic Provided No Quantitative Support for PlexOS "Intellectual Property" Allegedly Accounting for 20% of the BNP Software License Fee.**

To reach his offered rate of ▮▮▮▮▮▮▮▮, Mr. Bratic applied two apportionment multipliers. In the first of these, he multiplied the ▮▮▮▮▮▮ fee that was paid under the BNP Agreement for PlexOS software by 20%. Ex. 3 at ¶ 139. To justify the 20% apportionment, citing only to an interview with Mr. Harlow, Mr. Bratic claimed that the value of the PlexOS "intellectual property" in the BNP Agreement accounts for 20% of the license fee. Ex. 4 at 123:6–8, 158:23–159:3.

When asked how this 20% number was determined, Mr. Bratic testified:

> [Jim Harlow] and [Bjorn Ahlblad] sat down and discussed how much development effort went into developing the PlexOS product. And they determined of that, 20% of the output, the work product, associated with PlexOS was the intellectual property embodied in PlexOS and 80% related to development -- software development efforts. And they decided that if they were going to charge a maintenance fee, the maintenance fee would reflect a 20% of the -- the 20% reflecting the intellectual property portion of the development efforts because the maintenance was to keep the intellectual property updated.

Ex. 4 at 128:18–129:8. That is, Mr. Bratic's sole support for his assertion is a subjective decision between named inventor of the Patents-In-Suit Jim Harlow and a single former colleague with no technical background, Mr. Ahlblad.[5] The two of them allegedly determined, apparently based on a

---

[5] There can be no question that Mr. Ahlblad is not qualified to provide opinions or assessments, ultimately relied upon by Mr. Bratic, about what is or is not "embodied" in PlexOS. He testified that he does not have any academic technical background or any "technical background at all." Ex. 13 (Ahlblad Dep. Tr.) at 17:1-7; *id.* at 17:10-13.  He further admitted that he is "not familiar with the technical aspects of [PlexOS]." *Id.* at 84:22-85:5. His understanding of PlexOS is limited to "marketing." *Id.* at 27:7-14.  When asked about PlexOS, he admitted he "simply do[es]n't have an understanding of what it did or how it worked." *Id.* at 37:21-38:5.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

software "maintenance fee," that the "intellectual property embodied in PlexOS" was worth 20% of the license fee. Mr. Bratic did not do any independent analysis to support the 20% figure, did not rely on any math or data to show why the so-called "intellectual property embodied in PlexOS" was allegedly worth 20% of the ███████████████, and did not offer any explanation of how Mr. Harlow and Mr. Ahlblad came up with this percentage. Ex. 4 at 124:15–20, 125:7–20. Mr. Bratic also offered no support or analysis for why they treated the value of a software "maintenance fee" and the value of purported "intellectual property" in the software as a one-to-one relationship.[6] Ex. 4 at 146:21–24.

Furthermore, it is unclear what is included (and not included) in the "intellectual property" that correlates to the 20% figure, except that it is everything other than "software development efforts." Ex. 3 at ¶ 139; Ex. 4 at 128:14–129:8, 134:25–135:6. In 2008, at the time of the BNP Agreement, neither of the Patents-In-Suit had issued. Ex. 4 at 140:16–21, 128:18–129:8. In deposition, Mr. Bratic admitted that "intellectual property" could have included various types of intellectual property such as trademarks, trade secrets, or copyrights (*id.* at 135:2–6) and admitted that he did not know whether PlexOS included these other types of intellectual property and failed to account for them. Ex. 4 at 132:7–15, 133:13–17. Mr. Bratic stated that in "the way [he] viewed it," the 20% value of intellectual property in the BNP Agreement did not include "any other intellectual property, like trademarks or trade secrets or trade dress or copyrights." Ex. 4 at 135:2–6. Mr. Bratic's "view" was shortsighted. The "final agreement," which Mr. Bratic claimed he reviewed (Ex. 4 at 107:7–15), states that "the Software," PlexOS, "is protected by copyright," that "[t]he structure, organization and code of the Software are the valuable trade secrets and confidential information of NetFuel," and that PlexOS is a "trademark[] of NetFuel Inc." Ex. 14 (NETFL00001873) at 3–4.

Mr. Bratic thus entirely failed to account for whatever "intellectual property" the agreement refers to or what, if anything, this "intellectual property" had to do with the Patents-In-Suit, as required

---

[6] The "maintenance fee" charged under the BNP transaction was actually 18%, not 20%. Ex. 3 at ¶ 137. Further, Mr. Ahlblad testified that the maintenance fee for PlexOS allegedly corresponded to an "***industry standard of 16 to 18*** percent" of the license price (Ex. 13 at 29:2-15), further undercutting any notion that a figure of 20% (or 18%) is accurately or specifically tailored to represents the proportion of "intellectual property" within PlexOS.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   under *Georgia-Pacific* Factor 1. Without any underlying analysis or quantitative reasoning, the 20%

2   figure is as good as "plucked out of thin air" (*GPNE*, 2014 WL 1494247, at *6), and Mr. Bratic's

3   apportionment is the proverbial "black box"—made even worse by the fact that the "data . . . fed at

4   one end and from which an answer emerges at the other" is not actually "data" at all, but simply the

5   unsupported and unexplained say-so of the named inventor of the Patents-In-Suit. *Id.* at *4.

6   Mr. Bratic's opinion based on a 20% value of PlexOS "intellectual property" in the BNP software

7   license should be excluded.

8           **b.    The Opinion that 60% Of PlexOS Intellectual Property Is
                    Attributable to the Patents-In-Suit Is Unsupported.**
9

10          For the second step in his process of reducing or apportioning ███████████████ under

11  the BNP Agreement, Mr. Bratic applied a percentage of 60%. Ex. 3 at ¶ 144. To justify this number,

12  Mr. Bratic again relied on "Dr. Rubin's analysis." Ex. 3 at ¶ 144. Specifically, Dr. Rubin apparently

13  told Mr. Bratic that "60% of the intellectual property in PlexOS was comparable to the Patents-In-

14  Suit." Ex. 4 at 158:17–22. In other words, Mr. Bratic "took the 60% apportionment [Dr. Rubin]

15  provided [], multiplied it by ████, and that's how [Mr. Bratic] derived ████." *Id.* at 158:25–159:2.

16          Mr. Bratic did not know how Dr. Rubin came to his conclusion. And Dr. Rubin did not provide

17  Mr. Bratic with any details, data, or documents describing how Dr. Rubin reached his 60% figure.

18  Ex. 4 at 159:7–160:12. Because Mr. Bratic relies on Dr. Rubin's conclusions, and Dr. Rubin's

19  conclusions are unsupported by facts, data, reliable principles, or methods, both experts' testimony on

20  this issue should be excluded.

21          Dr. Rubin's expert reports provided no quantitative analysis as to how he reached his

22  conclusion that "60% of the intellectual property in PlexOS [is allegedly] comparable to the Patents-

23  In-Suit." Ex. 4 at 158:17–22. For example, in his Opening Report, Dr. Rubin simply stated:

24          PlexOS is highly extensible and is operable with functionality that extends beyond what
            is claimed in the Patents-In-Suit, such as business process automation and workflow
25          management. NETFL00001805 p. 9 (describing workflow management with the
            following example: "For example, … Tracy submits a paycheck request. Dave is then
26          notified on his blackberry and can either approve or deny the request. Once approved,
            the request is queued in the payroll system."). PlexOS also provides agents and policies
27          that extend beyond network management and into the area of enterprise resource
            management. Id. ("Custom agents engineered in-house or through a services
28          organization might embody custom business logic…"). Based on my analysis, I

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

conclude that the patented inventions represent 60% of the functionality or value of PlexOS.

Ex. 5 at ¶ 382. In his reply report, Dr. Rubin offered more of the same vague, qualitative statements:

> In my review, I noted that PlexOS performed similar functions as the patented technology, but I also observed that PlexOS has the option to be extended beyond the limitations of the [Patents-In-Suit] to perform other tasks not related to monitoring a computer network. I understand that clients actually used PlexOS for these purposes. Based on all of my experience and analysis, and the sources of information I have identified, and because the main default use-case for PlexOS is captured by the patents, I made the conservative determination that 60% of PlexOS represents the patented technology. However, there are substantial uses—which I concluded constitute 40% of the value of PlexOS—that are not captured by the Patents-In-Suit.

Ex. 6 at ¶ 124. Dr. Rubin did not identify what intellectual property was included in (or excluded from) the 60% portion of intellectual property he deemed to "represent[] the patented technology." *Id.* He also identified no particular aspects of the claims of the Patents-In-Suit for which the "main default use-case of PlexOS is captured by the patents," and did not explain what that "main default use-case" is. Dr. Rubin also mentions "functionality that extends beyond what is claimed in the Patents-In-Suit, such as business process automation and workflow management," (Ex. 5 at ¶ 382) but fails to explain the importance, or lack of importance, of these features or compare that to the importance of the features "captured by the patents." Ex. 6 at ¶ 124. He ascribes a value of 60% without providing any reasoning, quantitative analysis, or sound explanation.

When pressed during deposition, Dr. Rubin admitted that he had no actual analysis to support this conclusion—much less any quantitative analysis. For example, Dr. Rubin said he chose 60% because he concluded it was "more than 50 percent." *See* Ex. 7 at 205:1–9 ("50 percent would not have made sense because there was more than 50 percent attributable to the Patents-In-Suit."). He "didn't perform a further analysis to see if it [sh]ould be a different number." *Id.* at 215:1–8. When asked how much value or weight he attributed to specific PlexOS features, he admitted: "I didn't specifically assign a weight or a value to any feature in—explicitly in my report, but I did weigh them in my consideration by applying my familiarity with the technology with the Patents-In-Suit and with PlexOS as part of my analysis." *Id.* at 218:10–18.

Dr. Rubin's conclusion that 60% of PlexOS intellectual property is attributable to the Patents-In-Suit lacks "quantitative[] support" and is "plucked out of thin air." *GPNE,* 2014 WL 1494247, at

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1 *6. It fails to "follow [any] discernable methodology," is "classic *ipse dixit* reasoning" and must be

2 excluded. *Id.* at *4–5; *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. 04-

3 02266, 2010 WL 11575000, at *4 (N.D. Cal. Aug. 30, 2010) ("[I]t is the Court's duty as a gatekeeper

4 to exclude any expert testimony which is speculative and unreliable.").

> **2.  The BNP Transaction Is Neither Technologically nor Economically Comparable to the Hypothetical Negotiation, and Mr. Bratic Failed to Account for the Differences.**

7          Under *Georgia-Pacific* Factor 1, when relying on a transaction that involves "technologies

8 *other* than the patent in suit," (*ResQNet.com*, 594 F.3d at 869), an expert "must account for 'the

9 technological and economic differences' between them." *Wordtech Sys., Inc v. Integrated Networks

10 Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *see also Finjan*, 626 F.3d at 1211 ("[U]se of past

11 patent licenses under factors 1 and 2 must account for differences in the technologies and economic

12 circumstances of the contracting parties."). NetFuel's experts have failed to meet this requirement.

> **a.  Mr. Bratic Assumes Economic Comparability and Fails to Account for Differences in Circumstances.**

15          In addition to accounting for "technological" differences between the Patents-In-Suit and an

16 agreement or transaction that does not involve the patents, an expert must also "account for '[the]

17 economic differences' between them." *Wordtech*, 609 F.3d at 1320. Mr. Bratic failed to do this, which

18 creates an additional, independent reason to exclude his reliance on the BNP Agreement. *See

19 DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2011) ("[Plaintiff's

20 expert] has failed to establish economic comparability and his testimony regarding the [prior

21 agreements] should be excluded on this ground alone.").

22          First, as a threshold matter, the BNP Agreement did not involve either of the Patents-In-Suit—

23 in fact, it involved no patents at all. It was a sale of PlexOS *software licenses* for exclusive use by

24 BNP, a banking entity. Briefly, the agreement was executed because of NetFuel's pre-existing

25 relationship with banking entity B of A, which began with a 2003 "Series B Agreement." Under that

26 agreement, ███████████████████████████████████████████████████████

27 ███████████████████████████████████████████████████████

28 ██. Ex. 3 at ¶¶ 135–36. ██████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   ████████████████ Ex. 3 at ¶¶ 135-36; Ex. 4 at 95:7–18; Ex. 15 (NETFL00001355). When BNP

2   acquired B of A's prime brokerage unit, which had rights to use PlexOS, the BNP Agreement allowed

3   the acquired unit to continue to have those rights. Ex. 4 at 101:23–102:3; Ex. 3 at ¶ 137. The BNP

4   Agreement does not involve the transfer of any patent rights, and is "absolutely silent on any relation

5   to the Patents-In-Suit." *See ResQNet.com*, 594 F.3d at 871; Ex. 4 at 129:23–130:2 (Q: "So there were

6   no patent rights that were included in the sale to—of PlexOS?" A: Mr. Bratic: "The license."

7   Q: "There's no license to any patents." A: Mr. Bratic: "Not that I'm aware of."). Indeed, the Patents-

8   In-Suit had not even been issued at the time of this agreement. Mr. Bratic did not address the

9   fundamental economic differences between sale of a software license to use PlexOS and a non-

10  exclusive license to patents, like the hypothetical negotiation between Cisco and NetFuel. Moreover,

11  neither B of A nor BNP are networking product companies who licensed patents in order to have rights

12  to make, use, offer for sale, or import what the patents covered, as would be the case in the proposed

13  hypothetical negotiation between NetFuel and Cisco. Mr. Bratic completely failed to address this

14  fundamental difference in economic circumstances, and his opinions should be excluded. Ex. 4 at

15  102:8–14; *see also Apple*, 2014 WL 794328, at *10 (finding analysis "fundamentally flawed because

16  it treats all the agreements the same regardless of whether any of the licensed technology has any

17  relationship to the Patents-In-Suit.").

18      Second, Mr. Bratic failed to account for the pre-existing and ongoing relationship between

19  NetFuel and B of A that led to the BNP Agreement. *See* Ex. 3 at ¶ 136. As explained above, the BNP

20  Agreement permitted BNP's newly acquired group to maintain the *status quo* and continue its use of

21  the PlexOS software without interruption. Ex. 4 at 101:23–102:3. The hypothetical negotiation with

22  Cisco, however, would involve no rights to use the PlexOS software, nor would it carry the added

23  benefit of avoiding disruption to pre-existing business operations, as was the case under the BNP

24  Agreement. Mr. Bratic did not account for this additional value and differing circumstances in his

25  analysis. Ex. 3 at ¶¶ 139–144.

26      Third, Mr. Bratic specifically failed to account for the fact that prior to the BNP Agreement,

27  NetFuel had granted B of A an "implied license" to PlexOS software at *no cost*. Ex. 3 at ¶ 136; Ex. 4

28  at 96:19–23, 97:22–25. Mr. Bratic did not factor this free PlexOS license that allowed B of A to use

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   PlexOS for ten years into his royalty calculation. *See* Ex. 4 at 98:5–13. He selectively used only the

2   ▮▮▮▮▮ that was paid by BNP when it acquired one of B of A's business units. Ex. 4 at 98:5–13

3   (Q: "Did you factor that no money was paid for the PlexOS software by Bank of America into your

4   analysis where you reached your royalty rate of ▮▮▮▮▮?" A: "No, because it didn't enter into

5   my analysis. It wasn't relevant."). Mr. Bratic's analysis of the BNP Agreement should be excluded

6   because it is not economically comparable to the hypothetical negotiation and Mr. Bratic failed to

7   account for any differences. *See Apple*, 2014 WL 794328, at *8.

8               **b.      Mr. Bratic's   Technological   Comparability   Conclusions   Are**

9               **Unsupported.**

10          Mr. Bratic supported his units-based royalty calculation based solely on a single transaction

11  concerning PlexOS—NetFuel's sale of software licenses to banking entity BNP Paribas. In doing so,

12  he failed to address technological differences between PlexOS and the Patents-In-Suit. In his Opening

13  Report, Mr. Bratic simply claimed that "PlexOS is in the same field of invention as the Patents-In-

14  Suit. Specifically, PlexOS makes use of closely related technology to the technology claimed in the

15  Patents-In-Suit." Ex. 3 at ¶ 140. He also claimed that PlexOS is "architecturally similar" to the Patents-

16  In-Suit because it consists of agents that collect information and provide it to a modeler to make policy

17  determinations. Ex. 3 at ¶ 141. These statements comprise Mr. Bratic's entire basis for relying on

18  PlexOS software licenses to represent a hypothetical license for the Patents-In-Suit, and his ***only***

19  ***support*** for these foundational claims underlying his analysis is an "Interview of Dr. Rubin." Ex. 3 at

20  ¶¶ 140, 141.

21          Mr. Bratic did not review any analysis from Dr. Rubin—indeed, there is no analysis offered

22  by Dr. Rubin—evaluating whether particular features of PlexOS are technically comparable to

23  elements of the claims of the Patents-In-Suit. Dr. Rubin did not provide, and Mr. Bratic did not ask

24  for, a "claim-by-claim comparison" (Ex. 4 at 154:11–16), "any technical work product," (Ex. 4 at

25  155:3–6) "any documents," (Ex. 4 at 157:1–3) or "any details" about Dr. Rubin's analysis that led to

26  Dr. Rubin's conclusions (Ex. 4 at 155:14–17).

27          Ultimately, Mr. Bratic simply relied on Dr. Rubin's vague assertions that PlexOS "is in the

28  same field of invention" as the Patents-In-Suit and makes use of "closely related technology" (Ex. 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

at ¶ 140) without understanding "the level of detail and analysis and the nature of the technical analysis [Dr. Rubin] conducted." Ex. 4 at 154:18–23. He did not even know what Dr. Rubin meant when he used phrases such as "same field of invention," "closely related to the technology," and "architecturally similar." Ex. 4 at 152:12–153:1; *see also id.* at 156:1–13 (Q: "[D]o you know what it means to be architecturally similar?" A: Mr. Bratic: "No. That's a technical matter."); *id.* at 156:10–13 (Q: "Did [Dr. Rubin] tell you how it was architecturally similar?" A: Mr. Bratic: "No. He just said it was architecturally similar."). Mr. Bratic simply assumed technical comparability based on a conversation with Dr. Rubin that he did not understand, and he neglected to consider any actual technical similarities or differences between PlexOS software and the Patents-In-Suit.

Mr. Bratic's conclusory approach does not meet the legal standard. The Federal Circuit has held in no uncertain terms that "[w]hen relying on licenses to prove a reasonable royalty" the type of "loose or vague comparability between different technologies or licenses" that Mr. Bratic employs here plainly "does not suffice." *LaserDynamics*, 694 F.3d at 79. Past licenses that are not shown to be technologically comparable "are 'irrelevant' and 'simply [have] no place in this case.'" *Open Text*, 2015 WL 349197 at *5 (quoting *LaserDynamics*, 694 F.3d at 80). Mr. Bratic should have been well aware of this requirement, as conspicuously similar testimony offered by him was excluded by a court in the Eastern District of Texas on a similar basis:

> The Court also finds Mr. Bratic's report inadequate for failing to supports [*sic*] his conclusion that the relied on licenses are comparable to the hypothetical agreements between Plaintiff and Defendants. Mr. Bratic concluded each license agreement is comparable to the hypothetical agreement by simply reciting 'I understand that this technology is in the same field of technology as are the Patents–in–Suit.' To support this statement, Mr. Bratic merely cited to "Interview with Andrew Walding," the Plaintiff's technical expert. Mr. Bratic did not detail the substance of his interview with Mr. Walding nor did he offer further explanation or rationale to justify his conclusions the license agreements pertained to comparable technology."

*See Fenner Investments, LTD. v. Hewlett-Packard Co.*, No. 08-273, 2010 WL 3911372, at *2 (E.D. Tex. Apr. 16, 2010) (citations omitted).

Dr. Rubin cannot salvage Mr. Bratic's vague and conclusory opinions, at least because his expert reports do not explain the opinions he provided for Mr. Bratic to rely upon. Indeed, the relevant section of Dr. Rubin's report cited only to the deposition of named inventor Jim Harlow and a single document that "describes PlexOS's elements at a high-level." Ex. 5 at ¶ 379. Dr. Rubin provided no

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

technical comparison between functionality of PlexOS and even a single claim of the Patents-In-Suit. In fact, the pertinent section of his report does not identify or cite to any element or claim of either Patent-In-Suit. Ex. 5 at ¶¶ 376–382. It merely states that "PlexOS is architecturally similar" to the Patents-In-Suit because it consists of agents and runtime environments, but without any technical comparison related to agents and runtime environments. *Id.* at ¶ 381.[7] He does not attempt to analyze whether these are essential elements to the Patents-In-Suit. *See Fenner Investments*, 2010 WL 3911372, at *2 (excluding Mr. Bratic's hypothetical negotiation analysis because, among other reasons, he "failed to explain whether the license agreements pertained to patented inventions that were essential to or only a small feature or component of the overall product"). In fact, Dr. Rubin does not provide any analysis of agents and runtime environments in the Patents-In-Suit. Ex. 5 at ¶ 381. Without citation to or analysis of the patented claims, Dr. Rubin's opinion that PlexOS is "highly comparable to the technology claimed by the patent claims asserted in this matter" (Ex. 5 at ¶ 376) is unsupported and unreliable.

Mr. Bratic's reliance on the BNP Agreement without any supporting technical comparability analysis, amounts to "little more than a recitation of royalty numbers" and will not permit a jury to "evaluat[e] the probative value" of the BNP Agreement. *Apple*, 2014 WL 794328, at *8. It should be excluded.

Because Mr. Bratic has failed to account "for the technological and economic differences," (*ResQNet.com*, 594 F.3d at 873) between the BNP Agreement and the license in the hypothetical negotiation, he has not shown that the BNP Agreement is "sufficiently comparable." *GPNE*, 2014 WL 1494247, at *5. His opinions are therefore "unreliable, irrelevant, and unhelpful to the jury's task of evaluating the result of the hypothetical negotiation" (*Apple*, 2014 WL 794328, at *11) or "[t]he probative value of [the BNP agreements]." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-01846, 2013 WL 5958176, at *6 (N.D. Cal. Nov. 7, 2013). His opinions that rely on the BNP Agreement are "little

---

[7] Mr. Harlow has testified that PlexOS embodies the Patents-In-Suit. Ex. 16 (10/2/19 Harlow Dep. Tr.) 112:19–24. Regardless, NetFuel's expert must justify his reliance on the BNP Agreement and a sale of software licenses for PlexOS, rather than simply relying on generalities about the "field of the invention" and "related technology."

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

more than a recitation of royalty numbers," and should be excluded. *Apple*, 2014 WL 794328, at *8 (citing *Lucent Techs.*, 580 F.3d at 1328–29).

## V.   CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Court exclude as unreliable and impermissible under *Daubert* and progeny the opinions offered by NetFuel's experts described above.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

DATED: January 16, 2020

Respectfully submitted,

PERKINS COIE LLP

_/s/ Elise S. Edlin_

Sarah E. Piepmeier (SBN 227094)
May Eaton (SBN 298123)
Elise S. Edlin (SBN 293756)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA  94105
spiepmeier@perkinscoie.com
eedlin@perkinscoie.com
mayeaton@perkinscoie.com
Telephone:     (415) 344-7000
Facsimile:     (415) 344-7050

Adam R. Alper (SBN 196834)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA  94104
adam.alper@kirkland.com
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
michael.devries@kirkland.com
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Elizabeth A. Cutri (_pro hac vice_)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
elizabeth.cutri@kirkland.com

_Attorneys for Defendant Cisco Systems, Inc._