UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NETFUEL, INC.,

              Plaintiff,

v.

CISCO SYSTEMS INC.,

              Defendant.

Case No. 5:18-cv-02352-EJD

**ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S MOTION TO STRIKE**

Re: Dkt. Nos. 256, 258

      The Parties have filed motions to exclude portions of the opposing sides' expert testimony. The Court finds these motions suitable for consideration without oral argument. *See* N.D. Cal. Civ. L.R. 7-1(b). Having considered the Parties' papers, the Court **DENIES** Plaintiff's motion to strike portions of Dr. Almeroth's expert reports and **GRANTS** Defendant's motion to strike portions of Dr. Rubin and Mr. Bratic's expert reports.[1]

## I.      BACKGROUND

### A.  Factual Background

      Plaintiff alleges that Defendant infringed two of its patents. The Patents-in-Suit—U.S. Patent Nos. 7,747,730 (the "'730 Patent") and 9,663,659 (the "'659 Patent")—disclose the use of software programs called "agents" to monitor and manage computer networks and the devices (such as routers and switches) that run those networks. Plaintiff accuses four features of

---

[1] The Court has filed this Order under seal because it contains material subject to sealing orders. Within **seven days** of the filing date of this Order, the Parties shall provide the Court a stipulated redacted version of this Order, redacting only those portions of the Order containing or referring to material for which the Court has granted a motion to seal and for which the Parties still request the material be sealed. The Court will then issue a redacted version of the Order.

1  Defendant's operating systems—IOS, IOS XE, IOS XR, or NX-OS ("the Accused Operating

2  Systems")—of infringing the Patents-in-Suit.  Those features ("the Accused Features") are the

3  Embedded Event Manager ("EEM"), Control Plane Policing ("CoPP"), Local Packet Transport

4  Services ("LPTS"), and Excessive Punt Flow Trap ("EPFT").  EEM is included in all four Cisco

5  network operating systems, CoPP is included in three (IOS, IOS XE, and NX-OS), and LPTS and

6  EPFT are included in one (IOS XR).

7       Defendant hired Dr. Kevin Almeroth, a computer-networking expert, to serve as

8  Defendant's designated expert on invalidity.  Plaintiff retained Dr. Aviel Rubin, a computer

9  security expert, to opine about the importance of the technology in the asserted claims, how that

10  technology contributed to the value of Plaintiff's software, and how that technology currently

11  contributes to the value of the Accused Features.  Plaintiff also retained Walter Bratic to provide

12  expert opinions on the damages owed to Plaintiff as a result of Defendant's alleged infringement.

13  Several steps of Mr. Bratic's apportionment analysis rely on Dr. Rubin's technical opinions

14  concerning the Accused Feature and the Patents-in-Suit.

15       Each side has raised objections to part of the testimony of the others' expert witnesses

16  based on either a Federal Rule of Civil Procedure 26 or Federal Rule of Evidence 702, including

17  the principles set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The

18  Court addresses these arguments below.

19       **B.  Procedural History**

20       On January 16, 2020, Plaintiff filed a motion to strike portions of Defendant's expert

21  report and exclude related testimony.  Plaintiff NetFuel Inc.'s Notice of Motion and Motion to

22  Strike ("P Mot."), Dkt. 255-3.  Defendant file an opposition on January 30, 2020.  Defendant

23  Cisco Systems, Inc.'s Opposition to NetFuel's Motion to Strike ("D Opp."), Dkt. 275-4.  On

24  February 6, 2020, Plaintiff filed a reply.  NetFuel's Reply in Support of its Motion to Strike ("P

25  Reply"), Dkt. 284-4.

26       On January 16, 2020, Defendant filed a motion to strike portions of Plaintiff's expert

27

28  Case No.: 5:18-cv-02352-EJD
ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S
MOTION TO STRIKE

report and exclude related testimony.  Defendant Cisco Systems, Inc.'s Motion to Exclude ("D Mot."), Dkt. 257-4.  Plaintiff filed an opposition on January 30, 2020.  NetFuel's Opposition to Cisco's Motion to Exclude ("P Opp."), Dkt. 274-4.  On February 6, 2020, Plaintiff filed a reply. Defendant Cisco Systems, Inc.'s Reply in Support of Cisco's Motion to Exclude ("D Reply"), Dkt. 286.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure 26(a)(2)(B) requires that a party seeking to offer expert witness testimony at trial disclose a "written report—prepared and signed by the witness."  This rule, however, does not "preclude counsel from providing assistance to experts in preparing the reports."  Fed. R. Civ. P. 26(a)(2)(B) advisory committee's note to 1993 amendment; *but see Bekaert Corp. v. City of Dyersburg*, 256 F.R.D. 573, 578 (W.D. Tenn. 2009) ("[T]he expert must substantially participate in the preparation of his report.").  "Determining whether counsel crosses the line separating permissible assistance from improper participation in the expert's report writing calls for a 'fact-specific inquiry.'"  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 2019 WL 4780183, at *2 (N.D. Cal. Sept. 30, 2019) (quoting *Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 942 (E.D. Mich. 2014)).  The key question is "whether counsel's participation so exceeds the bounds of legitimate assistance as to negate the possibility that the expert actually prepared his own report."  *Bekaert*, 256 F.R.D. at 578.  Additionally, if the "opinions expressed in an expert report are not the opinions of the expert, the expert will not be able to satisfy the requirements of [Rule 702] . . . that the report be based on the expert's own valid reasoning and methodology." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 294 (E.D. Va. 2001) (citing Fed. R. Evid. 702).

### B.  Federal Rule of Evidence 702

Federal Rule of Evidence 702 provides that once an expert has been qualified on their "knowledge, skill, experience, training, or education," they may testify as to their opinions if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact

1    to understand the evidence or to determine a fact in issue;

2    (b) the testimony is based on sufficient facts or data;

3    (c) the testimony is the product of reliable principles and methods; and

4    (d) the expert has reliably applied the principles and methods to the facts of the case.

5    When considering motions to exclude expert testimony, the trial court "acts as a

6    gatekeeper" by "making a preliminary determination that the expert's testimony is reliable."

7    *Optronic Techs., Inc.*, 2019 WL 4780183 at *1; *see also Oxford Gene Tech. Ltd. v. Mergen Ltd.*,

8    345 F. Supp. 2d 431, 433 (D. Del. 2004) ("Motions to exclude evidence are committed to the

9    court's discretion."). Rule 702 and *Daubert* are not "guarantees of correctness;" rather, they are

10   safeguards against unreliable or irrelevant expert opinions. *i4i Ltd. P'ship v. Microsoft Corp.*, 598

11   F.3d 831, 855 (Fed. Cir. 2010). *Daubert* thus tests "the soundness of [the expert's] methodology."

12   *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010) ("Under *Daubert*, the district judge is 'a

13   gatekeeper, not a fact finder.'").

14   The Federal Circuit[2] has condemned the use of arbitrary, "plucked out of thin air"

15   percentages in damages apportionment analyses. *LaserDynamics, Inc. v. Quanta Comput., Inc.*,

16   694 F.3d 51, 69 (Fed. Cir. 2012). "Experts must follow some discernable methodology, and may

17   not be a black box into which data is fed at one end and from which an answer emerges at the

18   other." *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) (quotation

19   marks and citation omitted). So long as an opinion is "premised on reliable scientific principles, it

20   should not be excluded by the trial judge." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d

21   1102, 1109 (N.D. Cal. 2018).

22

23   _____
     [2] Plaintiff contends that "Ninth Circuit law governs the admission of expert testimony." P Opp. at

24   5. While it is true that Ninth Circuit law governs the admissibility of expert testimony generally,
     when a *Daubert* motion raises patent-specific damages issues, district courts must use Federal

25   Circuit precedent. *See, e.g.*, *Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308,
     1318 (Fed. Cir. 2010) ("When reviewing damages in patent cases, we apply regional circuit law to

26   procedural issues and Federal Circuit law to substantive and procedural issues 'pertaining to patent
     law.'" (citation omitted)). This Court thus uses Federal Circuit, and not Ninth Circuit, precedent

27   when reviewing Plaintiff's experts' damage calculations. *Cf.* P Opp. at 1 (arguing this Court must
     apply Ninth Circuit law).

     Case No.: 5:18-cv-02352-EJD
28   ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S
     MOTION TO STRIKE
                                                 4

United States District Court
Northern District of California

III.    DISCUSSION

A.  Plaintiff's Motion to Exclude Portions of Dr. Almeroth's Expert Report

As noted above, Defendant retained Dr. Almeroth to offer an opinion as to whether the Patents-in-Suit are invalid.  *See* Opening Expert Report of Dr. Kevin C. Almeroth of Invalidity of U.S. Patent Nos. 7,747,730 and 9,663,659 ("Almeroth Report"), Dkt. 255-5.  Plaintiff challenges portions of the report on the grounds that (1) Dr. Almeroth did not author his own opinions on anticipation and obviousness for 21 out of 25 primary prior-art references and (2) Dr, Almeroth's opinions about anticipation and obviousness are so conclusory and lacking in analysis that they are unreliable and thus unhelpful to the jury.  P Mot. at 4.  The Court addresses each argument in turn.

1.  Ghost-Writing

Plaintiff first argues that Dr. Almeroth's report must be excluded pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) because the portions sought to be struck were "ghost-written."  *Id.* at 5.  There is no dispute that Dr. Almeroth's report relies on, and at some points recites verbatim, Defendant's initial invalidity contentions.  *See* D Opp. at 7.  Plaintiff contends that Dr. Almeroth did not write or assist in writing these invalidity contentions.  P Mot. at 13.  Thus, in Plaintiff's view, because Dr. Almeroth did not write the initial invalidity contentions recited in his invalidity report, the Court must strike portions of the report that recite the initial invalidity contentions.  *Id.* at 12.

Plaintiff's argument, however, is flawed.  It ignores the reality that Federal Rule of Civil Procedure 26 does not require experts to unilaterally write their reports.  Indeed, attorneys may be involved in the preparation of an expert report.  *Manning v. Crockett*, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999) (noting that an expert need only "substantially participate" in the preparation of a report).  This involvement can include "counsel's paraphrasing of the expert's qualifications, counsel's providing 'teamwork,' 'collaboration,' or editorial assistance on the report, counsel's composing of initial drafts of reports based upon communications with the expert and allowing the expert to substantively revise the report to reflect the expert's opinions, or

counsel's drafting of the report with the expert's substantive assistance." *Accentra Inc. v. Staples, Inc.*, 2010 WL 11459205, at *4 (C.D. Cal. Oct. 7, 2010) (collecting cases). For instance, in *Numatics*, the court excluded the expert's report because counsel wrote the entire report and the expert only made "fairly minor" changes before signing it. 66 F. Supp. 3d at 944 (noting that the expert "conceded" at his deposition that he did not draft his report). Thus, there, the report did not represent the expert's own commentary on the evidence and was, in fact, "several degrees removed from his own work." *Id.*

Unlike *Numatics*, counsel did not "ghost-write" Dr. Almeroth's report. Dr. Almeroth not only wrote a significant portion of his report, but also provided the information, analyses, and opinions expressed in the report. First, during his deposition, Dr. Almeroth testified that he helped draft the report and that the opinions therein are his own. *See* D Opp. at 12 (citing deposition testimony); *see also Icon-IP*, 87 F. Supp. 3d at 950 (holding that even though counsel typed the report, the expert still wrote the report since he testified that the information in the report came from him); *Accentra Inc.*, 2010 WL 11459205, at *5 (concluding that expert met Rule 26's requirements because her "testimony does not indicate that she had no involvement in the final report); *Optronics Techs.*, 2019 WL 4780183 at *2 (noting that expert testified that he reviewed and edited the report and that the report captured his opinions and analysis); *cf. Numatics*, 66 F. Supp. 3d at 944. Dr. Almeroth thus "substantially participated" in the preparation of the report. *Bekaert Corp.*, 256 F.R.D. at 578. This is confirmed by the fact that Dr. Almeroth spent over 100 hours between August 2019 and October 2019 working on his Opening Report and "provided feedback on multiple drafts of the report before applying his signature." D Opp. at 10; *see also Manning*, 1999 WL 342715 at *3 (holding that an expert is not "substantially involved" in the drafting of a report if the attorney simply drafts the report, without prior substantive input from the expert, and then ask the expert to approve and sign the report).

Second, much like in *Icon-IP*, it is irrelevant that the "[claim] charts are similar to claim charts prepared by counsel earlier in the litigation" because the charts "necessarily address *the*

Case No.: 5:18-cv-02352-EJD
ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S MOTION TO STRIKE

United States District Court
Northern District of California

1    *same claims and prior art references*." 87 F. Supp. 3d at 943 (emphasis added).  Finally, Dr.

2    Almeroth wrote a significant portion of his report.  While Dr. Almeroth's report recites

3    Defendant's initial invalidity contentions, he does add analysis to the invalidity contentions.[3]  *See*

4    *e.g.*, Dkt. 256-3.  Accordingly, because Dr. Almeroth provided the information, analyses, and

5    opinions expressed in his report, the Court will not exclude his report or testimony.  *See Icon-IP*,

6    87 F. Supp. 3d at 950; *cf. Numatics*, 66 F. Supp. 3d at 941 (excluding expert witness who served

7    as "lawyer's avatar").[4]

8    ### 2.  Reliability of Dr. Almeroth's Opinions

9         Plaintiff next argues that Dr. Almeroth's opinions on anticipation and obviousness are

10   unreliable and unhelpful to the trier of fact because they are "conclusory and unsupported."  P

11   Mot. at 16.  Plaintiff contends that Dr. Almeroth never explains how the specific claim elements at

12   issue are to be understood and, based on that interpretation, how the claim elements are disclosed

13   or taught in the asserted prior art references.  P Reply at 11.  The Court disagrees.

14        Expert testimony is relevant if it assists the trier of fact in determining the case.  *Daubert v.*

15   *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590–95 (1993).  "It is well-established that the first step

16   in any validity analysis is to construe the claims of the invention to determine the subject matter

17   for which patent protection is sought."  *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d

18   1347, 1353 (Fed. Cir. 1999) (citation omitted).  Hence, in order for an expert's report to be

19   relevant, it must explain how the expert understands the specific claim elements at issue.  *Oxford*

20   *Gene Technology* is instructive.  In *Oxford Gene*, the court excluded the invalidity expert's report

21   pursuant to Federal Rule of Evidence 702 because the expert "fail[ed] to disclose a clear

22

---

23   [3] Notably, Dr. Almeroth did spend four hours assisting Defendant with these initial invalidity
     contentions.  P Mot. at 10.

24   [4] In the alternative to Federal Rule of Civil Procedure 26, Plaintiff argues Dr. Almeroth's "ghost-
     written" report should be excluded under Federal Rule of Evidence 703.  This argument, however,

25   depends on the Court concluding that Dr. Almeroth did not prepare his report.  As established
     above, the Court has held to the contrary.  *See supra.*  Thus, because the "opinions expressed in

26   [the] expert report are . . . the opinions of [Dr. Almonte]," the requirements of Rule 702 are
     satisfied since the "report [is] based on [Dr. Almonte's] own valid reasoning and methodology."

27   *Trigon Ins.*, 204 F.R.D. at 294.
     Case No.: 5:18-cv-02352-EJD

28   ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S
     MOTION TO STRIKE

construction of each disputed claim element," which made his report "less than helpful to the trier of fact." 345 F. Supp. 2d at 436. The expert only "appl[ied] a negative or alternative construction of the claims . . . and [made] blanket conclusions of invalidity based on 'anticipation and/or obviousness,' [after] assuming the court found that such construction did not apply." *Id.*

Unlike the expert in *Oxford Gene*, Dr. Almeroth did not "ignore[] this fundamental first step." *Id.* at 435. Dr. Almeroth's report contains a detailed "Claim Construction" chart and language that indicates that Dr. Almeroth's opinions are based on these constructions. *See* Dkt. 255-5 at 17–19. He confirms this in his deposition testimony. *See* D Opp. at 23 ("[My report] talks about the different claim scopes based on plain and ordinary meaning and the court's constructions. NetFuel's infringement contentions. And then in the reply report, Dr. Rubin's infringement report."); *cf. Oxford Gene*, 345 F. Supp. 2d at 435 (noting that the expert did not set out his claim construction "in a separate section" of his report).

Plaintiff argues in response that even while this is true, the report is flawed because Dr. Almeroth never indicates whether he is relying on the Court's construction, his own understanding, or his interpretation of how Plaintiff understands the terms. P Reply at 12. Instead, Plaintiff contends, the report simply states at the outset of each section that the reference "anticipates and renders obvious the claims . . . at least under the apparent application of the claims in NetFuel's infringement contentions." *Id.* at 12 (citing Dr. Almeroth report) (emphasis omitted). This, in Plaintiff's view, is fatal because it shows that Dr. Almeroth failed to disclose what interpretation he is applying when analyzing the prior art. *Id.* at 13.

The Court, again, disagrees. First, the claim construction section of the report clearly identifies how Dr. Almeroth construes certain claim terms. *See* Dkt. 255-5 at 17–19. Second, for terms that this Court has not defined, Dr. Almeroth explains that his interpretation of claim terms and prior art is based "at least under the apparent application of the claims in NetFuel's infringement contentions." *See, e.g.*, *id.* at 19. Dr. Almeroth thus uses the same claim elements as Plaintiff. And, despite Plaintiff's statements to the contrary, Dr. Almeroth need not commit to *one*

interpretation.  It is permissible for him to qualify claim terms with expressions like "at least."  *Compare Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1276 n.4 (Fed. Cir. 2016) ("[N]othing precludes Zimmer from arguing for a narrower application of the limitation on the infringement context, while also arguing, in the alternative, that . . . the patent claim would be so broad as to be invalid."), *with* P Reply at 12 ("Cisco cannot avoid the fact that not once in his entire report does Dr. Almeroth state which interpretation of a given claim term he is using, let alone indicate whether he is relying on the Court's construction, his own . . . [or] how he believes NetFuel understands each term in light of NetFuel's contentions.").  Thus, much like in *Icon-IP*, Dr. Almeroth's expert report is permissible because "he assumes that [Plaintiff's] understanding of the construed claims is correct, and then proceeds to demonstrate how, in his opinion, each element of the claim[] is found in the prior art."  87 F. Supp. 3d at 943; *cf. TruePosition, Inc. v. Andrew Corp.*, 2007 WL 2429415, at *1 (D. Del. Aug. 23, 2007) (holding expert could not rely on broad interpretation because he failed to include in his invalidity report how the defendant's equipment compares to either the claim limitations or the prior art).

The Court also disagrees with Plaintiff's position that Dr. Almeroth's report is conclusory and lacking in analysis.  P Mot. at 18.  "The second step in evaluating the validity of a patent is to perform an element-by-element comparison of each claim to each prior reference."  *Oxford Gene*, 345 F. Supp. 2d at 436.  Dr. Almeroth performs such an element-by-element analysis.  For instance, in his report, on page 25 of the report, Dr. Almeroth explains why the prior art discloses an element of claim 1.  *See* Dkt. 255-5 at 25; *compare id.* at 370–71 (comparing claims of the '659 patent to prior art and then analyzing why a person of ordinary skill in the art would have been motivated to combine the prior art), *with Elder v. Tanner*, 205 F.R.D. 190, 194 (E.D. Tex. 2001) (holding expert's opinions about infringement, anticipation, and obviousness were too conclusory because the report simply listed the resources used and then stated an ultimate opinion without discussing the expert's thought process), *and Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (same).  Dr. Almeroth thus explains "in detail how each claim element is

disclosed in the prior art reference." *Finjan, Inc. v. Blue Coat Sys., LLC*, 283 F. Supp. 3d 839, 855 (N.D. Cal. 2017); *see also In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[T]here must be some articulated reasoning with some rational underpinnings to support the legal conclusion of obviousness.").

Moreover, courts have found that "claim charts appended to [expert] reports are sufficiently detailed . . . to establish that [the] opinions will be helpful to the jury." *Icon-IP Pty Ltd.*, 87 F. Supp. at 943. As Dr. Almeroth notes on page 34 of his report, Exhibit B-3 attached to the report contains such claim charts. Accordingly, Dr. Almeroth's opinions are not conclusory and are permissible under Federal Rule of Evidence 703 and Federal Rule of Civil Procedure 26(a). For the foregoing reasons, Plaintiff's motion to strike portions of Dr. Almeroth's testimony is **DENIED.**

## B. Defendant's Motion to Exclude Portions of Mr. Bratic's and Dr. Rubin's Expert Reports

Mr. Bratic used two methods to calculate damages—an apportioned profit theory and a per-unit royalty theory. Dkt. 274-5 ("Bratic Report") ¶ 206. Defendant argues both theories must be excluded because each is "based on vague, qualitative notions that lack underlying support or methodology" in contravention of *Daubert*. D Mot. at 1–2. The Court addresses each damage theory in turn.

### 1. Apportioned Profits

Mr. Bratic calculated a royalty based on a percentage of Defendant's alleged gross revenues. Bratic Report ¶ 174. To calculate this percentage, Mr. Bratic took the gross revenues from the Accused Devices and then applied a series of apportionments to arrive at a 2.1% apportionment rate. *See id.* ¶ 212 ("[N]o less than approximately 2% of Cisco's sales and profits of [the] Accused Devices are attributable to the Patents-in-Suit."); *see also* P Opp. at 2 ("The Accused Devices are fifteen families of Cisco routers and switches that run one of [the Accused Operating Systems]."). Defendant takes issue with the following three apportionments:

- Apportionment of 33% for the profits allegedly representing the "contribution of security, reliability, and availability" to the Accused Operating Systems.

- Apportionment of 33% and 50% for the alleged contributions of the Accused Features to the value of all security, reliability, and availability on the Accused Devices.

- Apportionment of 70% and 40% for the portions of the Accused Features that are allegedly attributable to the Patents-in-Suit.

Defendant argues that these adjustments are unsupported and thus must be excluded. D Mot. at 7–8. The Court analyzes each apportionment below.

### a. Apportioning Security, Reliability, and Availability of Accused Operating Systems

Mr. Bratic estimated that "security, reliability, and availability" represented 33% of the value of the Accused Operating Systems. Bratic Report ¶ 198. Mr. Bratic relied on Dr. Rubin's analysis for this apportionment step.[5] *Id.* Plaintiff argues that this opinion is reliable because, in reaching this conclusion, Dr. Rubin considered: (1) industry research (including Defendant's own statements concerning the security, reliability, and availability of the Accused Operating Systems); (2) his knowledge and understanding of the Accused Devices (gained by his review of Cisco-produced technical documents and his testing of the Accused Devices); (3) his knowledge and understanding of Defendant's networking operating systems (gained by his extensive review of Cisco-produced technical documents and by his review of Cisco operating system source code); (4) his experience and specialized expertise in computer networking and security; and (5) his expert knowledge of the nature and function of routers and switches. P Opp. at 19 (citing Dkt. 274-10 ["Rubin Report"] ¶¶ 45–86, 230–72, 360–61, 384–386); *see also* Dkt. 274-11 ("Rubin Reply Report") ¶ 133–36.

---

[5] The Parties do not dispute that Mr. Bratic "relie[d] on a technical expert, Dr. Rubin, for this apportionment step." P Opp. at 18; *see also* Dkt. 257-9 ("Rubin Depo.") at 208 ("I don't know the specifics of how [Dr. Rubin] arrived at 33% . . . ."). Thus, because Mr. Bratic's analysis depends on the validity of Dr. Rubin's analysis, in order for Mr. Bratic's analysis to stand, Dr. Rubin's figure must be "reliable."

As discussed above, an expert witness must follow some discernable methodology, and may not be a "a black box into which data is fed at one end and from which an answer emerges at the other." *GPNE Corp.*, 2014 WL 1494247 at *4. In order for this Court to determine whether Dr. Rubin's conclusions are "reliable" and based on "sufficient facts or data," the Court must be able to follow his methodology. *See* Fed. R. Evid. 702. Indeed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). While the Federal Circuit allows for "some approximation" in the reasonable royalty context, this "does not negate the Federal Circuit's requirement of 'sound economic and factual predicates' for that analysis." *Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, at *2 (N.D.N.Y. May 27, 2008) (quoting *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2202).

After reviewing Dr. Rubin's reports, the Court agrees with Defendant—Dr. Rubin's conclusion that "security, reliability, and availability" represented 33% of the value of the Accused Operating Systems is an impermissible black box without "sound economic and factual predicates." *Riles*, 298 F.3d at 1311. In his opening report, Dr. Rubin cursorily determined that the security, reliability, and availability represent at least 33% of the Accused Operating System. *See* Rubin Report ¶ 386. This determination is made based on Dr. Rubin's "experience in computer network and security," "[his] knowledge of the nature and function of routers and switches," and "[his] knowledge and understanding of the Accused Products and Cisco's network operating systems." *Id.*; *but see GPNE Corp.*, 2014 WL 1494247 at *5 (noting that "experience" does not constitute "sufficient facts or data" or "reliable principles and methods"). Dr. Rubin further declares that "[s]ecurity, reliability, and availability are extremely important to the network operating systems that run on network routers and switches." *Id.* ¶ 384; *see also id.* ¶ 385. But, using industry-wide data as a starting point is improper. *See Open Text S.A. v. Box, Inc.*, 2015 WL

349197, at *6 (N.D. Cal. Jan. 23, 2015) ("[D]ecisions from the Federal Circuit and this district have rejected deriving a royalty rate by picking a starting point based on industry-wide data (rather than facts specific to the case at hand) and varying it upwards or downwards using the *Georgia– Pacific* and other factors.").

Moreover, to the extent Dr. Rubin bases his industry research on Cisco statements, he never explains how those statements weighed in his 33% evaluation. *See, e.g.*, Rubin Report ¶ 385 (stating that various technical documents published by Defendant confirm the importance of security, reliability, and availability); Rubin Reply Report ¶¶ 133–34 (same). This is fatal; without explaining *how* he arrived at "33%," the figure appears to have been "plucked out of thin air based on vague qualitative notions of the relative importance of [security, reliability, and availability to Defendant]." *LaserDynamics*, 694 F.3d at 69. As Dr. Rubin confirmed in his deposition, neither his opening nor reply report explain the features that comprise the 67% of remaining value. Dkt. 257-12 ("Rubin Depo."), at 248.

The complete lack of economic analysis to support Dr. Rubin's apportionment "echoes the kind of arbitrariness of the '25% Rule' that [the Federal Circuit] recently and emphatically rejected from damages experts." *Id.* In an attempt to evade *LaserDynamics*, Plaintiff argues that Defendant invents a new legal standard by seeking to impose a "quantitative analysis" requirement based "on a single word mentioned in dicta by a Federal Circuit opinion applying Fifth Circuit law concerning an entirely different concept." P Opp. at 6. Not so. First, as established, Federal Circuit law applies to a *Daubert* motion with patent-specific damages issues. *See, e.g.*, *Wordtech Sys.*, 609 F.3d at 1318; *see also supra* n.2. Thus, *LaserDynamics*, which addressed a patent-specific damages issue, controls this Court's analysis. Second, contrary to Plaintiff's position, *LaserDynamics*' requirement of quantitative support for apportionments is not limited to a specific theory of damages. *See* 694 F.3d at 69 (stating that the lack of quantitative support would "alone justify" excluding the expert's opinions at trial). Third, the requirement of quantitative support follows the requirement that percentages not be "plucked out of thin air." Fourth, contrary to

Plaintiff's contention that cross-examination and presentation of contrary evidence is the proper means to attack Dr. Rubin's opinion, cross-examination cannot cure the deficiencies in Dr. Rubin's analysis. *See GPNE Corp.*, 2014 WL 1494247 at *6 ("Without a methodology . . . cross-examination is futile."); *see also id.* (holding that cross-examination was futile because it the expert's opinion rested on his experience and his "numerous statements that 3G and 4G LTE technology is valuable"). Accordingly, because Dr. Rubin failed to provide the methodology underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case, his apportionment opinion is not backed by "sufficient facts or data" or by "reliable principles and methods" and so his 33% apportionment, and all opinions relying on the figure, must be excluded.

### b. Apportioning Security, Reliability, and Availability of Accused Features

Mr. Bratic's next revenue apportionment step relied on two opinions offered by Dr. Rubin: (1) that 33% of the value of "security, reliability, and availability" of Cisco's IOS-XR operating system is allegedly attributable to the Accused EPFT Feature and (2) that 50% of the value of the "security, reliability, and availability" of Cisco's IOS, IOS-XE, IOS-XR, and NX-OS operating systems is allegedly attributable to the Accused Combination of EEM and either CoPP or LPTS.[6] *See* P Opp. at 19–20 (citing Rubin Report ¶ 388). Plaintiff argues that these opinions are reliable because, in reaching this conclusion, Dr. Rubin considered: (1) his knowledge and understanding of the Accused Devices (gained by his review of Cisco-produced technical documents and his testing of the Accused Devices); (2) his knowledge and understanding of Defendant's networking operating systems (gained by his extensive review of Cisco-produced technical documents and by his review of Cisco operating system source code); (3) the analysis and opinions described in his

---

[6] Again, the Parties do not dispute that Mr. Bratic "relie[d] on Dr. Rubin's expert opinion for this apportionment step." P Opp. at 19; *see also* Rubin Depo. at 209–10, 214 (stating that Dr. Rubin did not provide any quantitative analysis to support his figures). Thus, because Mr. Bratic's analysis depends on the validity of Dr. Rubin's analysis, in order for Mr. Bratic's analysis to stand, Dr. Rubin's figure must be "reliable."

Case No.: 5:18-cv-02352-EJD
ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S MOTION TO STRIKE

report concerning the Accused Devices and the Accused Features (including his thorough analyses of the Accused Features' functionality and implementation); and (4) his experience and specialized expertise in computer networking and security.  *Id.* (citing Rubin Report ¶¶ 45–86, 230–72, 360–61, 388; Rubin Reply ¶ 134).

Similar to the Court's holding above, see *supra* III.B.1.a., Dr. Rubin's "33%" and "50%" findings lack "sound economic and factual predicates."  *Riles*, 298 F.3d at 1311.  In his opening report, Dr. Rubin again relies on his "experience" and vague notions about the Accused Features contribution to the "security, reliability, and availability of the Accused Devices."  *See* Rubin Report ¶¶ 387–88.  For instance, he claims, without support, that EPFT "ensures availability and reliability of the device" and that the combinations of EEM and CoPP or LPTS provide a "higher contribution" to the security, reliability, and availability of the Accused Devices than EPFT.  *Id.* ¶ 387.  Yet, Dr. Rubin fails to explain how the combination of EEM and CoPP or LPTS provided such "higher contribution."  Such vague, qualitative descriptions, without some indication as to the weight or value attributed to each feature, are insufficient to support Dr. Rubin's specific apportionment conclusions.  *Cf. LaserDynamics*, 694 F.3d at 69 (requiring some economic analysis to support the apportionment).

Dr. Rubin's Reply Report does not cure the deficiencies in his opening report.  *See* Rubin Reply Report ¶ 135.  There, Dr. Rubin analyzes the Accused Features' importance individually and notes that:

- Defendant's employees have called CoPP "critical to network operation," "essential in order to protect the CPU," and stated that, without CoPP, Cisco "cannot protect the switch against DoS attacks."

- Defendant's employees have described LPTS as "[e]quivalent to CoPP but MUCH better," and said that "LPTS is not a feature!  It has to be there otherwise the router would not work at all."  LPTS is "a basic functionality required in the box for it to function."

- EEM has been called a "big powerful tool to diagnose problems" and "has been a

differentiating feature that helped enable many sales opportunities in a competitive situation."

- EPFT is a necessary feature because it helps "maintain a 'fair share' of control packets sent by various devices and stop[s] bad actors from hogging the control packets sent to the LPTS/CPU of the router." It is a "must have feature" in Defendant's eyes and a "mandatory requirement."

But, apart from EPFT, the Accused Features do not infringe based on their individual functionality—they must be used in a specific combination to infringe.[7] *See* Order Denying Cisco's Motion for Summary Judgment at 2, Dkt. 283. Dr. Rubin does not explain how this information, about individual features, supports his conclusion as to the apportionment of 50% for the Accused Combination of EEM and CoPP/LPTS. Moreover, Dr. Rubin does not explain how the above information about EPFT factors into his 33% evaluation *See LaserDynamics*, 694 F.3d at 69 (finding that the lack of *quantitative* economic analysis to support the expert's apportionment echoes the type of arbitrariness that the Federal Circuit has rejected).

Plaintiff argues that Dr. Almeroth, Defendant's damages expert, similarly "offers bare opinions" and thus that this is nothing more than "experts' disagreement concerning the relative value of the Accused Features." P Opp. at 21. The Court disagrees. As stated above, in order for an expert's opinion to be admissible, there must be a proper factual basis for the opinion. *See Finjan*, 2015 WL 4272870, at *4. Hypothesized damages, not grounded in fact, are not admissible. *Id.*; *see also LaserDynamics*, 694 F.3d at 69. Moreover, Dr. Almeroth's opinion and apportionment rates are not "pulled out of thin air." To the contrary, Dr. Almeroth explains the facts underlying his apportionment percentages, how they connect to his apportionment percentages, and the methodology he used to arrive at his apportionment percentages. *See* Dkt. 274-13 at ¶¶ 388–91 (explaining the number of possible combinations and how they are

---

[7] Defendant argues Mr. Bratic's analysis fails to account for the fact that customers rarely use the accused features in the specific combination needed to infringe. The Court does not reach this argument as it holds that the percentages lack support.

Case No.: 5:18-cv-02352-EJD
ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S MOTION TO STRIKE

attributable to the accused functionality of the asserted patents). Accordingly, because Dr. Rubin failed to provide the "methodology" underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case, his apportionment opinion is not backed by "sufficient facts or data" or by "reliable principles and methods" and so his 33% EPFT and 50% Accused Combination apportionments, and all opinions relying on the figures, must be excluded.

### c. Apportioning the Accused Features for the Patents-in-Suit

Mr. Bratic next determined the portion of the Accused Features' functionality attributable to the asserted claims of the Patents-in-Suit. He relied on Dr. Rubin's expert opinion to do this.[8] In his report, Dr. Rubin opined that "at least 70%" of EPFT's functionality and "at least 40%" of the functionality provided by the combination of EEM + CoPP/LPTS is attributable to the asserted claims of the Patents-in-Suit. *See* P Opp. at 21 (citing Rubin Report ¶ 389–90). Plaintiff argues that these opinions are reliable. Dr. Rubin proceeds as follows: he first concludes that EPFT and the combination of EEM + CoPP/LPTS infringe the asserted claims and thus include 100% of the functionality recited in those claims. Rubin Report ¶ 389. Dr. Rubin next notes that both EPFT and the combination of EEM + CoPP/LPTS include non-infringing functionality. *Id.* ¶¶ 389–90. He then compares the relative value of the Accused Features' infringing and non-infringing functionalities. *Id.*; *see also* Rubin Reply Report ¶¶ 139–44.

For EPFT, Dr. Rubin noted that the feature's primary function closely maps the asserted patent claims, but that it can be configured to perform a non-infringing function. Specifically, EPFT's "only" non-infringing functionality is that it can be used "where a customer wants to perform a dry run of EPFT before implementing it." Rubin Report ¶ 389; Rubin Reply Report ¶ 140. This, however, would "highly restrict[] the overall functionality of EPFT." Rubin Reply Report ¶ 140. Additionally, Defendant "advertises using EPFT's full functionality." *Id.* In light

---

[8] Again, the Parties do not dispute that Mr. Bratic "relie[d] on Dr. Rubin's expert opinion." P Opp. at 21; *see also* Rubin Depo. at 212 (stating that he simply adopted the numbers). Thus, because Mr. Bratic's analysis depends on the validity of Dr. Rubin's analysis, in order for Mr. Bratic's analysis to stand, Dr. Rubin's figure must be "reliable."

of EPFT's infringing and non-infringing functionality, Dr. Rubin attributed 70% of EPFT's functionality to patented functionality. *Id.* ¶ 139. This "under-estimated" the non-infringing functionality to "err on the side of caution." *Id.* ¶ 140.

For the combination of EEM + CoPP/LPTS, Dr. Rubin noted that the combination has more non-infringing functionality than EPFT. Rubin Report ¶ 390. He listed the non-infringing ways that EEM works with CoPP/LPTS. *Id.* Based on the non-infringing and infringing uses, Dr. Rubin "conservatively" attributed at least 40% of the functionality provided by the combination of EEM and CoPP or LPTS to the patented functionality. *Id.*; *see also* Rubin Reply Report ¶ 142.

These apportionment percentages suffer from the same problems analyzed above. Dr. Rubin again failed to explain the methodology underlying his percentage calculations and again relied on vague assertions about the Accused Feature's value. *See, e.g.*, Rubin Reply Report ¶ 139 (determining EPFT's infringing functionality is "somewhat more than twice as valuable" as its non-infringing functionality); *Id.* ¶ 144 (finding that EEM with CoPP or LPTS's non-infringing functionality "slightly outweighs" its infringing functionality); *see also Open Text*, 2015 WL 349197 at *5 ("[A] superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks is not enough." (quotation marks and citation omitted); *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) ("[W]hile mathematical precision is not required, some explanation of both *why* and generally *to what extent* the particular factor impacts the royalty calculation is needed." (emphasis added)); *TASER Int'l, Inc. v. Karbon Arms, LLC*, 2013 WL 6773663, at *1 (D. Del. Dec. 19, 2013) ("[The expert] offers almost no basis as to how he arrived at his royalty rate other than that he considered the above numbers and factors. This is the quintessential *ipse dixit* justification.").

Plaintiff argues that Dr. Rubin properly apportioned the value of the accused features by "relative valuation." P Opp. at 22. As support, Plaintiff cites to *Mass Engineered Design, Inc. v. Planar Systems, Inc.*, 2018 WL 6059375, at *1 (D. Or. Nov. 19, 2018). This case, however, does not support Plaintiff's position. While the *Mass Engineered Design* court denied the plaintiff's

post-verdict motion to strike the expert declaration of Walter Bratic, the issues in *Mass Engineered Design* are different from the issues present in this case. 2018 WL 6059375, at *1. There, the defendant argued that Mr. Bratic failed to apportion damages to account for possible non-infringement. *Id.* at *2. In contrast, here, the issue is not that Mr. Bratic (or Dr. Rubin) failed to apportion non-infringing uses. Rather, the issue is whether the apportionment percentages are properly supported. *Cf. id.* at *3 (noting that Mr. Bratic supported his apportionment rate because he used technical weighing factors to apportion his royalty rate). Moreover, *Mass Engineered Design* discussed a *post-verdict* royalty calculation, and so there was no need to exclude unreliable expert testimony to protect the jury from being swayed by "dubious scientific testimony." *See id.* at *3 ("The challenged notions are not going to a jury.").

Because Dr. Rubin failed to provide the "methodology" underlying his apportionment amount or explain how he arrived at that figure based on the facts of this case, his apportionment opinion is not backed by "sufficient facts or data" or by "reliable principles and methods" and so his 70% EPFT and 40% Accused Combination apportionments, and all opinions relying on the figures, must be excluded.

### 2. Per-Unit Royalty

Mr. Bratic also calculated a royalty rate of $120-per-unit based on two earlier transactions where Plaintiff licensed PlexOS software to two banking institutions. Plaintiff alleges that PlexOS "embodied the Patents-in-Suit." P Opp. at 9; *see also* Rubin Report ¶ 381 ("Although Mr. Harlow's testimony and the documentary evidence I have reviewed are not sufficient for me to form an opinion on whether PlexOS as implemented by NetFuel fully practiced the patents-in-suit, the PlexOS technology is very closely related to the inventions disclosed in the patent.").

Plaintiff licensed PlexOS twice. The first license was to Bank of America, which received an implied license to PlexOS through a 2003 investment agreement and used PlexOS from 2004 to 2014. Dkt. 274-5 ("Bratic Report") ¶¶ 135–36. Bank of America did not pay Plaintiff a cash royalty for the license. *Id.* ¶ 136. The Bank did, however, provide Plaintiff important benefits

through the investment agreement, including an investment in NetFuel that made Bank of America a minority owner in NetFuel. *Id.* The license also gave Plaintiff the chance to test and ruggedize PlexOS in a commercial bank environment which was a "priceless" opportunity. *Id.*; *see also* Dkt. 276-8 ("Harlow Decl."), at 106 ("[T]he value of having a large bank . . . providing us access to infrastructure to install PlexOS on and run and use and abuse, that was priceless. Very few small companies get a chance to do that."). Ultimately, in 2014, Bank of America and Plaintiff reached an impasse concerning the terms for the Bank's continued use of PlexOS. Bank of America wanted to use the service royalty-free, but Plaintiff insisted that the bank pay for a license. Harlow Decl. at 107–08. ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████. *See generally* Dkt. 274-14 ("Settlement Agreement").

The second PlexOS license was to BNP-Paribas. Bratic Report ¶ 137. In 2008, Bank of America sold its prime brokerage business unit to BNP-Paribas. *Id.* In connection with this sale, Bank of America purchased 244 PlexOS licenses that it then transferred to BNP-Paribas. *Id.* Bank of America paid $1,000 per PlexOS license. *Id.* Additionally, Bank of America paid an 18% software maintenance fee. Thus, the sale resulted in total fees of $287,920 to Plaintiff. *Id.*

Based on these licenses (and other expert data), Mr. Bratic reached his offered rate of $120 per processor. To reach this rate, he applied two apportionment multipliers. First, he multiplied the $1000-per-license fee that was paid in the BNP-Paribas Agreement by 20%. *Id.* ¶ 139 (basing 20% apportionment rate on statements of inventor of the Patents-in-Suit). Second, he multiplied the $1000-per-license fee by 60%. *Id.* ¶ 144 (using 60% apportionment rate because of "Dr. Rubin's analysis). Defendant argues that Mr. Bratic's per-unit royalty opinions should be excluded because (1) his 20% reduction has no basis in fact, (2) his 60% reduction has no basis in fact, and (3) he did not account for the severe differences in economic circumstances. The Court addresses these arguments below.

**a. 20% Reduction**

In order to use the $1000 license fee as a basis for reasonable royalty damages, Mr. Bratic needed to determine what portion of the fee was attributable to Plaintiff's intellectual property. *See* Bratic Report ¶ 139 (discussing *Georgia-Pacific* factor number 1). To answer this question, Mr. Bratic used NetFuel's determination that 80% of the license fee, or royalty, represented the investment and time and effort to develop PlexOS and 20% represented the value of NetFuel's intellectual property. *Id.* The 20% figure came from NetFuel founders', Bjorn Ahlblad and James Harlow, determination "the 20% software maintenance fee initially agreed to by [Bank of America] represented the recurring maintenance of the intellectual property in the PlexOS software." *Id.* Indeed, when asked how this 20% number was determined, Mr. Bratic testified:

> [Jim Harlow] and [Bjorn Ahlblad] sat down and discussed how much development effort went into developing the PlexOS product. And they determined of that, 20% of the output, the work product, associated with PlexOS was the intellectual property embodied in PlexOS and 80% related to development—software development efforts. And they decided that if they were going to charge a maintenance fee, the maintenance fee would reflect a 20% of the— the 20% reflecting the intellectual property portion of the development efforts because the maintenance was to keep the intellectual property updated.

Dkt. 257-9 ("Bratic Depo."), at 128–29.

This analysis suffers from the same flaws discussed above—how did NetFuel's founders arrive at 20%? Why does the maintenance fee amount to 20%? Neither Mr. Bratic nor NetFuel's founders provide an explanation as to why the value of a "maintenance fee" is equivalent to the value of the "market contribution of NetFuel's intellectual property." *See* P Opp. at 11–12. Without *any* underlying "economic analysis to quantitatively support the [20%] apportionment," the figure is as good as "plucked out of thin air." *See LaserDynamics, Inc.*, 694 F.3d at 69; *GPNE Corp.*, 2014 WL 1494247 at *6. This case, much like *GPNE Corp.*, involves an expert valuing a royalty-rate based on "vague qualitative notions of the relative [value of the intellectual property]." *GPNE Corp.*, 2014 WL 1494247 at *6. Hence, contrary to Plaintiff's argument, cross-examination does not salvage Mr. Bratic's opinion because his opinion is based on

NetFuel's Founders' arbitrary determination that 20% of the fee was attributable to Plaintiff's intellectual property. P Opp. at 12; *cf. Fail-Safe*, 744 F. Supp. 2d at 888 ("[T]he court cannot simply take an expert's word for a specific proposition."). Accordingly, the 20% figure is excluded.

### b. 60% Reduction

For his second apportionment step, Mr. Bratic applied a percentage of 60% to the $1000-per-license fee detailed above. Bratic Report ¶ 144. To justify this number, Mr. Bratic relied on "Dr. Rubin's analysis." *Id.* Dr. Rubin told Mr. Bratic that "60% of the intellectual property in PlexOS was comparable to the Patents-in-Suit." Bratic Depo. ¶ 158. In his report, Dr. Rubin stated:

> Unlike the technology of the [] patents-in-suit, however, PlexOS is highly extensible and is operable with functionality that extends beyond what is claimed in the patents-in-suit, such as business process automation and workflow management. NETFL00001805 p. 9 (describing workflow management with the following example: "For example, . . . Tracy submits a paycheck request. Dave is then notified on his blackberry and can either approve or deny the request. Once approved, the request is queued in the payroll system."). PlexOS also provides agents and policies that extend beyond network management and into the area of enterprise resource management. *Id.* ("Custom agents engineered in-house or through a services organization might embody custom business logic . . . ."). Based on my analysis, *I conclude that the patented inventions represent 60% of the functionality or value of PlexOS.*

Rubin Report ¶ 382 (emphasis added). In his Reply Report, Dr. Rubin similarly stated:

> To reach my conclusion that the patented inventions represent 60% of the functionality or value of PlexOS, I first reviewed the patents-in-suit. Then I reviewed various documents and testimony describing PlexOS and its functionality I note above. In my review, I noted that PlexOS performed similar functions as the patented technology, but I also observed that PlexOS has the option to be extended beyond the limitations of the asserted patents to perform other tasks not related to monitoring a computer network. I understand that clients actually used PlexOS for these purposes. *Based on all of my experience and analysis, and the sources of information I have identified, and because the main default use-case for PlexOS is captured by the patents, I made the conservative determination that 60% of PlexOS represents the patented technology.* However, there are substantial uses—which I concluded constitute 40% of the value of PlexOS—that are not captured by the patents-in-suit.

United States District Court
Northern District of California

1   Rubin Reply Report ¶ 124 (emphasis added).

2       Dr. Rubin's analysis amounts to nothing more than plucking 60% out of thin air. *See*

3   *LaserDynamics*, 694 F.3d at 69; *see also* D Reply at 6 (noting that even while Mr. Bratic was

4   unable to determine if PlexOS as implemented by Plaintiff fully practiced the patents-in-suit, he

5   was able to determine that the patented inventions represented 60% of the value of PlexOS

6   intellectual property). He ascribes a value of 60% without providing an analysis as to why he

7   picked that percentage or the methodology behind the percentage. *See GPNE Corp.*, 2014 WL

8   1494247 at *4–6 (noting that the failure to "follow [any] discernable methodology" is "classic *ipse*

9   *dixit* reasoning").

10      Indeed, when pressed during his deposition, Dr. Rubin could not explain *why* he selected

11  60%. Rubin Depo. at 205 ("Well, the features that I saw that were in PlexOS that were not

12  covered by the patents-in-suit were a small number of features, and so 50 percent would not have

13  made sense because there was more than 50 percent attributable to the patents-in-suit."). His

14  deposition answer, of course, begs the question, why not 59% or 62%? Notably, he "didn't

15  perform a further analysis to see if it [sh]ould be a different number." *Id.* at 215; *see also id.* at

16  205–06 (stating that he "didn't provide a deep analysis" as to why the non-patented inventions

17  amounted to 40%). And, when asked how much value or weight he attributed to specific PlexOS

18  features, he admitted, "I didn't specifically assign a weight or a value to any feature in—explicitly

19  in my report, but I did weigh them in my consideration by applying my familiarity with the

20  technology with the Patents-In-Suit and with PlexOS as part of my analysis." *Id.* at 218. Mr.

21  Bratic's generic descriptions of PlexOS's features do not tie his 60% figure to the facts of the case

22  and, without appropriate support, the jury cannot weigh the value of his opinion. *See GPNE*

23  *Corp.*, 2014 WL 1494247 at *6. Accordingly, the 60% figure is excluded.[9]

24

---

25  [9] Plaintiff argues Defendant "invents" a new quantitative standard. P Opp. at 15–16; *see also*
    *supra* III.B.1.a. Plaintiff misunderstands Defendant's argument. The Federal Circuit and courts in
26  this district have made it clear that percentages may not be "plucked out of thin air." The
    complete absence of *what methodology* underlies Mr. Bratic and Dr. Rubin's selection of
27  percentage values shows the figures are "arbitrary" and thus unreliable. Accordingly, it is

28  ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S
    MOTION TO STRIKE

### c. Accounting for Technological and Economic Differences

Defendant last argues that Mr. Bratic failed to account for the economic differences between the licenses. D Reply at 7. Mr. Bratic used the royalties received by Plaintiff from existing licenses as the basis for predicting the outcome of a hypothetical negotiation between the Parties. As noted above, the licenses that Mr. Bratic based his analysis on involved PlexOS software and not the Patents-in-Suit. *See supra* III.B.2.

Expert testimony based on license agreements "must provide a jury enough information to "evaluat[e] the probative value of those agreements," lest the jury be given "little more than a recitation of royalty numbers" to determine the outcome of a particular hypothetical negotiation. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 794328, at *8 (N.D. Cal. Feb. 25, 2014) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328–29 (Fed. Cir. 2009)). Thus, under the first *Georgia-Pacific* factor, when relying on a transaction that involves "technologies *other* than the patent in suit," the expert "must account for 'the technological and economic differences' between them." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010); *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010); *see also DataQuill Ltd. v. High Tech Comput. Corp.*, 887 F. Supp. 2d 999, 1023 (S.D. Cal. 2011) ("[Plaintiff's expert's] report appears to have no analysis at all of the economic differences . . . . Therefore, [the expert] has failed to establish economic comparability and his testimony regarding the [prior] agreements should be excluded . . . .").

Because the BNP transaction involves PlexOS, *i.e.* a technology that differs than the Patents-in-Suit, the Court must decide whether Mr. Bratic properly accounted for the technological and economic differences between the two licenses. Defendant argues that Mr. Bratic failed to address how the following fundamental economic differences affect the royalty rate:

(1) The differences between the sale of a software license to use PlexOS and a non-exclusive

---

irrelevant that it is clear *how* the percentages are applied because it is unclear how those same percentages were selected. *See* P Opp. at 16.

license to patents;

(2) The differences between licensing to Bank of America or BNP rather than Defendant, who, in contrast to the banks, is a networking product company that licenses patents for the rights to make, use, offer for sale, or import what the patent covers;

(3) The differences between licensing to companies who Plaintiff had pre-existing, ongoing relationships with, and Defendant, who Plaintiff had no relationship with; and

(4) The differences between giving Bank of America an "implied license" to use PlexOS software at no cost. D Mot. at 21–22.

Plaintiff contends that Mr. Bratic properly noted the "multiple differences" between the PlexOS licensing scenario in his hypothetical negotiation *and* factored those differences into the royalty rate. P Opp. at 14. The Court disagrees. After reviewing Mr. Bratic's report (specifically the paragraphs that Plaintiff directs the Court to), it is clear that even while Mr. Bratic notes the differing circumstances, he never explains how the differences are reflected in his royalty rate. *See* Bratic Report ¶¶ 135–45. Indeed, his only reductions are to account for the alleged value of Plaintiff's "intellectual property" (20%) and the portion of it that is "comparable to the patents-in-suit" (60%). *See id.* ¶¶ 139, 144; *see also supra* (discussing those apportionment percentages). This is confirmed by paragraph 145 of Mr. Bratic's report, which states "*Georgia-Pacific* Factor No. 1 indicates that the royalty rate per unit for a license to the Patents-in-Suit is $120 per single processor." Bratic Report ¶ 145. The $120 per processor figure was derived from multiplying the $1000-per-license fee by 20% and 60%. *See id.* at 47 n.284. Thus, only the percentages, and not the economic differences, were factored into the per-unit royalty calculation.

Accordingly, because Mr. Bratic failed to account for the "economic differences," between the BNP Agreement and the hypothetical license negotiation, he has not shown that the BNP agreement is sufficiently comparable.[10] *ResQNet.com, Inc.*, 594 F.3d at 873. Without some

---

[10] Defendant also argues that Mr. Bratic failed to address the technological differences between PlexOS and the Patents-in-Suit. D Mot. at 22. The Court does not reach this argument as it finds that Mr. Bratic failed to address the economic differences. *See ResQNet.com, Inc.*, 594 F.3d at

showing that the economic differences were accounted for, Mr. Bratic's use of the BNP agreement

to calculate his damages amount is "unreliable, irrelevant, and unhelpful to the jury's task of

evaluating the result of the hypothetical negotiation." *Apple, Inc.*, 2014 WL 794328 at *11.  The

Court thus excludes it.

### C.  Leave to Serve a Supplemental Damages Report

Plaintiff requests leave to serve a supplemental damages report to correct the deficiencies

identified in this Court's order.  The Court declines this request.  Allowing a "second bite" can

encourage "overreaching on the first bite." *Network Prot. Sciences, LLC v. Fortinet, Inc.*, 2013

WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013).  A second bite is thus only appropriate where the

expert report can be salvaged with "minimal disruption to an orderly trial." *Id.*  Where, however,

the report is "not even close," there is a need to deny a second bite so as to "encourage candor in

the first place. *Id.*; *see also Unwired Planet, LLC v. Apple Inc.*, 2017 WL 589195, at *1 (N.D.

Cal. Feb. 14, 2017) ("But where the initial effort misses the mark so badly, it would be

inappropriate to incentivize overreaching by allowing a second attempt.").

The Parties already have a trial date, which the Court and the Parties have built their

calendars around.  Mr. Bratic and Dr. Rubin have had multiple opportunities to submit sufficient

testimony.  Yet, they have failed to cure their deficient testimony.  *See Unwired Planet*, 2017 WL

589195 at *1.  Moreover, because of the sheer volume of deficiencies, Plaintiff would have to

advance new theories and methodologies.  Defendant, who has already invested substantial time,

money, and effort into defending against Plaintiff's experts, would be prejudiced by this.  Not to

mention, Defendant's expert already highlighted the deficiencies for Plaintiff's experts, which

means Plaintiff's experts submitted reply reports believing they cured any deficiencies.  Plaintiff

failed to cure its own overreaching and will not be allowed a second bite at the apple.  *Network*

*Prot. Sciences, LLC*, 2013 WL 5402089 at *9.  Accordingly, the request for leave to serve a

United States District Court
Northern District of California

---

873 (requiring the expert account for the "technological *and* economic differences" between
licenses) (emphasis added).

Case No.: 5:18-cv-02352-EJD

ORDER DENYING PLAINTIFF'S MOTION TO STRIKE; GRANTING DEFENDANT'S
MOTION TO STRIKE

supplemental damages report is **DENIED.**

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion to exclude portions of Dr. Almeroth's testimony and **GRANTS** Defendant's motion to exclude portions of Mr. Bratic's report. The following paragraphs shall be struck from Mr. Bratic's report:

- Mr. Bratic's per-unit royalty calculations based on the BNP Agreement: Paragraphs 11, 135–45, 207–11, 217 of Mr. Bratic's Expert Report (Dkt. 257-8), Paragraphs 11–12, 15 of Mr. Bratic's Supplement Report (Dkt. 257-6), and Paragraphs 70–76 of Mr. Bratic's Corrected Reply Report (Dkt. 257-7).

  - Dr. Rubin's opinion, which Mr. Bratic relies on, that the patented inventions represent 60% of the functionality or value of PlexOS: Paragraph 382 of Dr. Rubin Expert Report (Dkt. 257-10) and Paragraphs 121–24 of Dr. Rubin's Reply Report (Dkt. 257-11).

- Mr. Bratic's profit apportionment analysis based on Dr. Rubin's calculations: Paragraphs 11, 297–203, 205–06, 212–17 of Mr. Bratic's Expert Report (Dkt. 257-8), Paragraphs 9–10, 13–15 of Mr. Bratic's Supplement Report (Dkt. 257-6), and Paragraph 2 of Mr. Bratic's Corrected Reply Report (Dkt. 257-7).

  - Dr. Rubin's opinion, which Mr. Bratic relies on that 33% of the profits allegedly represent the "contribution of security, reliability, and availability to the Accused Operating Systems." Paragraphs 383–86 of Dr. Rubin's Expert Report (Dkt. 257-10) and Paragraphs 133–34 of Dr. Rubin's Reply Report (Dkt. 257-11).

  - Dr. Rubin's opinion, which Mr. Bratic relies upon that 33% and 50% of the value of all security, reliability, and availability features on the Accused Devices are attributable to EPFT and the combination of EEM and CoPP/LPTS, respectively. Paragraphs 387–88 of Dr. Rubin's Expert Report (Dkt. 257-10) and Paragraphs 135–36 of Dr. Rubin's Reply Report (Dkt. 257-11).

o   Dr. Rubin's opinion, which Mr. Bratic relies upon that 70% and 40% of EPFT and the combination of EEM and CoPP/LPTS, respectively, is allegedly attributable to the Patents-in-Suit.  Paragraphs 389–90 of Dr. Rubin's Expert Report (Dkt. 257-10) and Paragraphs 138–44 of Dr. Rubin's Reply Report (Dkt. 257-11).

**IT IS SO ORDERED.**

Dated: March 10, 2020

EDWARD J. DAVILA
United States District Judge