Sarah E. Piepmeier (SBN 227094)
Elise S. Edlin (SBN 293756)
May Eaton (SBN 298123)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
spiepmeier@perkinscoie.com
eedlin@perkinscoie.com
mayeaton@perkinscoie.com
Telephone: (415) 344-7000
Facsimile: (415) 344-7050

*Attorneys for Defendant Cisco Systems, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| NETFUEL, INC.,<br><br>       *Plaintiff,*<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>       *Defendant.* | CASE NO. 5:18-cv-2352-EJD (NMC)<br><br>**DEFENDANT CISCO SYSTEMS, INC.'S NOTICE OF MOTION AND MOTION TO STRIKE PLAINTIFF NETFUEL, INC.'S SUPPLEMENTAL DAMAGES CONTENTIONS AND INTERROGATORY RESPONSES**<br><br>Judge:    Hon. Edward J. Davila<br>Hearing: July 16, 2020<br>Time:    9:00 a.m. |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   RELEVANT FACTS ........................................................................................... 2

III.  LEGAL STANDARDS ....................................................................................... 5

IV.   NETFUEL'S SUPPLEMENTAL DISCLOSURES INTRODUCE MATERIALLY
      NEW DAMAGES THEORIES AND FACTUAL ALLEGATIONS ..................... 7

      A.    NetFuel Seeks to Add New and Stricken PlexOS-Based Reasonable-Royalty
            Theories.................................................................................................... 8

      B.    NetFuel's Supplemental Disclosures Include Technical Details Regarding
            PlexOS That It Previously Refused to Produce to Cisco ........................... 12

      C.    NetFuel Seeks to Add New and Stricken Apportionment Theories ........................ 14

V.    NETFUEL'S UNTIMELY DISCLOSURES MUST BE EXCLUDED BECAUSE
      THEY ARE NEITHER SUBSTANTIALLY JUSTIFIED NOR HARMLESS ................. 16

      A.    NetFuel's Supplemental Disclosures Are Not "Substantially Justified" ................. 16

      B.    NetFuel's Supplemental Disclosures Are Not "Harmless" ....................... 18

VI.   ATTORNEYS' FEES ARE WITHIN THE COURT'S DISCRETION .............................. 21

VII.  CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adobe Sys. Inc. v. Wowza Media Sys.*,
  No. 11-cv-02243-JST, 2014 WL 709865 (N.D. Cal. Feb. 23, 2014) ............................................19

*Apple, Inc. v. Samsung Elecs. Co.*,
  No. 11-CV-01846-LHK, 2012 WL 3155574 (N.D. Cal. Aug. 2, 2012)......................6, 16, 18, 19

*Apple Inc. v. Samsung Elecs. Co.*,
  No. C 11-1846 LHK (PSG), 2012 WL 2499929 (N.D. Cal. June 27, 2012)..................................5

*Asia Vital Components Co. v. Asetek Danmark A/S*,
  377 F. Supp. 3d 990 (N.D. Cal. 2019) .............................................................................7, 16, 23

*Bernstein v. Virgin Am., Inc.*,
  No. 15-CV-02277-JST, 2018 WL 6199679 (N.D. Cal. Nov. 28, 2018)......................................16

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)......................................................................................................................22

*Davis v. Elec. Arts Inc.*,
  No. 10-CV-03328-RS (DMR), 2018 WL 1609289 (N.D. Cal. Apr. 3, 2018) ............................16

*Fink v. Gomez*,
  239 F.3d 989 (9th Cir. 2001) ......................................................................................................22

*Golden Bridge Tech. Inc. v. Apple, Inc.*,
  No. 12-cv-04882-PSG, 2014 WL 1928977 (N.D. Cal. May 14, 2014) .........................................7

*Goodman v. Staples the Office Superstore, LLC*,
  644 F.3d 817 (9th Cir. 2011) ........................................................................................................6

*Goodyear Tire & Rubber Co. v. Haeger*,
  137 S. Ct. 1178 (2017) ................................................................................................................22

*Liew v. Breen*,
  640 F.2d 1046 (9th Cir. 1981) .....................................................................................................21

*Link v. Wabash R. Co.*,
  370 U.S. 626 (1962).....................................................................................................................22

*Looksmart Grp., Inc. v. Microsoft Corp.*,
  386 F. Supp. 3d 1222 (N.D. Cal. June 28, 2019)............................................................5, 6, 7, 21

*Mass Probiotics, Inc. v. Aseptic Tech., LLC*,
  No. SA CV 16-1394-DOC, 2017 WL 10621233 (C.D. Cal. Dec. 21, 2017) ..............................18

*MLC Intellectual Prop., LLC v. Micron Tech., Inc.*,
  No. 14-cv-03657-SI, 2019 WL 2863585 (N.D. Cal. July 2, 2019) ...............................................5

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
   467 F.3d 1355 (Fed. Cir. 2006)........................................................................6

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) .........................................................................16

*Oracle USA, Inc. v. SAP AG*,
   264 F.R.D. 541 (N.D. Cal. 2009).....................................................................6

*Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia De P.R.*,
   248 F.3d 29 (1st Cir. 2001)..............................................................................7

*Torres v. City of Los Angeles*,
   548 F.3d 1197 (9th Cir. 2008) ....................................................................7, 16

*Woods v. DeAngelo Marine Exhaust, Inc.*,
   692 F.3d 1272 (Fed. Cir. 2012)......................................................................23

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
   259 F.3d 1101 (9th Cir. 2001) ....................................................7, 16, 18, 21

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ......................................................................6, 12, 16, 23

Fed. R. Civ. P. 37 ................................................................................. passim

Local Rule 3-8.......................................................................................2, 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on July 16, 2020 at 9:00 a.m., or as soon thereafter as it may be heard before the Honorable Edward J. Davila, Defendant Cisco Systems, Inc. ("Cisco") moves this Court to strike Plaintiff NetFuel, Inc.'s Second Supplemental Damages Contentions and Second Supplemental Responses to Interrogatory Nos. 10, 15, and 20 (collectively, the "Supplemental Disclosures"), served on May 1, 2020.

## STATEMENT OF RELIEF REQUESTED

This Motion to Strike seeks entry of an order striking NetFuel's May 1, 2020 Supplemental Disclosures in their entirety.  The Motion is based on the following Memorandum of Points and Authorities, the Declaration of May Eaton, all pleadings and papers on file, argument of counsel in person or by remote means, and any other matters that may properly come before the Court for its consideration.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On May 1, 2020, NetFuel served Supplemental Disclosures, which contain fourteen pages of new damages theories and factual allegations that did not appear in NetFuel's previously supplemented contentions or discovery responses.  NetFuel served these new Supplemental Disclosures seven months after the close of fact discovery and five months after the close of expert discovery, apparently in response to the Court's Order excluding unreliable damages theories from its expert reports.  Not only does NetFuel present new theories regarding reasonable royalty and apportionment calculations, but it also seeks to rely on evidence that it disavowed and refused to produce in discovery, as well as theories that this Court struck from Mr. Bratic and Dr. Rubin's reports as unreliable.  Having lost the motion to exclude such theories, and its later motion seeking reconsideration, NetFuel now seeks to "backdoor" the same theories and evidence in through its fact witnesses.  NetFuel should not be allowed to circumvent this Court's exclusion Order by repackaging its stricken expert testimony as "supplemental" contentions and discovery responses.  With all fact and expert depositions having concluded long ago, and trial imminently approaching, there is no means by which the serious

prejudice these new disclosures pose to Cisco could be mitigated.  Cisco thus respectfully requests that the Court strike NetFuel's Supplemental Disclosures and award Cisco its reasonable fees incurred in having to bring this motion.

## II.    RELEVANT FACTS

Over eighteen months ago, on October 16, 2018, Cisco served Interrogatory No. 10 to better understand the scope of NetFuel's contention that its PlexOS product practiced the patents-in-suit, as NetFuel contended in its July 30, 2018 Response to Cisco's Interrogatory No. 2 ("NetFuel first licensed software embodying the inventions (called PlexOS) for use to Bank of America in or about August 2003."):

> Identify, for each asserted claim limitation, as numbered in NetFuel's Amended Disclosure of Asserted Claims and Infringement Contentions served on September 4, 2018, that you contend was practiced by PlexOS, the specific functionality in PlexOS you contend satisfies the limitation and all documents supporting your contention.

Eaton Decl., ¶ 4; *id.*, Ex. 6 (NetFuel's 11/15/2018 Resp. Interrog. No. 10); *id.* Ex. 3 (NetFuel's 7/30/18 Resp. Interrog. No. 2).  Despite multiple meet and confers by phone and in writing, NetFuel refused to substantively respond to this interrogatory through the close of fact discovery on October 3, 2019. *Id.* at Ex. 6 (NetFuel's 11/15/2018 Resp. Interrog. No. 10); *see also* Eaton Decl., Ex. 4 (3/21/2019 Eaton Letter) at 4–5.  Cisco only refrained from filing a motion to compel on this Interrogatory because NetFuel disavowed all use of PlexOS: "This will ***confirm that NetFuel is not relying in this litigation on any contention that PlexOS or any other NetFuel product practiced or practices the asserted claims of either the '730 or '659 patent***."  Eaton Decl., Ex. 5 (8/19/19 Seigel Email to Cutri) (emphasis added).

On November 6, 2018, NetFuel served its Preliminary Damages Contentions.  *See* Eaton Decl., Ex. 13 (NetFuel's Prelim. Damages Contentions).  These contentions did not include a damages estimate or any factors relating to apportionment, and they included just seven sentences for *Georgia-Pacific* Factor No. 1 regarding received royalties.  *See id.*  Cisco requested that NetFuel supplement its deficient contentions, including in a November 21, 2018 letter that explained how and why they did not comply with Patent Local Rule 3-8.  *See id.*, Ex. 7 (11/21/18 Kang Letter to NetFuel).  NetFuel

refused to supplement these contentions. *See id.*, ¶ 5.

On July 24, 2019, Cisco tried another approach and served Interrogatory Nos. 15 and 20 to discover damages information not provided in NetFuel's deficient damages contentions well before the close of fact discovery. *See* Eaton Decl., ¶ 6. Interrogatory No. 15 asks for the bases of NetFuel's contentions regarding comparable licenses:

> If You contend You are entitled to a reasonable royalty as a result of Cisco's alleged infringement of any of the Asserted Patents, for each such patent, identify any and all licenses You contend are comparable licenses or relate to comparable technology, or are licenses that otherwise are relevant in any way to your calculation of a royalty rate and/or royalty base in this Action, including identifying such licenses by Bates number or by date and title or identifying information.

Eaton Decl., Ex. 8 (NetFuel's 8/23/2019 Resp. to Interrog. Nos. 15, 20). In its response, NetFuel identified six documents solely by bates number and provided no narrative response other than objections. *Id.* at 5–7. Cisco also directed Interrogatory No. 20 to NetFuel's apportionment theories:

> Identify and explain all factual and legal bases for any contentions by NetFuel regarding apportionment of damages in this Action, including how NetFuel's contentions regarding entitlement to damages in the form of a reasonable royalty allegedly satisfy all applicable requirements related to apportionment.

*Id.* NetFuel objected to this Interrogatory as premature, and instead of providing the requested narrative response, simply referenced its forthcoming expert report and referred Cisco to NetFuel's November 16, 2018 Preliminary Damages Contentions, which it contended "disclose[] NetFuel's contentions concerning its entitlement to a reasonable royalty." *Id.* at 14–15.

The Court originally set August 23, 2019 as the deadline for fact discovery. *See* Dkt. 34 (7/11/2018 Scheduling Order). In the parties' July 31, 2019 Joint Case Management Statement, Cisco requested that the Court extend the fact-discovery cutoff by two months in order to accommodate additional fact discovery necessitated by NetFuel's addition of new infringement theories. *See* Dkt. 146 (7/31/2019 Joint Case Management Statement), 4–8. In that Statement, NetFuel opposed "any extension to the fact-discovery cutoff, and adamantly oppose[d] Cisco's proposed extension of fact discovery by two months, which would require extending the entire case schedule." *Id.* at 1. The

Court extended the fact-discovery cutoff to October 3, 2019. *See* Dkt. 152 (8/1/2019 Scheduling Order).

On October 3, 2019, the last day of fact discovery, NetFuel served its First Supplemental Damages Contentions and Supplemental Responses to Cisco's Interrogatory Nos. 10, 15, and 20 (among others).  In its supplemental response to Interrogatory No. 15 (comparable licenses), NetFuel only identified seven documents, including expert reports, expert deposition transcripts, and a settlement agreement, which were all from a separate case between Cisco and an unrelated party. Eaton Decl., ¶ 6; *id.* at Ex. 8 (NetFuel's 8/23/2019 Resp. to Interrog. Nos.15, 20).  In its supplemental response to Interrogatory No. 20 (apportionment), NetFuel referenced its First Supplemental Damages Contentions, a number of documents, expert reports, and deposition transcripts from that unrelated case, but provided no explanation of any relevance to a purported theory of apportionment in this case. *Id.*  At this point, when the parties had completed all fact witness depositions and opening expert reports were three weeks away, Cisco decided not to move on deficiencies in these responses because the motion would likely be heard after NetFuel's expert reports were served.[1]

Both parties served their three rounds of technical and damages expert reports by December 5, 2019.  Expert discovery closed on December 20, 2019.  *See* Dkt. 34. Cisco deposed NetFuel's damages expert, Mr. Walter Bratic, on December 19, 2019 and NetFuel's validity and infringement expert, Dr. Aviel Rubin, on December 16, 2019 and December 17, 2019.  Eaton Decl., ¶ 7.  NetFuel declined to depose Cisco's damages expert, Dr. Greg Leonard.  *Id.*

On March 10, 2020, the Court granted Cisco's Motion to Exclude Expert Testimony by Mr. Walter Bratic and Dr. Aviel Rubin.  Dkt. 293 (3/10/2020 Order).  Two weeks later, NetFuel moved for leave to file a motion for reconsideration of the Court's Order excluding the testimony of Mr.

---

[1]    Cisco could have moved to exclude large portions of NetFuel's damages and technical expert reports because the opinions went far beyond what NetFuel disclosed during discovery—including opinions related to information NetFuel steadfastly refused to produce during discovery.  In an attempt to streamline the issues before the Court and to respect the *Daubert* page limits, Cisco ultimately moved to exclude under Rules 702 and 703 and *Daubert* instead of moving on both grounds.

1   Bratic and Dr. Rubin.  Dkt. 304 (3/24/2020 Mot. for Reconsideration).  The next day, the Court denied

2   this request, noting that NetFuel's request is problematic because it "ignores the unfair burden this

3   would place on Defendant" Cisco and "does not address the Court's fear that allowing supplemental

4   briefing would give Plaintiff a 'second bite at the apple.'"  Dkt. 305 (3/25/2020 Order), 3.

5          On May 1, 2020, NetFuel served Second Supplemental Damages Contentions and Second

6   Supplemental Responses to Cisco's Interrogatory Nos. 10, 15, and 20.  In each of its interrogatory

7   responses, NetFuel incorporated its Second Supplemental Damages Contentions.  That same week,

8   Cisco asked NetFuel to withdraw these untimely and prejudicial disclosures, which were not

9   substantially justified or harmless, provided legal authority, and noted that Cisco intended to move for

10  fees if NetFuel refused.  Eaton Decl., Ex. 15 (5/6/2020 Piepmeier Letter to NetFuel).  At NetFuel's

11  request, the parties engaged in a further meet and confer process via email and telephone, but NetFuel

12  still refused to withdraw its Supplemental Disclosures.  Eaton Decl., ¶ 8.  On May 26, 2020, the parties

13  confirmed that they were at an impasse.  *Id.*

14  **III.   LEGAL STANDARDS**

15         Patent Local Rule 3-8 requires a patentee to "[i]dentify … its theories of recovery, factual

16  support for those theories, and computations of damages within each category, including: …

17  reasonable royalty."  Pat. L.R. 3-8(a).  Damages contentions "inform the parties and the court on issues

18  of relevance and proportionality, and also to create a potential opportunity for meaningful settlement

19  discussions."  *Looksmart Grp., Inc. v. Microsoft Corp.*, 386 F. Supp. 3d 1222, 1229 (N.D. Cal. June

20  28, 2019) (internal quotation marks and citation omitted).  And while a party does not have to disclose

21  its expert opinions during fact discovery, it must supply the factual bases for its damages claims.  *See*

22  *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, No. 14-cv-03657-SI, 2019 WL 2863585, at *15

23  (N.D. Cal. July 2, 2019) ("[W]hile MLC was not required to disclose its expert opinions during fact

24  discovery, MLC was still required to disclose the factual basis for its reasonable royalty claim.").

25  Damages contentions thus serve a vital role in fact discovery: "[O]nly when the patent local rules

26  requiring contentions kick in, or contention interrogatory responses are served, can parties begin to

27  understand the particulars of their adversary's case."  *Apple Inc. v. Samsung Elecs. Co.*, No. C 11-

28  1846 LHK (PSG), 2012 WL 2499929, at *1 (N.D. Cal. June 27, 2012).  The Northern District of

California has affirmed that there is an ongoing duty to update damages contentions prior to expert reports. *Looksmart*, 386 F. Supp. 3d at 1228 ("Looksmart's position is that the Patent Local Rules replaced this ongoing duty to supplement damages contentions with a scheme under which a party discloses the required damages information at a fixed point in time and then has no obligation to update that disclosure until serving an expert report. The Court disagrees."). "If parties know that damages contentions may bear no relation to a party's ultimate theories and thus become stale immediately upon service, the Court fails to see how their disclosure effectively serves any of the above purposes." *Id.* (citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006)).

Federal Rule of Civil Procedure 26(e), in turn, requires that all parties supplement or correct their disclosures and responses to discovery requests disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect…" Fed. R. Civ. P. 26(e)(1). "The parties are expected to supplement and/or correct their disclosures promptly when required under that Rule, without the need for a request from opposing counsel or an order from the Court." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3155574, at *4 (N.D. Cal. Aug. 2, 2012) (citing *Oracle USA, Inc. v. SAP AG,* 264 F.R.D. 541, 544 (N.D. Cal. 2009)). Notably, "[a] party is not excused from making its disclosures because it has not fully investigated the case." Fed. R. Civ. P. 26(a)(1)(E). This duty applies to damages contentions, as well: Rule 26(e) "imposes a duty to supplement or amend damages contentions when a party's damages theory shifts '***in some material respect***.'" *Looksmart*, 386 F. Supp. 3d at 1227 (quoting Fed. R. Civ. P. 26(e)(1)(A)) (emphasis added).

The consequences of a party's failure to comply with the obligations of Rule 26 are unequivocal: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party ***is not allowed to use that information*** or witness to supply evidence on a motion, at a hearing, or at a trial, ***unless the failure was substantially justified or is harmless***." Fed. R. Civ. P. 37(c)(1) (emphasis added). Rule 37 thus "gives teeth to Rule 26's disclosure requirements by forbidding the use at trial of any information that is not properly disclosed." *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (internal quotation marks and citation omitted). Further, "Rule 37(c)(1) thus ***requires exclusion*** unless the offending party carries its burden

'to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless.'" *Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1002 (N.D. Cal. 2019) (quoting *Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008)) (emphasis added). "The Advisory Committee Notes describe [Rule 37] as a 'self-executing,' 'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material[.]'" *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105–06 (9th Cir. 2001) (quoting Fed. R. Civ. P. 37 advisory committee's note (1993)).

"A party aggrieved by an untimely amendment to damages contentions, or an expert report that exceeds their scope, may therefore move to strike the offending material under those rules." *Looksmart*, 386 F. Supp. 3d at 1232 (citing *Asia Vital*, 377 F. Supp. 3d at 1003–06). Further, "[a] party that plays fast and loose with its damages theories risks having its whole theory struck, as well as additional sanctions." *Id.* at 1232 (citing Fed. R. Civ. P. 37(c)(1)). In fact, "[c]ourts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded." *Yeti by Molly, Ltd.*, 259 F.3d at 1105–06 (citing *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia De P.R.*, 248 F.3d 29, 35 (1st Cir. 2001) ("although the exclusion of an expert would prevent plaintiff from making out a case and was 'a harsh sanction to be sure,' it was 'nevertheless within the wide latitude of' Rule 37(c)(1)")). *Id.* at 1106.

## IV.   NETFUEL'S SUPPLEMENTAL DISCLOSURES INTRODUCE MATERIALLY NEW DAMAGES THEORIES AND FACTUAL ALLEGATIONS

NetFuel's Supplemental Disclosures introduce damages theories and underlying factual allegations that differ materially from what NetFuel disclosed during discovery. The Northern District of California does not narrowly interpret what constitutes an incomplete or incorrect response "in some material respect," but rather decries the idea that only "categories" of damages are material under the Rule. *See Looksmart*, 386 F. Supp. 3d at 1233. The Northern District also recognizes that, "[a]t the very least, a party's damages contentions must disclose the basis for its expert's specific theory of recovery." *Id.* (citing *Golden Bridge Tech. Inc. v. Apple, Inc.*, No. 12-cv-04882-PSG, 2014 WL 1928977, at *3 (N.D. Cal. May 14, 2014) (asking whether "the expert has permissibly specified the application of a disclosed theory, or has . . . impermissibly substituted a new theory altogether"). NetFuel's Supplemental Disclosures include over fourteen pages of new or changed damages theories

and factual allegations, including new theories about the alleged technical and economic comparability of the PlexOS software license and alleged apportionment of the PlexOS software license, apportionment of Cisco's gross profits, non-infringing alternatives (Supplemental Disclosures, ¶ 77), willfulness (*id.*, ¶ 61), the patents' expiration date (*id.*, ¶ 67), convoyed sales (*id.*, ¶¶ 65–66), the purported benefits of the invention (*id.*, ¶ 78), and *Georgia-Pacific* Factors 1, 2, 4, 5, 7, 8, 10, 11, and 13-15.  It is indisputable that NetFuel's Supplemental Disclosures—which are double the length of the supplemental disclosures it served on the last day of fact discovery—introduce theories and factual allegations wholly absent from its earlier disclosures.  But even setting aside the volume, these new theories are material and far too late.

### A.    NetFuel Seeks to Add New and Stricken PlexOS-Based Reasonable-Royalty Theories

NetFuel's Preliminary and First Supplemental Damages Contentions contained only scant reference to PlexOS, NetFuel's now defunct product, and no express mention of the purported 2008 software license to BNP Paribas.  *See* Eaton Decl., Ex. 13 (NetFuel's Prelim. Damages Contentions); *id.*, Ex. 14 (NetFuel's 10/3/2019 First Suppl. Damages Contentions).  Likewise, NetFuel's First Supplemental Response to Interrogatory No. 15 regarding reasonable royalties identified six documents solely by their Bates numbers with no narrative description, including documents concerning Bank of America, but did not describe or reference any description of a theory of recovery based on the purported 2008 license to BNP Paribas.  *See id.*, ¶ 6.  By contrast, months after expert reports and *Daubert*, NetFuel's proposed second supplement now adds thirty-two entirely new paragraphs of previously undisclosed technical analysis regarding the purported "Technical Comparability of PlexOS and the Patents-in-Suit" (Supplemental Disclosures, ¶¶ 12–43); six entirely new paragraphs regarding purported "Economic Comparability of PlexOS and the Patents-in-Suit" (*id.*, ¶¶ 44–49); and seven entirely new paragraphs regarding "Apportioning the PlexOS License." *Id.*, ¶¶ 50–56.  All of these new disclosures, which now *expand NetFuel's contentions regarding per-unit reasonable royalties from a half page to twelve pages*, rely on information that was available to NetFuel during discovery, if not before the Complaint was filed.  *See id.*, Ex. 1 (NetFuel's 5/1/2020 Redline Second Suppl. Damages Contentions), ¶¶ 11–56.  Moreover, NetFuel withheld these

1    disclosures during fact discovery.

2          For example, NetFuel purports to add two new theories regarding purported "Apportioning the

3    PlexOS License," neither of which has ever been disclosed before, the first regarding apportionment

4    based on hours spent (¶¶ 52–53), the second regarding apportionment based on money invested (¶54):

5          52. As another example, a jury may apportion the PlexOS license by comparing NetFuel's time

6          invested in developing PlexOS to Mr. Harlow's time in conceiving and developing the

7          inventions claimed in the Patents-in-Suit. PlexOS was a renamed and redeployed version of an

           earlier NetFuel software called Cichlid, which NetFuel began developing in October 2000. The

8          version of PlexOS licensed to BNP Paribas in 2008 was completed in June 2008. From October

9          2000 until June 2008, NetFuel invested approximately 38 man-years (or 76,000 hours) into

10         developing PlexOS: 2,000 hours in 2000; 40,000 hours in 2001; 6,000 hours each in 2002, 2003,

           2004, and 2005; 4,000 hours in 2006; 4,000 hours in 2007; and 2,000 hours in 2008.

11
           53. Between October 1999 and June 2002, the inventor of the patented inventions (James
12
           Harlow) devoted approximately 3,800 hours to conceiving and developing the inventions
13
           patented in the '730 Patent. Mr. Harlow devoted approximately an additional 1,040 hours from
14         March to October, 2012 developing the inventions patented in the '659 Patent.

15         54. As another example, a jury may apportion the PlexOS license by comparing the financial

16         investment in developing PlexOS to the financial investment in developing the patented

17         inventions. From October 2000 to December 2001, NetFuel spent approximately $3 million to

           develop PlexOS. That $3 million came from NetFuel's Series A investors and is described in

18         various NetFuel and Bank of America documents. See, e.g., NETFL00001029;

19         NETFL00004619. From January 2002 to June 2008, NetFuel spent approximately $200,000 per

           year to continue developing PlexOS. The financial investment in developing the patented
20
           inventions consisted of 4,840 hours of Mr. Harlow's time, at his professional consulting billing
21
           rate of $300 per hour, for a total of $1,452,000.

22         Eaton Decl., Ex. 1 (NetFuel's 5/1/2020 Redline Second Suppl. Damages Contentions), ¶¶ 52–

23    53.[2] These theories regarding the alleged value of NetFuel's intellectual property are not only new—

24
      _____

25    [2]    The "redline" that NetFuel provided shows all additions and deletions in greyscale, making it

26    difficult to read and determine what is new.  To make the additions clear for the Court, Cisco has

27    modified the color of new text from grey to red but has made no other changes.  Cisco has also attached

28    the original redline proposed second supplemental contentions as Ex. 1 to the Eaton declaration.

first disclosed after close of fact and expert discovery—but they are also contrary to Mr. Harlow's deposition testimony.  *See, e.g.*, *id.*, Ex. 10 (10/3/19 Harlow Dep. Tr.), 339:19-24 ("Q Is it correct as you sit here today that you do not have any ability to quantify what the alleged loss or damages are or were as a result of the alleged theft of NetFuel IP?  A Yes").

Factually, paragraph 52 also introduces, for the first time, a theory based on the allegation that PlexOS, which NetFuel now asserts practices the patents, is "a renamed and redeployed version of an earlier NetFuel software called Cichlid[.]"  Of course, this is not only new, but it is also contrary to NetFuel's prior disclosures: NetFuel's response to Cisco's interrogatory directed to the conception and reduction to practice of the asserted patents did not mention PlexOS or Cichlid.  *See, e.g.*, *id.*, Ex. 9 (NetFuel's 10/3/2019 First Suppl. Resp. to Cisco's Interrog. No. 1), 2.  NetFuel also introduces a new willfulness theory relating to this Cichlid product at paragraph 61, despite the fact that this Court struck NetFuel's willful infringement and pre-suit induced infringement claims in 2018. *See* Dkt. 38 (9/18/2018 Order Granting Cisco's Partial Motion to Dismiss).

NetFuel never disclosed the above theories until May 1, 2020.  But NetFuel's supplementation does not stop there.  In fact, NetFuel also reintroduces a damages theory based on the PlexOS software license with BNP Paribas, which was in its expert reports, and which the Court struck as unreliable. *See* Dkt. 293 at 27.  In particular, the Court concluded that "[w]ithout some showing that the economic differences were accounted for, Mr. Bratic's use of the BNP agreement to calculate his damages amount is 'unreliable, irrelevant, and unhelpful to the jury's task of evaluating the result of the hypothetical negotiation.'  The Court thus excludes it." *Id*. at 25-6 (internal cites omitted).  Unable to add in this new theory in its expert report, NetFuel now tries again in its Supplemental Disclosures:

> 11. NetFuel also licensed PlexOS to BNP Paribas through a transfer agent in 2008. NetFuel sold 244 licenses at a rate of $1,000 for each single core processor, totaling $244,000, plus an 18% annual software maintenance fee for an additional $43,920. See NETFL00001162; NETFL00001200; NETFL00001401; NETFL00011299; NF005397.

Eaton Decl., Ex. 1, ¶ 11 (showing additions underlined in tracked changes).  NetFuel presumably now intends to rely on fact witness testimony to introduce a theory that the Court has already excluded as unreliable.  But this theory was never disclosed during fact discovery.  While Cisco was aware of the existence of a transaction involving PlexOS software, NetFuel never disclosed in discovery that it

1    would rely on the transaction for its damages claims, much less the relevant underlying facts of that

2    transaction.  *See, infra*, Section IV.B.

3    In addition to trying to revive the excluded PlexOS software license theory, NetFuel reiterates

4    other damages theories that the Court's *Daubert* Order excluded and that NetFuel never disclosed

5    during discovery.  For example, the Court excluded NetFuel's expert's theory reducing the stricken

6    PlexOS software license by 20%, finding that "[w]ithout any underlying 'economic analysis to

7    quantitatively support the [20%] apportionment,' the figure is as good as 'plucked out of thin air.'"

8    Dkt. 293 at 21 (citation omitted).  But this stricken theory is resurrected in NetFuel's new contentions:

9
10   51. In addition, a jury may rely on NetFuel's own estimate of the value of its intellectual
     property inherent in PlexOS. Based on the 2008 license to BNP Paribas, NetFuel estimates that
11   20% of the $1,000 per-unit license fee represented the value of NetFuel's intellectual property, as
     distinct from the value of the time and resources required to develop PlexOS as software. This
12   estimate is based on the software maintenance fee that NetFuel charged BNP Paribas under the
     software license, which NetFuel's principals considered to be a fair representation of NetFuel's
13   expected profits under that license.
14

15   Eaton Decl., Ex. 1, ¶ 51.  NetFuel offers no citations to support this new theory; the only alleged

16   factual basis to which it can point is contained within stricken paragraphs of Mr. Bratic's report.  *See*

17   Dkt. 293 at 21 ("Neither Mr. Bratic nor NetFuel's founders provide an explanation as to why the value

18   of a 'maintenance fee' is equivalent to the value of the 'market contribution of NetFuel's intellectual

19   property.'").

20   As another example, the Court excluded NetFuel's theory regarding economic comparability

21   of the PlexOS-BNP license and the asserted patents "because Mr. Bratic failed to account for the

22   'economic differences,' between the BNP Agreement and the hypothetical license negotiation, he has

23   not shown that the BNP agreement is sufficiently comparable." Dkt. 293 at 25.  Now, its Supplemental

24   Disclosures have a new section titled "Economic Comparability of PlexOS and the Patents-in-Suit,"

25   in which NetFuel seeks to introduce never-before-seen statements regarding a hypothetical negotiation

26   between NetFuel and Cisco, as compared to NetFuel's relationship with BNP Paribas and Bank of

27   America:

28

44. In addition to considering the technological comparability of PlexOS and the Patents-in-Suit, a jury may also compare the economic circumstances underlying the PlexOS license to BNP in 2008 and a hypothetical negotiation for a license to the Patents-in-Suit between NetFuel and Cisco in 2010.

Eaton Decl., Ex. 1, ¶ 44.  These new statements also include bare allegations—with no supporting citations—such as "BNP used PlexOS internally and did not re-sell NetFuel technology, but Cisco would have incorporated the patented inventions into products for sale" and "NetFuel had a pre-existing relationship with Bank of America, and Bank of America was involved in NetFuel's software license to BNP. With Cisco, however, Bank of America would not have been involved in the hypothetical negotiation." *Id.*, ¶¶ 46, 48.

As yet another example, in its section pertaining to *Georgia-Pacific* Factor No. 15, NetFuel again bases its theory on the stricken BNP License and the per-unit royalty theory that was explicitly stricken by the Court:

30.95. NetFuel anticipates that its NetFuel's claim for reasonable royalty damages will be based, in part, on the terms of licenses to comparable patented technology and/or the portion to Bank of Cisco's sales and/or incremental profits that are attributable to the patented invention. America and to BNP Paribas. This may take the form of a running royalty rate based on a percentage of Cisco's revenues or a per-unit royalty based on the number of Accused Products sold.

*Id.*, Ex. 1, ¶ 95.

In sum, NetFuel's Supplemental Disclosures not only add new theories, but also attempt to revive theories that this Court has struck. These new disclosures are material and should have been disclosed before the close of fact discovery, and their belated disclosure violates Rule 26(e).

**B.     NetFuel's Supplemental Disclosures Include Technical Details Regarding PlexOS That It Previously Refused to Produce to Cisco**

NetFuel's Supplemental Disclosures are all the more troubling because they contain previously undisclosed technical details regarding PlexOS that NetFuel withheld from Cisco during discovery. Cisco's Interrogatory No. 10, served on October 16, 2018, sought information regarding NetFuel's PlexOS product and NetFuel's claims that PlexOS embodied the patents-in-suit.  Eaton Decl., ¶ 4.

Because NetFuel did not respond, Cisco diligently pursued information responsive to Interrogatory No. 10, including meeting and conferring, sending a letter, and drafting a joint letter brief, but NetFuel repeatedly refused.[3]  *See id.*; *see e.g.*, *id.*, Ex. 11 (3/29/2019 R. Burningham Email to Eaton).

To avoid providing this information, NetFuel shifted its position, stating unequivocally that it no longer intended to rely on PlexOS practicing the patents for damages or any other purpose in this litigation.  *See id.*, Ex. 5 (8/19/19 Seigel Email to Cutri) ("This will ***confirm that NetFuel is not relying in this litigation on any contention that PlexOS or any other NetFuel product practiced or practices the asserted claims of either the '730 or '659 patent***.") (emphasis added).  NetFuel also supplemented its response to Interrogatory No. 10 on the last day of fact discovery to reflect the same position, still refusing to provide any substantive analysis with respect to PlexOS and claims of the patents-in-suit.  *See id.*, Ex. 9 (NetFuel's 10/3/2019 First Suppl. Resp. to Cisco's Interrog. No. 10) ("NetFuel does not contend that any asserted claim was fully practiced by PlexOS.").  Relying on NetFuel's representations that it was no longer pursuing this theory, Cisco did not move to compel responses.  And NetFuel also did not provide any substantive analysis of PlexOS against the patents-in-suit in its technical expert reports, which instead provided the cursory allegation that "[a]lthough Mr. Harlow's testimony and the documentary evidence I have reviewed are not sufficient for me to form an opinion on whether PlexOS as implemented by NetFuel fully practiced the patents-in-suit, the PlexOS technology is very closely related to the inventions disclosed in the patent."  *See* Dkt. 293 at 19 (quoting Rubin Report, ¶ 381).

Now, seven months after the close of fact discovery and almost three months after NetFuel's

---

[3]     During discovery, NetFuel refused to respond to Interrogatory No. 10 on the basis that it "does not have the full PlexOS code" and would not "provide a limitation-by-limitation claim chart for PlexOS."  But Interrogatory No. 10 did not require a response in the form of a claim chart.  It simply requested that NetFuel "[i]dentify, for each asserted claim limitation, as numbered in NetFuel's Amended Disclosure of Asserted Claims and Infringement Contentions served on September 4, 2018, that you contend was practiced by PlexOS, the specific functionality in PlexOS you contend satisfies the limitation and all documents supporting your contention."  Eaton Decl., Ex. 9.

expert opinions regarding PlexOS were struck, NetFuel has served Supplemental Disclosures asserting that "PlexOS could not have performed the vast majority of its functions without relying on key technological components disclosed in the Patents-in-Suit" followed by thirty-two new paragraphs, spanning nine pages, of technical details regarding PlexOS and the asserted patents that NetFuel refused to produce during discovery. *See* Eaton Decl., Ex. 1 (NetFuel's 5/1/2020 Redline Second Suppl. Damages Contentions), pp. 5–16; Ex. 2 (NetFuel's 5/1/2020 Second Suppl. Resp. to Cisco's Interrog. Nos. 10, 15, and 20).

### C.    NetFuel Seeks to Add New and Stricken Apportionment Theories

NetFuel also seeks to introduce new apportionment theories, which include portions of Mr. Bratic's apportionment analysis (apportionment to the smallest salable unit and 50/50 split) that were stricken. *See* Dkt. 293 at 27 (striking "Mr. Bratic's profit apportionment analysis based on Dr. Rubin's calculations" as unreliable).  Notably, none of NetFuel's apportionment analysis was disclosed in its First Supplemental Damages Contentions and First Supplemental Response to Interrogatory No. 20 regarding apportionment.  *See* Eaton Decl., Ex. 14 (NetFuel's 10/3/2019 First Suppl. Damages Contentions); Ex. 9 (NetFuel's 10/3/2019 First Suppl. Resp. to Cisco's Interrog. No. 20).

Now, however, after the close of fact and expert discovery, NetFuel seeks to add dozens of paragraphs of new apportionment theories and underlying factual allegations to at least *Georgia-Pacific Factor* nos. 8, 11, 13, and 15.  Most egregiously, NetFuel appears to add new damages theories based on remnants of Mr. Bratic's stricken apportionment analysis, as well as theories suggesting that apportionment to the patented technology is optional for the jury.  For example, NetFuel suggests that "a jury may apportion" to the value of the Accused Products based on parts of Mr. Bratic's stricken apportionment theories:

> 71. Based on the opinions of Mr. Bratic and Dr. Leonard, a jury may apportion between $5.1 billion and $3.0 billion in revenue to the value of the Accused Products, which are the smallest saleable patent practicing units.

Eaton Decl., Ex. 1, ¶ 71.  Similarly, NetFuel states that a "jury may apportion" to "profits attributable to the value of the Patents-in-Suit" based on Mr. Bratic's stricken theories:

1

2    83. A jury may apportion the profits Cisco received from selling the Accused Products to the
     profits attributable to the value of the Patents-in-Suit. Cisco's damages expert, Dr. Leonard,
3    offered two steps to make this apportionment calculation: (1) apportion the value of the Accused
     Products to the value of the Accused Features; and (2) apportion the value of the Accused
4    Features to the value of the Patents-in-Suit. See Expert Responsive Report of Dr. Gregory K.
5    Leonard (Nov. 14, 2019) ¶¶ 68, 75–77. NetFuel's damages expert, Mr. Bratic, generally agreed
     on the apportionment steps but criticized certain of Dr. Leonard's methods. See Corrected Expert
6    Reply Report of Walter Bratic (Dec. 9, 2019) ¶¶ 39–60.

7

8    *Id.*, ¶ 83.  To be clear, NetFuel never disclosed apportionment theories during fact discovery.  To the

9    extent NetFuel believes it disclosed apportionment theories in its expert report, the Court struck those

10   theories.  Dkt. 293.

11       Similarly, NetFuel also re-packages another stricken apportionment theory here as a new

12   theory presumably to be presented by fact witnesses:

13   97. If the parties had agreed to a running royalty based on a percentage of Cisco's revenues, the
14   parties would have split revenues between them. The parties' relative leverage in a hypothetical
     negotiation would have influenced the parties' final determination of a reasonable profit split.
15   NetFuel would have been willing to accept a 50/50 split of revenues. Cisco's expert, Dr.
16   Leonard, opined that the parties would have split revenues with 44% going to NetFuel and 56%
     going to Cisco. See Expert Responsive Report of Dr. Gregory K. Leonard (Nov. 14, 2019) ¶¶
17   78–79. He reached that determination by comparing the parties' weighted average cost of capital.
18   Id. Mr. Bratic criticized this methodology, see Corrected Reply Expert Report of Walter Bratic
19   (Dec. 9, 2019) ¶¶ 61–69, but NetFuel would also have been willing to accept a 44/56 split of
20   revenues.

21   98. Based on testimony by NetFuel and by Dr. Leonard, a jury may determine that the parties
22   would have split revenues by giving between 44% and 50% to NetFuel and between 50% and
     56% to Cisco.
23

24   *Id.*, ¶¶ 97–98.  But NetFuel did not disclose this 50/50 profit-split theory in its earlier disclosures.  *See*

25   Eaton Decl., Ex. 14 (NetFuel's 10/3/2019 First Suppl. Damages Contentions); Ex. 9 (NetFuel's

26   10/3/2019 First Suppl. Resp. to Cisco's Interrog. No. 20).  Additionally, the Court explicitly struck

27   Mr. Bratic's 50/50 profit-split analysis.  *See* Dkt. 293 at 27 (excluding "Mr. Bratic's profit

28   apportionment analysis based on Dr. Rubin's calculations" including paragraphs 212–217, which

include Mr. Bratic's profit-splitting apportionment).

NetFuel cannot now disclose a new, incomplete apportionment theory that simply removes apportionment steps excluded by the Court to arrive at a higher damages figure.  These materially new additions to essentially the entirety of NetFuel's damages contentions amount to a violation of Rule 26(e).

## V.    NETFUEL'S UNTIMELY DISCLOSURES MUST BE EXCLUDED BECAUSE THEY ARE NEITHER SUBSTANTIALLY JUSTIFIED NOR HARMLESS

Rule 37 requires exclusion unless NetFuel can show that its late disclosure of materially new and stricken damages theories and underlying factual allegations is "substantially justified and harmless."  *See Asia Vital*, 337 F. Supp. 3d at 1002) ("Rule 37(c)(1) thus requires exclusion unless the offending party carries its burden 'to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless.'") (quoting *Torres*, 548 F.3d at 1213).  In addition to exclusion of the undisclosed information, the court may also impose further sanctions, including "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence" and "striking pleadings in whole or in part." Fed. R. Civ. P. 37(c)(1), 37(b)(2)(A). The Ninth Circuit "'give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)' . . . ."  *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 859 (9th Cir. 2014) (quoting *Yeti by Molly, Ltd.*, 259 F.3d at 1106).  Courts in this district regularly strike theories (as well as the underlying evidence) as a sanction for failure to timely disclose those theories as required under Rule 26.  *See Asia Vital*, 377 F. Supp. 3d at 1003-7; *Apple, Inc.*, 2012 WL 3155574, at *1-5; *Bernstein v. Virgin Am., Inc.*, No. 15-CV-02277-JST, 2018 WL 6199679, at *5 (N.D. Cal. Nov. 28, 2018); *Davis v. Elec. Arts Inc.*, No. 10-CV-03328-RS (DMR), 2018 WL 1609289, at *4 (N.D. Cal. Apr. 3, 2018).

### A.    NetFuel's Supplemental Disclosures Are Not "Substantially Justified"

Simply put, there is no justification—substantial or otherwise—for NetFuel's failure to timely comply with the Local Patent Rules' requirement that NetFuel disclose its damages contentions and properly respond to Cisco's discovery requests regarding NetFuel's damages theories and PlexOS. Over sixteen months have passed since NetFuel served its Preliminary Damages Contentions and more

than seven months have passed since NetFuel served its First Supplemental Damages Contentions on the last day of fact discovery. Expert discovery is closed, all depositions were completed over five months ago, and the parties are headed for trial at the end of the year. *See* Eaton Decl., ¶ 7. The Court has (twice) denied NetFuel's request to resurrect its stricken expert opinions, noting that in order to cure, "because of the sheer volume of deficiencies, Plaintiff would have to advance new theories and methodologies. Defendant, who has already invested substantial time, money, and effort into defending against Plaintiff's experts, would be prejudiced by this." Dkt. 293 at 26. NetFuel's Supplemental Disclosures are simply far too late.

In a May 12, 2020 email, responding to Cisco's May 1, 2020 letter requesting that NetFuel withdraw its Supplemental Disclosures, NetFuel's counsel asserted that its Supplemental Disclosures "include descriptions of documents that were provided in discovery long ago and facts from our primary witness, the inventor Jim Harlow, who has been deposed multiple times and for multiple days, both by you and in the previous F5 case." *See* Eaton Decl., Ex. 12 (5/12/2020 F. Short Email to S. Piepmeier). NetFuel's counsel further asserted that they "decided to pull together this information in the supplemental damages contentions—even though it is not clear that we had any actual obligation under court rules to do so … so it would  be clear what facts [they] intend to present at trial regarding damages in light of the Court's damages ruling." *See id.* (citation omitted). This ex post facto rationale does not make the Supplemental Disclosures substantially justified.

First, NetFuel actually conceded that its Supplemental Disclosures are based on content that NetFuel had in its possession but refused to disclose during discovery. *See id.* Because NetFuel had the information underlying its supplement "long ago," NetFuel is not justified in its delayed disclosure of these theories and underlying factual allegations. Indeed, NetFuel refused to provide the information Cisco requested until now, when it is too late for Cisco for to use it in any meaningful way in crafting its invalidity, noninfringement, or damages defenses. This situation is easily distinguished from a situation in which a new fact arises—*e.g.*, the PTAB invalidating a patent after the close of fact discovery—that could not have been disclosed during discovery. Since NetFuel had this information on or before October 3, 2019 but simply chose not to disclose it, the only plausible reason for this late addition is that NetFuel now intends to try to establish via fact witnesses what it

1    cannot establish through its damages expert report after the Court's *Daubert* ruling.  This does not

2    amount to substantial justification.

3    　　　Further, it is not credible for NetFuel to suggest that it is simply clarifying existing theories for

4    Cisco's benefit, and that the material it has added is justified in response to the Court's *Daubert* ruling.

5    The Supplemental Disclosures do not merely add a handful of citations to existing theories or remove

6    components of stricken theories.  Its *fourteen pages* of wholly new theories and factual allegations

7    dwarf its original contentions.  That NetFuel's damages theories regarding both reasonable royalties

8    and apportionment were stricken as "unreliable" does not create an opportunity to come up with new

9    theories where there were none, especially when the Court (twice) denied NetFuel's request to cure

10   those deficiencies.  *See Apple, Inc.*, 2012 WL 3155574, at *7 ("In light of Judge Grewal's ruling,

11   ***Samsung will not be permitted to argue, through fact witnesses or otherwise***, for invalidity of design

12   patents, non-infringement of design patents, or lack of distinctiveness of trade dress based on theories

13   not timely disclosed in Samsung's amended responses to contention interrogatories.") (emphasis

14   added).

15   　　　Finally, to the extent NetFuel suggests that it is entitled to statutory damages should it prevail

16   on its liability case.  NetFuel will have the opportunity to present its damages case within the confines

17   of its existing contentions, should any cognizable theory remain.  *See, e.g.*, *Yeti by Molly, Ltd.*, 259

18   F.3d at 1101 (finding that district court did not abuse its discretion in excluding testimony of

19   defendant's only damages expert as sanction).

20   　　　In sum, NetFuel's disclosures simply come too late, and NetFuel has offered no new

21   occurrence that it believes justifies its actions other than the Court's *Daubert* opinion, which plainly

22   does not condone adding new theories.  Courts in the Ninth Circuit exclude untimely damages theories

23   disclosed even on the last day of fact discovery, whereas this case is at a much more advanced stage.

24   *See e.g.*, *Mass Probiotics, Inc. v. Aseptic Tech.*, *LLC*, No. SA CV 16-1394-DOC (GJSx), 2017 WL

25   10621233, at *3 (C.D. Cal. Dec. 21, 2017) (granting motion to strike supplemental initial disclosures

26   served on last day of fact discovery that included new damages theories and a new damages number).

27   **B.**　　**NetFuel's Supplemental Disclosures Are Not "Harmless"**

28   　　　NetFuel's failure to timely disclose its damages theories and underlying factual contentions is

not harmless.  The Northern District of California recognizes that "prejudice is inherent in the assertion of a new theory after discovery."  *Adobe Sys. Inc. v. Wowza Media Sys.,* No. 11-cv-02243-JST, 2014 WL 709865, at * 15 n.7 (N.D. Cal. Feb. 23, 2014).  Disclosures after the close of fact discovery, such as these, are presumed prejudicial, as the opposing party is deprived of "the opportunity to conduct additional fact discovery regarding [the] new theories."  *Apple, Inc.*, 2012 WL 3155574, at *5 (finding that amended responses to contention interrogatories served after the close of fact discovery but prior to the close of expert discovery were prejudicial and striking expert report sections based on those late interrogatory responses).

Cisco could not have anticipated NetFuel's service of Second Supplemental Damages Contentions that nearly doubled the content of its previous supplemental disclosures.  NetFuel Supplemental Disclosures' include new or changed damages theories and factual allegations pertaining not only to per-unit reasonable royalties and apportionment, but also to a slew of other miscellaneous topics, including: non-infringing alternatives (Supplemental Disclosures, ¶ 77), willfulness (*id.*, ¶ 61), the patents' expiration date (*id.*, ¶ 67), convoyed sales (*id.*, ¶¶ 65–66), the purported benefits of the invention (*id.*, ¶ 78), and the list goes on.  Compounding this harm, NetFuel's per-unit royalty arguments hinge on technical information regarding PlexOS that NetFuel withheld during discovery and expressly disavowed in writing.  *See, supra* Section IV.B.

There would be significant prejudice to Cisco if NetFuel is permitted to dramatically expand its damages case in the manner it proposes.  This case has been pending since April 2018.  Cisco has already made significant and expensive efforts over the past two years to collect discovery, depose and defend fact and expert witnesses, and to develop its defenses.  By waiting until just months from trial—when the record is long-since closed—NetFuel deprived Cisco of the opportunity to conduct any discovery on these newly claimed damages theories.  This late disclosure also robbed Cisco's experts of the ability to consider and provide opinions relating to the new theories and factual contentions.  At a time when Cisco should be making preparations for trial, its entire defense strategy would have to shift to attempt to adapt to this new information.  What is more, NetFuel's new apportionment theories appear to *significantly increase* the dollar amount of damages sought, up to as much as $5.1 billion, and the contours of its new apportionment theories are both unclear and untested,

as Cisco was deprived of the opportunity to depose any witnesses or to seek additional discovery regarding these theories.  This potentially drastic increase in the damages claimed as well as the expansion of all NetFuel's damages theories cannot be cured at this late stage in the case.

During the parties' meet and confer, NetFuel's only proposed solution to ameliorate the tremendous prejudice to Cisco was to ask the Court to reopen fact and/or expert discovery.  But this compounds the prejudice: New discovery requests would have to be issued, fact and expert depositions would have to be re-taken, expert reports would have to be re-written.  *See* Dkt. 293 at 26.

Further, had these potential damages theories been disclosed earlier, Cisco would likely have approached its defenses differently.  For example, had Cisco had the PlexOS technical information that it requested over 18 months ago, the entire shape of its invalidity case would likely be different.  Additionally, NetFuel now advances a theory that an early NetFuel prototype, Cichlid, dating back to nearly two years before the '730 Patent's filing date, was "renamed and redeployed" as PlexOS, which it now contends practices the patents. Cisco cannot now pursue additional discovery regarding this potential statutory bar to patent protection under Section 102(b).  This prejudice cannot be cured.

Moreover, until its recent abrupt about-face turn, NetFuel steadfastly opposed any proposed deviation from this set schedule.  Indeed, over four months ago, NetFuel represented that the case was "trial-ready" and complained about alleged "numerous extensions to fact and expert discovery." Dkt. 254 (1/6/2020 Opp. to Cisco's Mot. To Stay) at 1.  Any proposed re-opening of discovery would necessarily be prejudicial to Cisco and would disrupt the trial schedule that NetFuel believed was already far too late.  Moreover, the Court already rejected a similar proposal by NetFuel in its Order denying NetFuel leave to file a motion for reconsideration.  There, in response to NetFuel's argument that allowing supplemental expert reports would not disrupt the case schedule, the Court noted that NetFuel's argument "ignores the unfair burden this would place on Defendant—something the Court raised in its initial order. Defendant timely finished its expert report and already litigated the *extensive* deficiencies with Plaintiff's reports."  Dkt. 305 at 3 (emphasis in original).  The only tenable way to ameliorate the prejudice to Cisco is to eliminate it by striking these Supplemental Disclosures.

Finally, it is of paramount importance that these new theories be stricken from the case now rather than at the *Motion in Limine* stage or during trial.  The next 4 to 5 months before trial are critical.

Cisco cannot focus on both trial preparation and defending against these new theories and factual allegations. Moreover, because the contours of NetFuel's Supplemental Disclosures are unclear—they include new and conflicting apportionment and reasonable royalty theories, as well as an apparently higher damages figure—Cisco would have to dedicate a massive amount of resources to decoding these contentions, serving new discovery requests and expert reports, and re-taking depositions to address them. NetFuel's delinquency should not be rewarded with derailing Cisco's trial preparations this late in the case.

All the factors weigh in favor of exclusion under Rule 37, and the Court should forbid NetFuel from using at trial all the information in its supplemental disclosures.

## VI. ATTORNEYS' FEES ARE WITHIN THE COURT'S DISCRETION

Under Rule 37, a court "may order payment of the reasonable expenses, including attorney's fees, caused by the failure" to timely supplement incomplete or incorrect disclosures and discovery responses. Fed. R. Civ. P. 37(c)(1). This Court enjoys broad discretion to impose sanctions. *Yeti by Molly, Ltd.*, 259 F.3d at 1106 ("Furthermore, although we review every discovery sanction for an abuse of discretion, we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)."); *see also Liew v. Breen*, 640 F.2d 1046, 1050 (9th Cir. 1981) ("Imposition of sanctions under Rule 37(b), and the selection of the particular sanction, are matters left to the discretion of the trial court."). The Northern District of California recognizes that "[a] party that plays fast and loose with its damages theories risks having its whole theory struck, as well as additional sanctions." *Looksmart*, 386 F. Supp. 3d at 1232 (citing Fed. R. Civ. P. 37(c)(1)). Having failed twice to obtain leave to cure *(see* Dkt. 293; *see also* Dkt. 305), these Supplemental Disclosures are a third effort to cure the failings of its expert reports, this time under the guise of more than seven-month-late, more than fourteen-page "supplement" to its contentions. As a result of this late disclosure of new damages theories, including those that were unequivocally stricken by the Court, Cisco incurred a significant amount of attorney fees for time spent dissecting the new theories, meeting and conferring with NetFuel's counsel, and researching and writing the instant motion to preserve its rights.

Before moving this Court, Cisco provided NetFuel with prompt and clear notice that it intended to move for exclusion of these disclosures, including authority and a detailed analysis of its basis for

moving, in order to give NetFuel the opportunity to withdraw its Supplemental Disclosures.  And although no meet and confer is required under the Rules, Cisco acquiesced to NetFuel's request for further explanation of its positions both in writing and during a telephonic meet and confer, until the parties agreed that no resolution could be reached.  *See* Eaton Decl., ¶ 8.  Cisco respectfully requests that in addition to excluding NetFuel's Supplemental Disclosures, the Court grant reasonable attorneys' fees incurred in reviewing the disclosures, preparing this motion and reply brief, and any argument that the Court deems necessary.

Alternatively, monetary sanctions are also available under this Court's "'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631(1962)).  Those inherent powers include "'the ability to fashion an appropriate sanction for conduct which abuses the judicial process,'" and "one permissible sanction is an 'assessment of attorney's fees.'"  *Goodyear*, 137 S. Ct. at 1186 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).  The Ninth Circuit has made clear that "sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith" and that "[s]anctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001).  The addition of undisclosed damages theories at this late stage of the case, in an apparent attempt to sidestep the Court's *Daubert* ruling and denial of NetFuel's requests to cure, warrants the imposition of monetary sanctions under the Court's inherent power in addition to exclusion of these new disclosures under Rule 37.

## VII.   CONCLUSION

In order to prevent manifest prejudice to Cisco, Cisco respectfully requests that this Court strike NetFuel's May 1, 2020 Second Supplemental Damages Contentions and Second Supplement Interrogatory Responses.  This Court struck NetFuel's expert testimony (much of which overlaps with the material NetFuel added to its Supplemental Disclosures) and denied its request to for leave to supplement its report. The Court noted that "[a]llowing a 'second bite' can encourage 'overreaching on the first bite'" and that where "the report is 'not even close,' there is a need to deny a second bite

so as to 'encourage candor in the first place.[']"  Dkt. 293 at 26 (internal citations omitted).  NetFuel's attempt to infuse new and stricken theories into its contentions and interrogatory responses amounts to a third bite of the apple.  "Rule 26(e) requires that as theories mature and as the relevance of various items of evidence changes, responses to interrogatories, and particularly contention interrogatories, be corrected or supplemented to reflect those changes." *Asia Vital*, 377 F. Supp. 3d at 1003-04 (quoting *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012)).  NetFuel did not timely provide those corrections and supplementations, and its belated and prejudicial Supplemental Disclosures must be excluded.

DATED:  May 29, 2020

**PERKINS COIE LLP**

By: */s/ Sarah E. Piepmeier*
        Sarah E. Piepmeier (SBN 227094)
        Elise S. Edlin (SBN 293756)
        May Eaton (SBN 298123)
        PERKINS COIE LLP
        505 Howard Street, Suite 1000
        San Francisco, California 94105
        spiepmeier@perkinscoie.com
        eedlin@perkinscoie.com
        mayeaton@perkinscoie.com
        Telephone: (415) 344-7000
        Facsimile: (415) 344-7050

        *Attorneys for Defendant Cisco Systems, Inc.*