# EXHIBIT 13

# REDACTED VERSION OF DOCUMENT PROPOSED TO FILED UNDER SEAL

Floyd G. Short (WSBA No. 21632) (*Pro hac vice*)
Matthew R. Berry (WSBA No. 37364) (*Pro hac vice*)
Steven M. Seigel (MD No. 1412180127) (*Pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
Telephone:  (206) 516-3800
Facsimile:  (206) 516-3883
fshort@susmangodfrey.com
mberry@susmangodfrey.com
sseigel@susmangodfrey.com

Kalpana Srinivasan (237460)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
ksrinivasan@susmangodfrey.com

*Attorneys for Plaintiff NetFuel, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| NETFUEL, INC., | Case No. 3:18-cv-2352 |
| Plaintiff, | **DEMAND FOR JURY TRIAL** |
| vs. | |
| CISCO SYSTEMS, INC., | |
| Defendant. | |

### NETFUEL, INC.'S PRELIMINARY DAMAGES CONTENTIONS

Plaintiff NetFuel, Inc., ("NetFuel") serves the following preliminary Damages Contentions on Defendant Cisco Systems, Inc. ("Cisco") in compliance with Patent Local Rule 3-8. These contentions are based on the information currently produced in the litigation. As set forth in greater detail below, Cisco has failed to produce documents relating to damages that are responsive to NetFuel's document requests and continue to be the subject of the parties' meet and confers. In addition, Cisco served a late and incomplete production of damages related documents under Patent Local Rule 3-4(c)-(e), Cisco has produced no emails, no depositions have taken place, no expert discovery has taken place, and fact discovery does not close until August 23, 2019. NetFuel reserves the right to amend and/or supplement its damages model and underlying support as the case proceeds, including by serving an expert report from its damages expert on the October 4, 2019 deadline set forth in the scheduling order.

1.   Damages in patent infringement cases are governed by 35 U.S.C. § 284, which states as follows:

> *Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.*
>
> *When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.*

2.   NetFuel contends that it is entitled to reasonable royalty damages as a result of Cisco's infringement of the following "Patents-in-Suit":

| The Patents-in-Suit | | |
|---|---|---|
| **Patent No.** | **Title** | **Issue Date** |
| 7,747,730 (the "'730 Patent") | Managing Computer Network Resources | 06/29/2010 |
| 9,663,659 (the "'659 Patent") | Managing Computer Network Resources | 05/30/2017 |

3.     NetFuel also seeks an award of reasonable attorney's fees and costs, and prejudgment and post-judgment interest on NetFuel's award.  These damages contentions address NetFuel's claim for reasonable royalty damages.  NetFuel will address fees, interest, and costs at the appropriate time.

4.     Determination of a reasonable royalty is typically based on the hypothetical negotiation framework set forth in *Georgia-Pacific Corp. v. United States Plywood Corp* ("*Georgia-Pacific*").[1]  In determining reasonable royalties for a license to the Patents-in-Suit, a hypothetical license scenario is considered in which the parties would have negotiated the terms of a non-exclusive hypothetical license to the Patent-in-Suit.  The determination of damages based on a reasonable royalty is generally based on a hypothetical negotiation between a willing licensor and a willing licensee at or about the time of first infringement.  With respect to this hypothetical willing licensor/licensee negotiation, courts have established a number of factors to be considered, including those factors established by the *Georgia-Pacific* lawsuit, (the "*Georgia-Pacific* Factors").[2]

5.     The reasonable royalty analysis focuses on the economic and bargaining positions of NetFuel and Cisco at the time of the hypothetical negotiation and the likely outcome of such negotiation given their respective bargaining positions.   In calculating reasonable royalty damages, generally a determination is made regarding:  1) the reasonable royalty rate; and 2) the appropriate royalty base.   While *Georgia-Pacific* enumerates various factors that should be considered in determining reasonable royalties, the *Georgia-Pacific* Factors are not absolute determinants of a reasonable royalty, but rather are guidelines to evaluating the likely actions of

---

[1] *Georgia-Pacific Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971).
[2] *Id.*

the parties in a hypothetical negotiation.  Based on the facts and circumstances of the case, the *Georgia-Pacific* Factors are not necessarily given equal weight nor are they are all-inclusive.  Rather, the *Georgia-Pacific* Factors are part of the overall analysis of reasonable royalty damages that NetFuel anticipates will be conducted through expert discovery in this matter.

6.     The hypothetical negotiation would have occurred on the later of:   1) the date the infringed patent(s) issued; or 2) the date the infringing product was first manufactured, used, offered for sale, or sold.  Cisco's infringing products are the routers and switches that are identified on Exhibit C to NetFuel's complaint, which run one of the four network operating systems accused in the complaint (the "Accused Products").  In a hypothetical negotiation, all parties would have recognized that the Patents-in-Suit were valid and had been infringed by Cisco.

7.     NetFuel alleges that Cisco first infringed the Patents-in-Suit on June 29, 2010, when the '730 Patent issued.  Therefore, the hypothetical negotiation between NetFuel and Cisco would have occurred on or about June 29, 2010.  The hypothetical negotiation would have involved negotiations regarding a license to the Patents-in-Suit.

8.     In the sections that follow, NetFuel presents its preliminary understanding of facts and information that may have been considered by the parties to the hypothetical negotiation.  As Cisco has yet to make a fulsome damages production, NetFuel does not provide all of the factual support for this theory, or a computation of damages under this theory.  Pursuant to Northern District of California Local Rule 3-8(b), NetFuel instead identifies the information required to make a more fulsome disclosure.

### A. *Georgia-Pacific* Factor No. 1

> *The royalties received by the patentee for the licensing of the Patent-in-Suit, proving or tending to prove an established royalty.*

9.     NetFuel has not entered into any express patent license agreements that provided rights to the Patents-in-Suit.  NetFuel licensed the use of its software to Bank of America in a 2003 investment agreement.  Pursuant to the agreement, Bank of America licensed its proprietary

software to NetFuel, and in return, Bank of America received an implied license to use NetFuel's PlexOS by virtue of Bank of America acquiring a 25% equity stake in NetFuel.[3]  The terms of this agreement are listed at NF001311-56.  NetFuel also received offers and sold its PlexOS to other parties, which included an implied non-exclusive license to the technology at issue in the asserted patents.  *See, e.g.*, NETFL00001401; NETFL00001138; NETFL00001199; and NETFL00001200.  As part of NetFuel's sale of the PlexOS software, it also agreed to provide software maintenance for additional fees, as described in the purchase orders listed above.

### B. *Georgia-Pacific* Factor No. 2

> *The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.*

10.    As of the date of these contentions, Cisco has not produced any license agreements that appear to be comparable to the circumstances of the hypothetical negotiation, nor has NetFuel been able to identify any such license agreements despite its own efforts.  However, fact discovery is ongoing, and NetFuel may update its damages contentions if additional information becomes available regarding Cisco's license agreements.[4]

---

[3] Under *Georgia-Pacific*, the license resulting from a hypothetical negotiation is a bare patent license. This is different from the circumstances relating to the NetFuel / Bank of America transaction, which resulted in Bank of America obtaining an equity stake in NetFuel.

[4] NetFuel interrogatory 4 and requests for production 15, 16, 17, 26, 27, 34, 36, and 38 seek information and documents directly relevant to this factor and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.  In addition, Cisco was obligated to produce all licenses that it deems comparable under Patent Local Rule 3-4(c), but produced none.

### C. *Georgia-Pacific* Factor No. 3

> *The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

11.     License agreements reached in a hypothetical negotiation under *Georgia-Pacific* would provide a non-exclusive right to make, use, sell, or offer to sell products and services within the United States.

### D. *Georgia-Pacific* Factor No. 4

> *The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly.*

12.     NetFuel has not entered into any express patent license agreements that provided rights to the Patents-in-Suit.   In addition, NetFuel does not have an established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention.

### E. *Georgia-Pacific* Factor No. 5

> *The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

13.     NetFuel was founded in 2000, in part to provide programmable network solutions for financial services organizations and banks and their high-speed stock and futures trading platforms.[5]  NetFuel CEO James Harlow is the inventor of the Patents-in-Suit and has long been an entrepreneur in the field of computer software and networking technology.[6]  NetFuel and Mr.

---

[5] 4/18/18 Complaint ¶ 3.
[6] *Id.* at  ¶ 3.

Harlow had extensive communications with Cisco about the asserted inventions starting in the early 2000s, as explained in NetFuel's complaint.[7]

14.     Founded in 1984, Cisco focuses on solving business challenges due to technological shortcomings.[8]    Cisco's product offerings are categorized as infrastructure platforms, applications, security, and other products, serving customers such as "businesses of all sizes, public institutions, governments, and service providers."[9]

15.     NetFuel and Cisco are not currently competitors.

## F.   *Georgia-Pacific* Factor No. 6

> *The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.*

16.     NetFuel is in the process of investigating whether Cisco has generated sales of convoyed services and/or products as a result of its infringement of the Patents-in-Suit.  NetFuel anticipates that this information will become available during the course of ongoing fact discovery.  Without this information about Cisco's revenues, it is not possible for NetFuel to determine whether Cisco has generated revenues of non-patented items as a result of using NetFuel's patented technology, or the extent of any such revenues.[10]

---

[7] *Id.* at ¶¶ 44-47.
[8] https://newsroom.cisco.com/overview.
[9] Cisco System, Inc.'s Form 10-K for the fiscal year ended July 28, 2018, pg. 1.
[10] NetFuel requests for production 18 and 19 seek documents directly relevant to this factor and remain outstanding. The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

### G. *Georgia-Pacific* Factor No. 7

> *The duration of the patent and the term of the license.*

17.    A license resulting from the respective hypothetical negotiation would have been for the unexpired term of the Patents-in-Suit, which will continue at least until May 3, 2024.

### H. *Georgia-Pacific* Factor No. 8

> *The established profitability of the product made under the patent; its commercial success; and its current popularity.*

18.    As of the date of these contentions, Cisco has not produced documents regarding the Accused Products' demand or popularity. Cisco also has not produced comprehensive financial records regarding its sales, costs, and/or profits associated with the Accused Products.[11] For example, NetFuel has identified a number of Accused Products for which Cisco has not produced any sales or profit information, including, but not limited to, the following Accused Products:[12]

- Catalyst 2960-X Series Switches

    o Catalyst 2960X-48FPD-L Switch

    o Catalyst 2960X-48FPS-L Switch

    o Catalyst 2960X-48LPD-L Switch

    o Catalyst 2960X-48LPS-L Switch

    o Catalyst 2960X-48TD-L Switch

    o Catalyst 2960X-48TS-L Switch

[11] NetFuel interrogatories 2 and 5 and requests for production 18, 19, 21, 22, 23, 37, 43, and 49 seek information and documents that are directly relevant to this factor and remain outstanding. In addition, Patent Local Rule 3-4(d) required Cisco to produce "Documents sufficient to show the sales, revenue, cost, and profits for accused instrumentalities identified pursuant to Patent L.R. 3-1(b) for any period of alleged infringement" by August 18, 2018, but Cisco failed to do so. The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production. NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018. Cisco has indicated it will respond to that email early this week, but has not yet responded.
[12] Exhibit A to NetFuel's Disclosure of Asserted Claims and Infringement Contentions, September 4, 2018; CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1370.

- o Catalyst 2960X-48TS-LL Switch
- o Catalyst 2960X-24PD-L Switch
- o Catalyst 2960X-24PS-L Switch
- o Catalyst 2960X-24PSQ-L Cool Switch
- o Catalyst 2960X-24TD-L Switch
- o Catalyst 2960X-24TS-L Switch
- o Catalyst 2960X-24TS-LL Switch
- Catalyst 2960-XR Series Switches
  - o Catalyst 2960XR-48FPD-I Switch
  - o Catalyst 2960XR-48FPS-I Switch
  - o Catalyst 2960XR-48LPD-I Switch
  - o Catalyst 2960XR-48LPS-I Switch
  - o Catalyst 2960XR-48TD-I Switch
  - o Catalyst 2960XR-48TS-I Switch
  - o Catalyst 2960XR-24PD-I Switch
  - o Catalyst 2960XR-24PS-I Switch
  - o Catalyst 2960XR-24TD-I Switch
  - o Catalyst 2960XR-24TS-I Switch
- 3800 Series Integrated Services Routers
  - o 3845 Integrated Services Router
  - o 3825 Integrated Services Router
- 2800 Series Integrated Services Routers
  - o 2851 Integrated Services Router
  - o 2821 Integrated Services Router

- o   2811 Integrated Services Router
- 10000 Series Routers
  - o   10008 Router
  - o   10005 Router
- Cloud Services Router 1000V Series
  - o   Cloud Services Router 1000V
- ASR 9000 Series Aggregation Services Routers
  - o   ASR 9922 Router
  - o   ASR 9912 Router
  - o   ASR 9904 Router
  - o   ASR 9010 Router
  - o   ASR 9006 Router
  - o   ASR 9001 Router
- Nexus 7000 Series Switches
  - o   Nexus 7700 18-Slot Switch
  - o   Nexus 7700 10-Slot Switch
  - o   Nexus 7700 6-Slot Switch
  - o   Nexus 7000 18-Slot Switch
  - o   Nexus 7000 10-Slot Switch
  - o   Nexus 7000 9-Slot Switch
  - o   Nexus 7000 4-Slot Switch
- Cisco 10000 Series Routers
  - o   Cisco 10008 Router
  - o   Cisco 10005 Router

- Cisco 3800 Series Integrated Services Routers
  - o Cisco 3845 Integrated Services Router x
  - o Cisco 3845 NOVPN Integrated Services Router x
  - o Cisco 3845 RAN-O Integrated Services Router x
  - o Cisco 3825 IP RAN Integrated Services Router x
  - o Cisco 3825 Integrated Services Router x
  - o Cisco 3825 NOVPN Integrated Services Router
- Cisco 2800 Series Integrated Services Routers
  - o Cisco 2851 Integrated Services Router x
  - o Cisco 2821 Integrated Services Router x
  - o Cisco 2811 Integrated Services Router x
  - o Cisco 2801 Integrated Services Router
- Cisco MWR 1900 Mobile Wireless Routers
  - o Cisco MWR 1951-DC Mobile Wireless Edge Router
  - o Cisco MWR 1941-DC-A Mobile Wireless Edge Router
- Cisco Catalyst 8500 Series Multiservice Switch Routers
- Cisco Catalyst 6500 Series Switches
  - o Cisco Catalyst 6500 Borderless Services Node
- Cisco Catalyst 2960-C Series Switches
  - o Cisco Catalyst 2960CG-8TC-L Compact Switch
- Cisco Catalyst 2950 LRE Series Switches
- Cisco Lightstream ATM Switches
- Cisco ME 4500 Series Ethernet Switches
- Cisco Nexus 3000 Series Switches

- o Cisco Nexus 3064 Switch

- o Cisco Nexus 3064-T Switch

- Cisco Catalyst 2350 Series Switches

  - o Cisco Catalyst 2350-48TD-S Switch

  - o Cisco Catalyst 2350-48TD-SD Switch

- Industrial Ethernet 3010 Series Switches

  - o IE-3010-24TC Industrial Ethernet Switch

  - o IE-3010-16S-8PC Industrial Ethernet Switch

- ASR 900 Series Aggregation Services Routers

  - o ASR 902U Router

19.     Based on information produced by Cisco as of the date of these contentions, NetFuel has preliminarily determined that from April 18, 2012 through July 2018, Cisco generated no less than ███████ in revenues from Accused Products classified as switches or routers.[13]   In addition, Cisco generated another ███████ in revenues from Accused Products classified as assembly, base, power, feature, memory, cable, or devices.[14]   However, as discussed above, Cisco has not produced sales data for all Accused Products.   Therefore, this amount may significantly understate Cisco's sales of Accused Products.   This amount also does not include any future sales through the date of the trial in this action or through the date the patents expire.

20.     As of the date of these contentions, Cisco has not produced information sufficient to determine its profits from the Accused Products.[15]   For example, Cisco has not produced cost

---

[13] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.
[14] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.
[15] NetFuel interrogatories 2 and 5 and requests for production 18, 19, 21, 22, 23, 37, 43, and 49 seek information and documents that are directly relevant to this factor and remain outstanding.  In addition, Patent Local Rule 3-4(d) required Cisco to produce "Documents sufficient to show the sales, revenue, cost, and profits for accused instrumentalities identified pursuant to Patent L.R. 3-1(b) for any period of alleged infringement" by August 18, 2018, but Cisco failed to do so.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

information for all of the Accused Products.[16]  Furthermore, Cisco's cost information utilizes model numbers that are inconsistent with those contained in its sales production.[17]  As a result, NetFuel has been unable to quantify Cisco's profits from the Accused Products.  However, NetFuel expects that Cisco's sales of Accused Products have been profitable to Cisco.  For example, based on information contained in Cisco's public filings with the Securities and Exchange Commission, from 2012 through 2017, Cisco generated annual average gross profit margins ranging from 56.8% to 62.0% with respect to products.[18]

21.     As of the date of these contentions, NetFuel believes that Cisco's practicing of the patented invention in the Accused Products has enabled Cisco to generate significant economic value.  The Accused Products have been commercially successful and remain popular in the marketplace.

### I.  *Georgia-Pacific* Factor No. 9

> *The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results.*

### J.  *Georgia-Pacific* Factor No. 10

> *The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

22.     *Georgia-Pacific* Factors Nos. 9 and 10 are typically analyzed together given the overlap in the subject matter covered by these two factors.  The Patents-in-Suit provide significant benefits

---

deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

[16] Exhibit A to NetFuel's Disclosure of Asserted Claims and Infringement Contentions, September 4, 2018; CSI-NF-00001356-1366.

[17] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1370.

[18] Cisco System Inc.'s Form 10-K for the year ended July 27, 2013, pg. 53; Cisco System Inc.'s Form 10-K for the year ended July 30, 2016, pg. 50; Cisco System Inc.'s Form 10-K for the year ended July 29, 2017, pg. 46.

and functionalities in the router and switch industry including, but not limited to, the following benefits identified by Cisco:[19]

o EEM is able to monitor events, take corrective action automatically or when a threshold reached. EEM also allows on-device event management, which is "invaluable when taking immediate recovery actions and gathering information to perform root-cause analysis." CSI-NF-00001966, at 32 – 33.

o EEM "is a powerful tool for device and system management." CSI-NF-00001961, at 1.

o EEM "enables customers to . . . customize the behavior based on real network events as they happen." *Id.*

o EEM "can be deployed to automate tasks, program actions to take based on certain events, write custom syslog messages, or send alerts or e-mail from a router or switch to inform operations personnel." *Id.*

o "Customers can define policies to take specific actions when the Cisco IOS software recognizes certain events through the Event Detectors." *Id.*

o "EEM outfits Cisco Integrated Services Routers with an extremely powerful and flexible set of tools to automate many network management tasks and to create unique, custom solutions." *Id.* at 2.

o "The results are rapid deployment of ISR-based services, higher availability of the network, and reduced operational expense for Enterprises and SP customers offering managed services with the ISR portfolio." *Id.*

o Cisco regards control plane policing (CoPP) as an "innovative feature." Redacted Pat. Owner Resp. at 57, *Arista Networks, Inc. v. Cisco Systems, Inc.*, IPR 2016-00309 (PTAB).

o CoPP is a "core technolog[y] in network switching." Mark Chandler, General Counsel for Cisco, Protecting Innovation, CISCOBLOG (May 4, 2017) (available at https://blogs.cisco.com/news/protecting-innovation-itc-final-determination-945-investigation).

---

[19] *See also* the following examples, which Cisco has designated AEO under the protective order: CSI-NF-00001396 [AEO]; CSI-NF-00001434 [AEO]; CSI-NF-00001435 [AEO].

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

o CoPP is a "core Cisco networking technology," a "core Cisco invention for improving network device security," and "remain[s] critical to the cutting-edge products that [Cisco] sell[s]." *Id.*

o CoPP offers "[p]rotection against DoS [denial-of-service] attacks at infrastructure routers and switches." *See* QoS: Policing and Shaping Configuration Guide, available at https://goo.gl/GDqsyJ.

o CoPP can perform "QoS [quality-of-service] control for packets that are destined to the control plane of Cisco routers or switches." *Id.*

o CoPP provides "[e]ase of configuration for control plane policies" and "[b]etter platform reliability and availability." *Id.*

23.    Additional information about benefits will be produced by Cisco in response to NetFuel's document requests, including requests seeking marketing materials.[20]   Additional information will also be available during expert discovery, including from NetFuel's technical expert.

24.    As of the date of these contentions, NetFuel is not aware of any non-infringing alternatives that provided the same or similar benefits and functionalities as did the Patents-in-Suit as of the date of first infringement.  NetFuel has served discovery on Cisco concerning non-infringing alternatives, yet Cisco has not produced anything in response.[21]

---

[20] NetFuel requests for production 45, 46, 47, and 48 seek documents that are directly relevant to these factors and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

[21] NetFuel requests for production 31 and 33 also seek documents that are directly relevant to these factors and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

### K. *Georgia-Pacific* Factor No. 11

> *The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

25.     As of the date of these contentions, NetFuel believes that Cisco's use of the Patents-in-Suit has been widespread.    Based on information produced by Cisco as of the date of these contentions, NetFuel has preliminarily determined that from April 18, 2012 through July 2018, Cisco has sold no less than ▮▮▮▮▮ Accused Products classified as switches or routers.[22] However, as discussed above, Cisco has not produced sales data for all Accused Products. Therefore, this amount may significantly understate Cisco's unit sales of Accused Products.

### L. *Georgia-Pacific* Factor No. 12

> *The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*

26.     As of the date of these contentions, NetFuel has not identified a portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.    NetFuel has served discovery on Cisco seeking this type of information, but Cisco has not yet produced any such information.[23]

---

[22] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.

[23] NetFuel interrogatories 4 and 5 and requests for production 15, 16, 17, 18, 19, 21, 22, 23, 26, 27, 34, 36, 37, 38, 43, and 49 seek information and documents that are directly relevant to this factor and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## M. *Georgia-Pacific* Factor No. 13

> The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

27.     As of the date of these contentions, Cisco has not produced sufficient information to determine the portion of Cisco's sales and/or profits that are attributable to the Patents-in-Suit. For example, Cisco has not produced the following information:[24]

- Marketing materials, presentations, consumer surveys, white papers, product brochures, advertisements, videos, pamphlets, product announcements, product descriptions, and similar other documents prepared by or for defendant, or third parties, related to the Accused Products, or the market for the Accused Products and competing products, including, but not limited to:

  - Materials that discuss or identify the infringing functionalities;

  - Materials that discuss or analyze the importance of the accused features in the Accused Products;

- All documents and information published to potential customers/users that indicate features and benefits of using the accused features;

- All documents and other information that demonstrate, report, summarize, or otherwise address demand for the Accused Products; or

- All documents and other information that demonstrate, report, summarize, or otherwise address the factors that affect demand for the Accused Products.

---

[24] NetFuel interrogatories 4 and 5 and requests for production 15, 16, 17, 18, 19, 21, 22, 23, 26, 27, 34, 36, 37, 38, 43, and 49 seek information and documents that are directly relevant to this factor and remain outstanding.  In addition, Patent Local Rule 3-4(d) required Cisco to produce "Documents sufficient to show the sales, revenue, cost, and profits for accused instrumentalities identified pursuant to Patent L.R. 3-1(b) for any period of alleged infringement" by August 18, 2018, but Cisco failed to do so.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

28.     Based on information available as of the date of these contentions, NetFuel believes that a portion of Cisco's sales and/or profits are attributable to the Patents-in-Suit, but Cisco has produced insufficient information to permit the portion to be calculated or even estimated.

> ### N.  *Georgia-Pacific* Factor No. 14
>
> *The opinion and testimony of qualified experts.*

29.     As of the date of these contentions, prior to expert disclosures and expert discovery, no expert testimony is available yet to consider in NetFuel's analysis of damages with respect to Cisco's infringement of the Patents-in-Suit.  NetFuel expects that expert discovery will assist in determining reasonable royalty damages.

> ### O.  *Georgia-Pacific* Factor No. 15
>
> *The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*

30.     NetFuel anticipates that, based on additional information obtained from Cisco through discovery, NetFuel and/or its experts will determine the parties' relative bargaining positions at the hypothetical negotiation and the reasonable royalty that the parties ultimately would have negotiated.  NetFuel anticipates that the reasonable royalty will be based on an analysis of the *Georgia-Pacific* Factors and other relevant information that may have had an impact on the parties' economic bargaining positions at the hypothetical negotiation.  Furthermore, NetFuel anticipates that the parties to the hypothetical negotiation would have considered information dated subsequent to the hypothetical negotiation under the Book of Wisdom.  NetFuel has served

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

discovery on Cisco seeking the identification of any non-infringing alternatives, but Cisco has produced nothing.[25]

31.    NetFuel anticipates that its claim for reasonable royalty damages will be based, in part, on the terms of licenses to comparable patented technology and/or the portion of Cisco's sales and/or incremental profits that are attributable to the patented invention.  This may take the form of a running royalty rate based on a percentage of Cisco's revenues or a per-unit royalty based on the number of Accused Products sold.  As of the date of these contentions, Cisco has not produced information sufficient to determine the structure of royalty that would have been determined in the hypothetical negotiation.[26]

32.    NetFuel is presently unable to compute damages because of Cisco's failure to produce damages-related documents as identified above.  For example, Cisco has failed to produce comparable licenses; documents sufficient to show sales, revenues, cost, and profits for all of the accused devices; marketing material; consumer surveys; white papers; product brochures; and discussions of consumer demand for the accused products and accused functionality.[27]

33.    As discussed above, these contentions reflect NetFuel's preliminary damages analysis to date.  Fact and expert discovery in this matter are ongoing, and Cisco's production of damages-related documents has just commenced.  As additional data, information, or testimony become

[25] NetFuel requests for production 31 and 33 seek documents that are directly relevant to this factor and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.
[26] NetFuel requests for production 15, 16, 17, 26, 27, 34, 36, and 38 seek documents that are also directly relevant to this factor and remain outstanding.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.
[27] NetFuel requests for production 15, 16, 17, 18, 19, 21, 22, 23, 26, 27, 34, 36, 37, 38, 43, 45, 46, 47, 48, and 49 seek documents that are directly relevant and remain outstanding.  In addition, Patent Local Rule 3-4(d) required Cisco to produce "Documents sufficient to show the sales, revenue, cost, and profits for accused instrumentalities identified pursuant to Patent L.R. 3-1(b) for any period of alleged infringement" by August 18, 2018, but Cisco failed to do so.  The parties have met and conferred regarding these and all subsequently noted outstanding interrogatories and requests for production.  NetFuel most recently identified Cisco's discovery deficiencies in an email on October 31, 2018.  Cisco has indicated it will respond to that email early this week, but has not yet responded.

available to NetFuel, it intends to consider this information and update and/or amend its damages analysis to the extent it deems appropriate, including by serving a damages expert report on October 4, 2019, pursuant to the scheduling order.

Dated:  November 6, 2018

By:   /s/  Matthew R. Berry

Floyd G. Short (*Pro hac vice*)
Matthew R. Berry (*Pro hac vice*)
Steven M. Seigel (*Pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA  98101-3000
Telephone:  (206) 516-3800
Facsimile:  (206) 516-3883
fshort@susmangodfrey.com
mberry@susmangodfrey.com
sseigel@susmangodfrey.com

Kalpana Srinivasan
California State Bar No. 237460
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

*Attorneys for Plaintiff NetFuel, Inc.*

## CERTIFICATE OF SERVICE

I, Matthew R. Berry, hereby certify that on November 6, 2018, I served a true and correct copy of the foregoing on counsel listed below via electronic mail to the addresses listed below.

Sarah E. Piepmeier (SBN 227094)
Adam R. Alper (SBN 196834)
Robert Kang (SBN 274389)
May Eaton (SBN 298123)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
sarah.piepmeier@kirkland.com
adam.alper@kirkland.com
robert.kang@kirkland.com
may.eaton@kirkland.com
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
michael.devries@kirkland.com
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

*/s/ Matthew R. Berry*
Matthew R. Berry
Susman Godfrey LLP