**EXHIBIT 14**

**REDACTED VERSION OF DOCUMENT
PROPOSED TO FILED UNDER SEAL**

1 Floyd G. Short (*pro hac vice*)
Matthew R. Berry (*pro hac vice*)
2 Steven M. Seigel (*pro hac vice*)
P. Ryan Burningham (*pro hac vice*)
3 SUSMAN GODFREY L.L.P.
4 1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
5 Phone: (206) 516-3800
Fax: (206) 516-3883
6 fshort@susmangodfrey.com
mberry@susmangodfrey.com
7 sseigel@susmangodfrey.com
rburningham@susmangodfrey.com
8

9 Kalpana Srinivasan (237460)
SUSMAN GODFREY L.L.P.
10 1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
11 Phone: (310) 789-3100
Fax: (310) 789-3150
12 ksrinivasan@susmangodfrey.com
13
*Attorneys for Plaintiff NetFuel, Inc.*
14

15 **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
16 **SAN JOSE DIVISION**

17

18 NETFUEL, INC., | Case No. 3:18-cv-2352

19 Plaintiff, | **DEMAND FOR JURY TRIAL**

20 vs.

21

22 CISCO SYSTEMS, INC.,

23 Defendant.

24
25
26
27
Page 1 of 17
28

1

2

### NETFUEL, INC.'S SUPPLEMENT TO ITS PRELIMINARY DAMAGES CONTENTIONS

3

Plaintiff NetFuel, Inc., ("NetFuel") serves the following supplement to its preliminary

4

Damages Contentions on Defendant Cisco Systems, Inc. ("Cisco") in compliance with Patent Local

5

Rule 3-8. These contentions are based on the information currently produced in the litigation. As

6

set forth in greater detail below, Cisco has not completed its production of documents relating to

7

damages that are responsive to NetFuel's document requests and continue to be the subject of the

8

9

parties' meet and confers. NetFuel reserves the right to amend or supplement its damages model

10

and underlying support as the case proceeds, including by serving an expert report from its damages

11

expert on the October 24, 2019 deadline set forth in the scheduling order.

12

1.      Damages in patent infringement cases are governed by 35 U.S.C. § 284, which states as

13

follows:

14

> *Upon finding for the claimant the court shall award the claimant damages*
> *adequate to compensate for the infringement but in no event less than a*
> *reasonable royalty for the use made of the invention by the infringer,*
> *together with interest and costs as fixed by the court.*

15

16

17

> *When the damages are not found by a jury, the court shall assess them. In*
> *either event the court may increase the damages up to three times the*
> *amount found or assessed.*

18

19

20

2.      NetFuel contends that it is entitled to reasonable royalty damages as a result of Cisco's

21

infringement of the following "Patents-in-Suit":

22

| The Patents-in-Suit | | |
|---|---|---|
| **Patent No.** | **Title** | **Issue Date** |
| 7,747,730 (the "'730 Patent") | Managing Computer Network Resources | 06/29/2010 |
| 9,663,659 (the "'659 Patent") | Managing Computer Network Resources | 05/30/2017 |

23

24

25

26

27

28

3.     NetFuel also seeks an award of reasonable attorney's fees and costs, and prejudgment and post-judgment interest on NetFuel's award.  These damages contentions address NetFuel's claim for reasonable royalty damages.  NetFuel will address fees, interest, and costs at the appropriate time.

4.     Determination of a reasonable royalty is typically based on the hypothetical negotiation framework set forth in *Georgia-Pacific Corp. v. United States Plywood Corp* ("*Georgia-Pacific*").[1]  In determining reasonable royalties for a license to the Patents-in-Suit, a hypothetical license scenario is considered in which the parties would have negotiated the terms of a non-exclusive hypothetical license to the Patent-in-Suit.  The determination of damages based on a reasonable royalty is generally based on a hypothetical negotiation between a willing licensor and a willing licensee at or about the time of first infringement.  With respect to this hypothetical willing licensor/licensee negotiation, courts have established a number of factors to be considered, including those factors established by the *Georgia-Pacific* lawsuit, (the "*Georgia-Pacific* Factors").[2]

5.     The reasonable royalty analysis focuses on the economic and bargaining positions of NetFuel and Cisco at the time of the hypothetical negotiation and the likely outcome of such negotiation given their respective bargaining positions.  In calculating reasonable royalty damages, generally a determination is made regarding:  1) the reasonable royalty rate; and 2) the appropriate royalty base.  While *Georgia-Pacific* enumerates various factors that should be considered in determining reasonable royalties, the *Georgia-Pacific* Factors are not absolute determinants of a reasonable royalty, but rather are guidelines to evaluating the likely actions of the parties in a hypothetical negotiation.  Based on the facts and circumstances of the case, the *Georgia-Pacific* Factors are not necessarily given equal weight nor are they are all-inclusive.  Rather, the *Georgia-Pacific* Factors are part of the overall analysis of reasonable royalty damages that NetFuel anticipates will be conducted through expert discovery in this matter.

---

[1] *Georgia-Pacific Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971).
[2] *Id.*

6.      The hypothetical negotiation would have occurred on the later of:  1) the date the infringed patent(s) issued; or 2) the date the infringing product was first manufactured, used, offered for sale, or sold.  Cisco's infringing products are the routers and switches that are identified on Exhibit A to NetFuel's amended infringement contentions, which run one of the four network operating systems accused in the complaint (the "Accused Products").  In a hypothetical negotiation, all parties would have recognized that the Patents-in-Suit were valid and had been infringed by Cisco.

7.      NetFuel alleges that Cisco first infringed the Patents-in-Suit on June 29, 2010, when the '730 Patent issued.  Therefore, the hypothetical negotiation between NetFuel and Cisco would have occurred on or about June 29, 2010.  The hypothetical negotiation would have involved negotiations regarding a license to the Patents-in-Suit.

8.      In the sections that follow, NetFuel presents its preliminary understanding of facts and information that may have been considered by the parties to the hypothetical negotiation.  As Cisco has yet to make a fulsome damages production, NetFuel does not provide all of the factual support for this theory, or a computation of damages under this theory.  Pursuant to Northern District of California Local Rule 3-8(b), NetFuel instead identifies the information required to make a more fulsome disclosure.

### A. *Georgia-Pacific* Factor No. 1

> *The royalties received by the patentee for the licensing of the Patent-in-Suit, proving or tending to prove an established royalty.*

9.      NetFuel has not entered into any express patent license agreements that provided rights to the Patents-in-Suit.  NetFuel licensed the use of its software to Bank of America in a 2003 investment agreement.  Pursuant to the agreement, Bank of America licensed its proprietary software to NetFuel, and in return, Bank of America received an implied license to use NetFuel's PlexOS by virtue of Bank of America acquiring a 25% equity stake in NetFuel.[3]  The terms of this agreement are listed at NF001311-56.  NetFuel also received offers and sold its PlexOS to other

---

[3] Under *Georgia-Pacific,* the license resulting from a hypothetical negotiation is a bare patent license. This is different from the circumstances relating to the NetFuel / Bank of America transaction, which resulted in Bank of America obtaining an equity stake in NetFuel.

parties, which included an implied non-exclusive license to the technology at issue in the asserted patents. *See*, *e.g.*, NETFL00001401; NETFL00001138; NETFL00001199; and NETFL00001200. As part of NetFuel's sale of the PlexOS software, it also agreed to provide software maintenance for additional fees, as described in the purchase orders listed above.

### B. *Georgia-Pacific* Factor No. 2

> *The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.*

10. As of the date of these contentions, Cisco has not produced any license agreements that appear to be comparable to the circumstances of the hypothetical negotiation, nor has NetFuel been able to identify any such license agreements despite its own efforts. However, Cisco has not completed its production of documents, and NetFuel may update its damages contentions if additional information becomes available regarding Cisco's license agreements.

### C. *Georgia-Pacific* Factor No. 3

> *The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.*

11. License agreements reached in a hypothetical negotiation under *Georgia-Pacific* would provide a non-exclusive right to make, use, sell, or offer to sell products and services within the United States.

### D. *Georgia-Pacific* Factor No. 4

> *The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by gaining licenses under special conditions designed to preserve that monopoly.*

12. NetFuel has not entered into any express patent license agreements that provided rights to the Patents-in-Suit. In addition, NetFuel does not have an established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention.

### E. *Georgia-Pacific* Factor No. 5

> *The commercial relationship between the licensor and the licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.*

13.     NetFuel was founded in 2000, in part to provide programmable network solutions for financial services organizations and banks and their high-speed stock and futures trading platforms.[4]  NetFuel CEO James Harlow is the inventor of the Patents-in-Suit and has long been an entrepreneur in the field of computer software and networking technology.[5]  NetFuel and Mr. Harlow had extensive communications with Cisco about the asserted inventions starting in the early 2000s, as explained in NetFuel's complaint.[6]

14.     Founded in 1984, Cisco focuses on solving business challenges due to technological shortcomings.[7]  Cisco's product offerings are categorized as infrastructure platforms, applications, security, and other products, serving customers such as "businesses of all sizes, public institutions, governments, and service providers."[8]

15.     NetFuel and Cisco are not currently competitors.

### F. *Georgia-Pacific* Factor No. 6

> *The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.*

16.     Cisco has generated sales of convoyed services and/or products as a result of its infringement of the Patents-in-Suit.  Cisco has indicated that it will produce additional sales data. Those data should have been produced on August 18, 2018, under Patent L.R. 3-4(d). Today is the

---

[4] 4/18/18 Complaint ¶ 3.
[5] *Id.* at  ¶ 3.
[6] *Id.* at  ¶¶ 44-47.
[7] https://newsroom.cisco.com/overview.
[8] Cisco System, Inc.'s Form 10-K for the fiscal year ended July 28, 2018, pg. 1.

last day of fact discovery, and Cisco has not produced those data. NetFuel will review any additional data produced by Cisco and reserves the right to rely on those data to calculate damages.

### G. *Georgia-Pacific* Factor No. 7

*The duration of the patent and the term of the license.*

17.     A license resulting from the respective hypothetical negotiation would have been for the unexpired term of the Patents-in-Suit, which will continue at least until May 3, 2024.

### H. *Georgia-Pacific* Factor No. 8

*The established profitability of the product made under the patent; its commercial success; and its current popularity.*

18.     Cisco has indicated that it will produce additional sales data. Those data should have been produced on September 18, 2018, under Patent L.R. 3-4(d). Today is the last day of fact discovery, and Cisco has not produced those data. NetFuel will review any additional data produced by Cisco and reserves the right to rely on those data to calculate damages.

19.     However, based on information produced by Cisco as of the date of these contentions, NetFuel has preliminarily determined that from April 18, 2012 through July 2018, Cisco generated no less than ▮▮▮▮▮▮ in revenues from Accused Products classified as switches or routers.[9]  In addition, Cisco generated another ▮▮▮▮▮▮ in revenues from Accused Products classified as assembly, base, power, feature, memory, cable, or devices.[10]  However, as discussed above, Cisco has indicated that it will produce additional sales data.  Therefore, this amount may significantly understate Cisco's sales of Accused Products.  This amount also does not include any future sales through the date of the trial in this action or through the date the patents expire.

20.     Cisco's sales of Accused Products have been profitable to Cisco.  For example, based on information contained in Cisco's public filings with the Securities and Exchange Commission, from

---

[9] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.
[10] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.

2012 through 2017, Cisco generated annual average gross profit margins ranging from 56.8% to 62.0% with respect to products.[11]

21.     As of the date of these contentions, NetFuel believes that Cisco's practicing of the patented invention in the Accused Products has enabled Cisco to generate significant economic value.  The Accused Products have been commercially successful and remain popular in the marketplace.

**I.  *Georgia-Pacific* Factor No. 9**

> *The utility and advantage of the patent property over the old modes or devices, if any, that had been used for working out similar results.*

**J.  *Georgia-Pacific* Factor No. 10**

> *The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.*

22.     *Georgia-Pacific* Factors Nos. 9 and 10 are typically analyzed together given the overlap in the subject matter covered by these two factors.  The Patents-in-Suit provide significant benefits and functionalities in the router and switch industry including, but not limited to, the following benefits identified by Cisco:[12]

> o   EEM is able to monitor events, take corrective action automatically or when a threshold reached. EEM also allows on-device event management, which is "invaluable when taking immediate recovery actions and gathering information to perform root-cause analysis." CSI-NF-00001966, at 32 – 33.

> o   EEM "is a powerful tool for device and system management." CSI-NF-00001961, at 1.

> o   EEM "enables customers to . . . customize the behavior based on real network events as they happen." *Id.*

---

[11] Cisco System Inc.'s Form 10-K for the year ended July 27, 2013, pg. 53; Cisco System Inc.'s Form 10-K for the year ended July 30, 2016, pg. 50; Cisco System Inc.'s Form 10-K for the year ended July 29, 2017, pg. 46.
[12] *See also* the following examples, which Cisco has designated AEO under the protective order:  CSI-NF-00001396 [AEO]; CSI-NF-00001434 [AEO]; CSI-NF-00001435 [AEO].

o EEM "can be deployed to automate tasks, program actions to take based on certain events, write custom syslog messages, or send alerts or e-mail from a router or switch to inform operations personnel." *Id.*

o "Customers can define policies to take specific actions when the Cisco IOS software recognizes certain events through the Event Detectors." *Id.*

o "EEM outfits Cisco Integrated Services Routers with an extremely powerful and flexible set of tools to automate many network management tasks and to create unique, custom solutions." *Id.* at 2.

o "The results are rapid deployment of ISR-based services, higher availability of the network, and reduced operational expense for Enterprises and SP customers offering managed services with the ISR portfolio." *Id.*

o "TAC [Technology Assistance Center] said they depend on eem a lot. Having eem in ios is a big powerful tool to diagnose problems." CSI-NF-00001092.

o "Cisco IOS Embedded Event Manager (EEM) is a powerful and flexible subsystem that provides real-time network event detection and onboard automation. It gives you the ability to adapt the behavior of your network devices to align with your business needs." CSI-NF-00001423.

o "EEM supports over 20 event detectors that are highly integrated with different IOS components to trigger actions in response to network events." CSI-NF-00013209.

o "EEM is available on a wide range of Cisco platforms and customers can benefit from the capabilities of EEM without upgrading to a new version of IOS." Id.

o "Customer business logic can be injected into their operations using EEM Policies. These policies are programmed using either a simple CLI-based interface or using a scripting language called Tool Command Language (Tcl). EEM harnesses the significant intelligence within Cisco devices to enable creative solutions including automated troubleshooting, automatic fault detection and troubleshooting and device configuration automation." Id.

o "Embedded Event Manager (EEM) is a powerful and flexible feature that provides real-time network event detection and onboard automation. Using EEM, customers can adapt the behavior of their network devices to align with their business needs. This feature requires the IP Base feature set." CSI-NF-00062340 at 11.

o Cisco regards control plane policing (CoPP) as an "innovative feature." Redacted Pat. Owner Resp. at 57, *Arista Networks, Inc. v. Cisco Systems, Inc.*, IPR 2016-00309 (PTAB).

o CoPP is a "core technolog[y] in network switching." Mark Chandler, General Counsel for Cisco, Protecting Innovation, CISCOBLOG (May 4, 2017) (available at https://blogs.cisco.com/news/protecting-innovation-itc-final-determination-945-investigation).

o CoPP is a "core Cisco networking technology," a "core Cisco invention for improving network device security," and "remain[s] critical to the cutting-edge products that [Cisco] sell[s]." *Id.*

o CoPP offers "[p]rotection against DoS [denial-of-service] attacks at infrastructure routers and switches." *See* QoS: Policing and Shaping Configuration Guide, available at https://goo.gl/GDqsyJ.

o CoPP can perform "QoS [quality-of-service] control for packets that are destined to the control plane of Cisco routers or switches." *Id.*

o CoPP provides "[e]ase of configuration for control plane policies" and "[b]etter platform reliability and availability." *Id.*

o "The CoPP is critical to network operation. A Denial of Service (DoS) attack in the Control/Management Plane, which can be perpetrated either inadvertently or maliciously, typically involves high rates of traffic that result in excessive CPU utilization." CSI-NF-000009458.

o "CoPP is a hardware-based feature that protects the Supervisor from DoS attacks." Id.

o "CoPP is essential in order to protect the CPU against misconfigured servers or potential DoS attacks, which allows the CPU to have enough cycle to process critical control plane messages." Id.

o "CPP is a great differentiator for the [Catalyst] 6500." CSI-NF-00010330.

o Cisco can "[g]ain competitive advantage by the new software features (12.2(53)SG1) such as the Control plane policing (CoPP)." CSI-NF-00012899.

1
2
3
4

- o "The configurable CoPP is to ensure we limit traffic to self and CPU. Without configurable copp we cannot protect the switch against DoS attacks for example that is intended for an address on the switch. ACL cannot be defined to protect the CPU from a specific source. Similarly there are other control plane traffic that we won't be able to control if don't have the feature. Also we don't have anyway to restrict unnecessary traffic from reaching the CPU." CSI-NF-00031320.

5
6

- o "I agree with you David. LPTS is a basic functionality required in the box for it to function." CSI-NF-00083547.

7

- o "It is really non-sense for PMs [project managers] to deal with baseline features like LPTS even when the router does not function without it at all." *Id.*

8
9

- o "LPTS: I just discussed it with Sudhir K. LPTS is not feature! It has to be there otherwise the router would not work at all." *Id.*

10

- o LPTS is "[e]quivalent to CoPP but MUCH better." CSI-NF-00000727.

11
12

- o "Local Packet Transport Services (LPTS) maintains tables describing all packet flows destined for the secure domain router (SDR), making sure that packets are delivered to their intended destinations." CSI-NF-00000710.

13
14

- o "Why is LPS needed?

15

  - ▪ LPTS enables distributed applications to reside on any or all [route processors], [distributed route processors], or [line cards].

16
17

  - ▪ Filters and polices local 'receive' packets and send them only to the nodes that need them

18

  - ▪ Handles router destined fragments

19

  - ▪ High Availability for NSR (Non-Stop Routing)" CSI-NF-00000572.

20
21

- o "LPTS had Hardware policers on line cards to limit traffic sent to local or remote nodes." Id.

22

- o "LPTS is an automatic, built in firewall for control plane traffic." Id.

23

- o EPFT can "detect Bad Actors and throttle their control traffic so that others can get normal service." CSI-NF-00017441.

24
25
26

- o Cisco customers "need [EPFT] to maintain a 'fair share' of control packets sent by various devices and stop 'bad actors' from hogging the control packets sent to the LPTS/CPU of the router." CSI-NF-00089349.

27
28

Page 11 of 17

o    EPFT "is a must have feature. Without this feature there could be control packet loss and unpredictable behavior in the customer production network. Loss of control packets directly impact[s] network downtime." *Id.*

o    EPFT "is required by all geographies." *Id.*

23.    Additional information about benefits will also be available during expert discovery, including from NetFuel's technical expert.

24.    As of the date of these contentions, NetFuel is not aware of any non-infringing alternatives that provided the same or similar benefits and functionalities as did the Patents-in-Suit as of the date of first infringement.  NetFuel has served discovery on Cisco concerning non-infringing alternatives, yet Cisco has not produced anything in response.

### K.  *Georgia-Pacific* Factor No. 11

> *The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.*

25.    As of the date of these contentions, NetFuel believes that Cisco's use of the Patents-in-Suit has been widespread.   Based on information produced by Cisco as of the date of these contentions, NetFuel has preliminarily determined that from April 18, 2012 through July 2018, Cisco has sold no less than ███████ Accused Products classified as switches or routers.[13]   However, as discussed above, Cisco has indicated that it will produce additional sales data. Therefore, this amount may significantly understate Cisco's unit sales of Accused Products.

### L.  *Georgia-Pacific* Factor No. 12

> *The portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.*

26.    As of the date of these contentions, NetFuel has not identified a portion of the profit or selling price that may be customary in the particular business or in comparable businesses to allow

---

[13] CSI-NF-00000810-818; CSI-NF-00000956-966; CSI-NF-00001343-1355; CSI-NF-00001367-1370.

for the use of the invention or analogous inventions. NetFuel has served discovery on Cisco seeking this type of information, but Cisco has not yet produced any such information.

### M. *Georgia-Pacific* Factor No. 13

> *The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

27.     Based on information available as of the date of these contentions, NetFuel believes that a portion of Cisco's sales and/or profits are attributable to the Patents-in-Suit. Cisco has indicated in discovery responses and in deposition testimony that it does not maintain software-revenue data separate from hardware-revenue data, However, Cisco documents (and the deposition testimony of Cisco witnesses, including Andy Schutz) show that Cisco has sold ████████████████████ ████████████ Consequently, the portion of Cisco's sales or profits attributable to the Patents-in-Suit may be calculated with reference to Cisco's hardware revenue, revenue from ███████ ████████████ royalty data, forecast data, market-share data, annual reports, profit and loss statements, and with reference to Cisco's discovery responses and witness testimony. Cisco has indicated that it will produce additional sales data. Those data should have been produced on September 18, 2018, under Patent L.R. 3-4(d). Today is the last day of fact discovery, and Cisco has not produced those data. NetFuel will review any additional data produced by Cisco and reserves the right to rely on those data to calculate damages.

### N. *Georgia-Pacific* Factor No. 14

> *The opinion and testimony of qualified experts.*

28.     As of the date of these contentions, prior to expert disclosures and expert discovery, no expert testimony is available yet to consider in NetFuel's analysis of damages with respect to Cisco's infringement of the Patents-in-Suit. NetFuel expects that expert discovery will assist in determining reasonable royalty damages.

## O. *Georgia-Pacific* Factor No. 15

> *The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, that amount which a prudent licensee – who desires, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.*

29.     NetFuel anticipates that, based on additional information obtained from Cisco through discovery, NetFuel and/or its experts will determine the parties' relative bargaining positions at the hypothetical negotiation and the reasonable royalty that the parties ultimately would have negotiated. NetFuel anticipates that the reasonable royalty will be based on an analysis of the *Georgia-Pacific* Factors and other relevant information that may have had an impact on the parties' economic bargaining positions at the hypothetical negotiation. Furthermore, NetFuel anticipates that the parties to the hypothetical negotiation would have considered information dated subsequent to the hypothetical negotiation under the Book of Wisdom. NetFuel has served discovery on Cisco seeking the identification of any non-infringing alternatives, but Cisco has produced nothing.

30.     NetFuel anticipates that its claim for reasonable royalty damages will be based, in part, on the terms of licenses to comparable patented technology and/or the portion of Cisco's sales and/or incremental profits that are attributable to the patented invention. This may take the form of a running royalty rate based on a percentage of Cisco's revenues or a per-unit royalty based on the number of Accused Products sold.

31.     As discussed above, these supplemental contentions reflect NetFuel's preliminary damages analysis to date. Fact and expert discovery in this matter are ongoing, and Cisco's production of damages-related documents is still incomplete. As additional data, information, or testimony become available to NetFuel, it intends to consider this information and update and/or amend its damages analysis to the extent it deems appropriate, including by serving a damages expert report on October 24, 2019, pursuant to the scheduling order.

1

2

Dated: October 3, 2018

3

By: */s/ Matthew R. Berry*

4

5
Floyd G. Short (*pro hac vice*)
Matthew R. Berry (*pro hac vice*)
Steven M. Seigel (*pro hac vice*)

6
P. Ryan Burningham (*pro hac vice*)
SUSMAN GODFREY L.L.P.

7
1201 Third Avenue, Suite 3800

8
Seattle, WA  98101-3000
Telephone:  (206) 516-3800

9
Facsimile:  (206) 516-3883
fshort@susmangodfrey.com

10
mberry@susmangodfrey.com
sseigel@susmangodfrey.com

11
rburningham@susmangodfrey.com

12
Kalpana Srinivasan

13
California State Bar No. 237460
SUSMAN GODFREY L.L.P.

14
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067

15
Telephone: (310) 789-3100

16
Facsimile: (310) 789-3150
ksrinivasan@susmangodfrey.com

17

18
*Attorneys for Plaintiff NetFuel, Inc.*

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

I, Matthew R. Berry, hereby certify that on October 3, 2019, I served a true and correct copy

3

of the foregoing on counsel listed below via electronic mail to the addresses listed below.

4

5
Adam R. Alper (196834)
May Eaton (298123)

6
Elise S. Edlin (293756)
KIRKLAND & ELLIS LLP

7
555 California Street
San Francisco, CA  94104

8
Telephone: (415) 439-1400
adam.alper@kirkland.com

9
may.eaton@kirkland.com
elise.edline@kirkland.com

10

11
Michael W. De Vries (211001)
KIRKLAND & ELLIS LLP

12
333 South Hope Street
Los Angeles, CA 90071

13
Telephone: (213) 680-8400
michael.devries@kirkland.com

14

15
Elizabeth A. Cutri (pro hac vice)
KIRKLAND & ELLIS LLP

16
300 N. LaSalle Street
Chicago, IL 60654

17
Telephone: (312) 862-2000
elizabeth.cutri@kirkland.com

18

Sarah E. Piepmeier (227094)
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: (415) 344-7000
sapiepmeier@perkinscoie.com

Guy Ruttenberg (207937)
Steve A. Papazian (288097)
RUTTENBERG IP LAW,
A PROFESSIONAL CORPORATION
1801 Century Park East, Suite 1920
Los Angeles, CA 90067
Telephone: (310) 627-2270
guy@ruttenbergiplaw.com
steve@ruttenbergiplaw.com

*Attorneys for Defendant Cisco Systems, Inc.*

19

20
                                        */s/ Matthew R. Berry*
                                        Matthew R. Berry

21
                                        Susman Godfrey LLP

22

23

24

25

26

27

28